UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
JUSTYNA ZUBKO-VALVA, as Mother and Natural
Guardian of ANTHONY VALVA and ANDREW
VALVA, and as Administratrix of the Estate of THOMAS
VALVA, and JUSTYNA ZUBKO-VALVA individually,

Docket No.:
20 Civ. 02663 (JMA)(ARL)

Plaintiff,

-against-

THE COUNTY OF SUFFOLK, et al.

Defendants.
------------------------------------------------------------------------X

**PLAINTIFF'S MOTION
FOR A DEFAULT
JUDGMENT AGAINST
DEFENDANT VALVA**

## PRELIMINARY STATEMENT

On June 16, 2020, Plaintiff Zubko-Valva ("Plaintiff Zubko-Valva" or "Plaintiff"), acting on

behalf of herself and her three children, Anthony Valva, Thomas Valva and Andrew Valva, filed this

civil action against Defendant Michael Valva ("Defendant Valva" or "Defendant") and several

other defendants. Thereafter, Plaintiff properly served Defendant Valva, among others, with a

summons and a copy of the Complaint. Defendant Valva has since failed to answer, or otherwise

defend the claims against him, under the deadlines established by the Federal Rules of Civil

Procedure.

Pursuant to Fed. R. Civ. P. 55(a) and Local Civil Rule 55.1, on September 22, 2020, Plaintiff

made an application to the Clerk of the Court for a Certificate of Default against Defendant Valva.

The Clerk entered such a Certificate on September 23, 2020. Because Defendant has failed to answer

or appear, and because Plaintiff has satisfied the requirements of the relevant Civil and Local Rules

regarding default judgment, Plaintiff now respectfully asks this Court to enter a default judgment

against Defendant Valva.

1

## STATEMENT OF FACTS

This action arises out of the tragic death of an 8-year-old boy, Thomas Valva ("Tommy"), who was abused, starved, tortured and beaten for several years, until he froze to death in defendant Michael Valva's garage on January 17, 2020. Tommy's death was not only foreseeable, but completely preventable. For over three years, Plaintiff Justyna Zubko-Valva begged, implored and pleaded with Defendants to remove Tommy, as well as his two brothers, Anthony and Andrew (collectively, "the children"), from the custody of Defendant Michael Valva ("Valva"). Plaintiff provided Defendants with overwhelming evidence that the children were being physically and mentally abused by Defendant Valva, including documentary evidence, audio recordings and transcriptions, photographic evidence, and medical evidence. Notwithstanding this evidence, Defendants ignored Plaintiffs' complaints and allowed the children to remain in the custody of Defendant Valva, subjecting them to years of horrific abuse and leading to Tommy's tragic death.

On January 17, 2020, Tommy froze to death after being forced to spend the night locked into Valva's subfreezing garage. It was only then that the two surviving children, Andrew and Anthony, were finally removed from the custody of Valva and his fiancée, Angela Pollina, both of whom were arrested and charged with multiple criminal counts, including Second Degree Murder. In this action, Plaintiff has brought multiple claims against Valva, including but limited to, wrongful death, assault, battery and intentional infliction of emotional distress.

## ARGUMENT

I. **THE COURT SHOULD GRANT A DEFAULT JUDGMENT AGAINST DEFENDANT VALVA.**

   A. **The Defaulting Defendant Was Properly Served but Failed to Answer or Otherwise Defend the Allegations in the Complaint.**

Plaintiff filed the Complaint in this action on June 16, 2020, asserting affirmative claims for relief against the Defendant Valva and other named Defendants. (Complaint, Docket No.

2

1, Ex. A). In accordance with Fed. R. Civ. P. 4, Plaintiff properly served a copy of the Complaint and a summons on Defendant Valva on August 4, 2020, and subsequently filed proof of service with the Court. (Docket No. 35). The date of service on the Defendant, and the date that Defendant's answer was due, is set forth below:

|  | **Date Served:** | **Date Answer Due:** | **Proof of Service Filed at Docket No.:** |
|---|---|---|---|
| Defendant Michael Valva | 08/04/2020 | 08/28/2020 | 35 |

Defendant has failed to answer the Complaint or otherwise defend this action.

On September 14, 2020, Plaintiff wrote to Defendant Valva's criminal defense attorney, John LoTurco, Esq., and informed him of Plaintiff's intent to file a motion for a default judgment if he did not submit an answer on or before September 18, 2020. (Ex. B) ("Mr. Valva was required to respond to the Complaint on or before August 28, 2020. His failure to do so constitutes a default in this action … [I]f we do not receive an Answer from Mr. Valva by Friday, September 18, 2020, we will have no choice but to file a motion for a default judgment against him."). Notwithstanding this warning, Defendant Valva failed to file an answer or otherwise appear in this action by September 18, 2020.

Thereafter, on September 22, 2020, pursuant to Local Civil Rule 55.1 and Fed. R. Civ. P. 55(a), Plaintiff filed an application to the Clerk of the Court for a Certificate of Default against Defendant Valva. (Docket No. 39) The following day, the Clerk of the Court entered a Certificate of Default against him. (Docket No. 41, Ex. C).

On September 25, 2020, Plaintiff sent a follow up letter to Defendant Valva, enclosing the Certificate of Default and advising him that if he did not respond to the Complaint by October 9, 2020, Plaintiff would file a motion for a default judgment against him. (Ex. D) ("Please be advised that if we do not receive an answer from you in this action by October 9, 2020, we will have no choice but to make a motion for a default judgment in this action. Please guide your actions accordingly.")

3

Notwithstanding this warning, Defendant Valva did not respond or otherwise enter an appearance in this action. It is clear that Defendant Valva has no intention of defending himself in this action. Accordingly, Plaintiff is now entitled to default judgment against Defendant Valva pursuant to Fed. R. Civ. P. 55 and Local Civil Rule 55.2, on the issue of liability.[1]

## CONCLUSION

For all of the foregoing reasons, pursuant to Fed. R. Civ. P. 55 and Local Civil Rule 55.2, Plaintiff is entitled to a default judgment against Defendant. Plaintiff properly served Defendant Valva, but despite repeated warnings, Valva has never answered or otherwise appeared in this action. Prior to filing this motion, Plaintiff informed Valva that: i) his time to answer had expired (Ex. B); ii) a Certificate of Default had been entered by the Clerk (Ex. C); and that iii) Plaintiff intended to make a motion for a default judgment against him. (Ex. D). Notwithstanding these warnings, Defendant Valva has failed and refused to submit an answer, or otherwise respond to the Complaint. Accordingly, Plaintiff respectfully requests that this Court grant her motion and enter a default judgment against Defendant Valva on the issue of liability.

Dated: New York, New York
      October 15, 2020

<div align="right">

**JON L. NORINSBERG, ESQ., PLLC**

Jon L. Norinsberg, Esq.
*Attorney for Plaintiff*
110 East 59th Street, Suite 3200
New York, New York 10022
Telephone No.: (212) 791-5396

</div>

---

[1] At this time, Plaintiff only moves for a default judgment on the issue of liability. With respect to damages, Plaintiff requests that this matter be set down for an inquest, either at the time of trial or at any other time that this Court deems appropriate.

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send a notice of electronic filing to all counsel of record. I further certify that a copy of the foregoing was served, via certified mail and regular U.S. Mail, on October 15, 2020 upon the following:

      Michael Valva
      Inmate No.: 758283
      Suffolk County Correctional Facility
      100 Centre Drive South
      Riverhead, New York 11901

                                  Jon L. Norinsberg, Esq.

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X

JUSTYNA ZUBKO-VALVA, as Mother and Natural Guardian     Dkt. No.: 20 Civ. 02663
of ANTHONY VALVA and ANDREW VALVA, and as
Administratrix of the Estate of THOMAS VALVA, and
JUSTYNA ZUBKO-VALVA individually,     **COMPLAINT**

             Plaintiff,     **JURY TRIAL**
    -against-     **DEMANDED**

THE COUNTY OF SUFFOLK, CPS SENIOR     **ECF CASE**
CASEWORKER MICHELE CLARK, Individually and in her
Official Capacity, CPS SUPERVISOR EDWARD HEEPE,
Individually and in his Official Capacity, CPS ASSISTANT
DIRECTOR ROBERT LETO, Individually and in his Official
Capacity, CPS INVESTIGATOR JENNIFER LANTZ,
Individually and in her Official Capacity CPS
INVESTIGATOR MELISSA ESTRADA, Individually and in
her Official Capacity, CPS INVESTIGATOR LYDIA
SABOSTO, Individually and in her Official Capacity, CPS
SUPERVISOR JEAN MONTAGUE, Individually and in her
Official Capacity, DEPARTMENT OF SOCIAL SERVICES
COUNTY ATTORNEY RANDALL RATJE, ESQ.,
Individually and in his Official Capacity, ATTORNEY FOR
CHILDREN DONNA MCCABE, ESQ., Individually and in
her Official Capacity, THE LAW OFFICE OF DONNA
MCCABE, SHANA CURTI, ESQ., Individually and in her
Official Capacity, ORSETTI & CURTI PLLC, EAST
MORICHES UNION FREE SCHOOL DISTRICT,
PRINCIPAL EDWARD SCHNEYER, Individually and in his
Official Capacity, SCHOOL SUPERINTENDENT CHARLES
RUSSO, Individually and in his Official Capacity, HOPE
SCHWARTZ ZIMMERMAN, Individually, ATTORNEY
FOR CHILDREN ETHAN HALPERN, ESQ, Individually and
in his Official Capacity, THE LEGAL AID SOCIETY OF
SUFFOLK COUNTY, INC., CHILDREN'S LAW BUREAU,
MICHAEL VALVA, and ANGELA POLLINA,

             Defendants.
-------------------------------------------------------------------------------X

       Plaintiff, JUSTYNA ZUBKO-VALVA ("Plaintiff"), by her attorney, JON L.

NORINSBERG, ESQ., PLLC, complaining of the Defendants, respectfully alleges as follows:

## PRELIMINARY STATEMENT

1.      This action arises out of the tragic death of an 8-year-old boy, Thomas Valva ("Tommy"), who was abused, starved, tortured and beaten for several years, until he froze to death in his father's garage on January 17, 2020.  Tommy's death was not only foreseeable, but completely preventable.

2.      For over three years, Plaintiff Justyna Zubko Valva begged, implored and pleaded with Defendants to remove Tommy, as well as his two brothers, Anthony and Andrew (collectively, "the children"),  from the custody  of Defendant Michael Valva ("Valva"), and his fiancée, Defendant Angela Pollina ("Pollina"), who had abused, starved and tortured the children for years. The Defendants did nothing.

3.      Plaintiff provided Defendants with overwhelming and irrefutable evidence that the children were being physically and mentally abused by Valva and Pollina, including documentary evidence, audio recordings and transcriptions, photographic evidence, and medical evidence.  Still, the Defendants did nothing.

4.       Rather than take action to protect the children, Defendants willfully and deliberately ignored the alarming red flags and warning signs of child abuse, leaving Tommy and his two brothers completely unprotected from the cruel, inhumane and callous abuse of Valva and Pollina.

5.      As a result of Defendants' deliberate indifference and gross negligence, all three Valva children were, inter alia, starved and beaten, physically, mentally and sexually abused, denied access to food, water and clothing, and forced to sleep in the family's garage in subfreezing temperatures, without any access to a bathroom.

2

6.      On January 17, 2020, Tommy froze to death after being forced to spend the night locked into Valva and Pollina's subfreezing garage.  It was only then that the two surviving children, Andrew and Anthony, were finally removed from the custody of Valva and Pollina, who were arrested and charged with multiple criminal counts, including Second Degree Murder.

7.      By then, however, it was too late.   A wonderful, sweet and innocent little 8-year-old boy, Tommy (Ex. A), had suffered grievously for years and had lost his life.  Tommy, as well as his two brothers, Andrew and Anthony (Ex. B and Ex. C), had endured years of being physically, mentally and sexually abused, tortured and starved by Valva and Pollina.

8.      Plaintiff now brings this action to redress the wrongful actions of Defendants, whose deliberate indifference, reckless disregard for the children, and grossly negligent conduct allowed Valva and Pollina's abuse of the children to continue for years, and culminated in Tommy's death.

9.      Plaintiff seeks compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C.  § 1983 and 42 U.S.C. § 1988 for Defendants' flagrant violation of her children's civil rights, as well as her own constitutional rights, said rights are secured by said statutes and the Constitutions of the State of New York and the United States.  Plaintiff also asserts various supplemental claims under New York state law.

## **JURISDICTION**

10.      This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

11.      Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343 and 1367.

<u>**VENUE**</u>

12.     Venue is properly laid in the Eastern District of New York under U.S.C. §1391(b), in that this is the District in which the claim arose.

<u>**JURY DEMAND**</u>

13.     Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

<u>**PARTIES**</u>

14.     Plaintiff JUSTYNA ZUBKO-VALVA is a Caucasian female, a citizen of the United States, and at all relevant times a resident of the State of New York, residing presently at 350 North Corona Avenue, Valley Stream, New York.

15.     At all times hereinafter mentioned, defendant CPS INVESTIGATOR MICHELE CLARK was an investigator with the Child Protective Services Investigations Bureau ("CPS"), 3455 Veterans Memorial Highway, Ronkonkoma, New York, and was acting in the course of her employment with defendant THE COUNTY OF SUFFOLK ("Suffolk County"), and in furtherance of the business of the defendant THE COUNTY OF SUFFOLK.

16.     At all times hereinafter mentioned, defendant CPS SUPERVISOR EDWARD HEEPE ("Heepe"), was a supervisor with the Child Protective Services Investigations Bureau, 3455 Veterans Memorial Highway, Ronkonkoma, New York, and was acting in the course of his employment with defendant THE COUNTY OF SUFFOLK, and in furtherance of the business of the defendant THE COUNTY OF SUFFOLK.

17.     CPS ASSISTANT DIRECTOR ROBERT LETO was a high-level supervisor and Assistant Director with the Child Protective Services Investigations Bureau, 3455 Veterans

4

Memorial Highway, Ronkonkoma, New York, and was acting in the course of his employment with defendant THE COUNTY OF SUFFOLK, and in furtherance of the business of the defendant THE COUNTY OF SUFFOLK.

18.     At all times hereinafter mentioned, defendant CPS INVESTIGATOR JENNIFER LANTZ was an investigator with the Child Protective Services Investigations Bureau, 3455 Veterans Memorial Highway, Ronkonkoma, New York, and was acting in the course of her employment with defendant THE COUNTY OF SUFFOLK, and in furtherance of the business of the defendant THE COUNTY OF SUFFOLK.

19.     At all times hereinafter mentioned, defendant CPS INVESTIGATOR MELISSA ESTRADA ("Estrada") was an investigator with the Child Protective Services Investigations Bureau, 3455 Veterans Memorial Highway, Ronkonkoma, New York, and was acting in the course of her employment with defendant THE COUNTY OF SUFFOLK, and in furtherance of the business of the defendant THE COUNTY OF SUFFOLK.

20.     At all times hereinafter mentioned, defendant CPS INVESTIGATOR LYDIA SABOSTO ("Sabosto") was an investigator with the Child Protective Services Investigations Bureau, 3455 Veterans Memorial Highway, Ronkonkoma, New York, and was acting in the course of her employment with defendant THE COUNTY OF SUFFOLK, and in furtherance of the business of the defendant THE COUNTY OF SUFFOLK.

21.     At all times hereinafter mentioned, defendant CPS SUPERVISOR JEAN MONTAGUE ("Montague"), was a supervisor with the Child Protective Services Investigations Bureau, 3455 Veterans Memorial Highway, Ronkonkoma, New York, and was acting in the course of his employment with defendant THE COUNTY OF SUFFOLK, and in furtherance of the business of the defendant THE COUNTY OF SUFFOLK.

22.     At all times hereinafter mentioned, defendant DEPARTMENT OF SOCIAL SERVICES COUNTY ATTORNEY RANDALL RATJE, ESQ., ("Ratje") was an attorney with the Suffolk County Department of Law Family Court Social Services Bureau, located at 400 Carleton Avenue, Central Islip, New York, and was acting in the course of his employment with defendant THE COUNTY OF SUFFOLK, and in furtherance of the business of the defendant THE COUNTY OF SUFFOLK.

23.     At all times hereinafter mentioned, defendant ATTORNEY FOR CHILDREN DONNA MCABE, ESQ. ("McCabe"), was an attorney with Law Office of Donna M. McCabe, 1305 Franklin Ave Ste 200, Garden City, New York, and was an Attorney for Children ("AFC") appointed to act on behalf of the children in the matrimonial proceedings taking place in the Supreme Court of the State of New York, Nassau County.

24.     At all times hereinafter mentioned, defendant the LAW OFFICE OF DONNA MCCABE, was a law firm duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business, 1305 Franklin Ave Ste 200, Garden City, New York, and was owned, operated, maintained and controlled by defendant Donna McCabe.

25.     At all times hereinafter mentioned, defendant SHANA CURTI, ESQ. ("Curti"), was an attorney and principal in the law firm of defendant ORSETTI & CURTI PLLC, located at 1305 Franklin Ave, Suite 200, Garden City, New York, and was acting as counsel on behalf of Defendant Michael Valva in the matrimonial proceedings, and in various real estate and financial transactions.

26.     At all times hereinafter mentioned, defendant ORSETTI & CURTI PLLC, was a law firm duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 1305 Franklin Ave, Suite 200, Garden City, New York, and

was acting as counsel on behalf of Defendant Michael Valva in the matrimonial proceedings, and in various real estate and financial transactions.

27.     At all times hereinafter mentioned, defendant EAST MORICHES UNION FREE SCHOOL DISTRICT ("East Moriches School District" or "the School District"), was and is, a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business located at 9 Adelaide Avenue, East Moriches, New York.

28.     At all times hereinafter mentioned, defendant PRINCIPAL EDWARD SCHNEYER ("Schneyer"), was a Principal with the East Moriches Elementary School, located at 523 Montauk Hwy, East Moriches, New York, and was acting in the course of his employment with defendant EAST MORICHES UNION FREE SCHOOL DISTRICT, and in furtherance of the business of the defendant EAST MORICHES UNION FREE SCHOOL DISTRICT.

29.     At all times hereinafter mentioned, defendant SCHOOL SUPERINTENDENT CHARLES RUSSO ("Russo"), was a superintendent with the East Moriches Union Free School District, located at 9 Adelaide Avenue, East Moriches, New York, and was acting in the course of his employment with defendant EAST MORICHES UNION FREE SCHOOL DISTRICT, and in furtherance of the business of the defendant EAST MORICHES UNION FREE SCHOOL DISTRICT.

30.     At all times hereinafter mentioned, defendant HOPE SCHWARTZ ZIMMERMAN ("Judge Zimmerman") was a Justice with the Supreme Court of New York, Nassau County, located at 100 Supreme Court Drive, Mineola, New York, and was presiding over the divorce proceedings between Plaintiff and Michael Valva through December 2017.

7

31.     At all times hereinafter mentioned, defendant ATTORNEY FOR CHILDREN ETHAN HALPERN, ESQ. ("Halpern"), was an attorney employed by defendant LEGAL AID SOCIETY OF SUFFOLK COUNTY, INC., CHILDREN'S LAW BUREAU, located at 320 Carleton Avenue Suite 2500, Central Islip, New York. Halpern also had a private law office located at 889 East Main Street, Riverhead, New York, and was the Attorney for Children appointed to act on behalf of the children in the Family Court proceedings taking place in Suffolk County, New York, before the Honorable Bernard Cheng.

32.     At all times hereinafter mentioned, defendant LEGAL AID SOCIETY OF SUFFOLK COUNTY, INC., CHILDREN'S LAW BUREAU, was a domestic corporation duly organized and existing under and by virtue of the laws of the State of New York, with its principal place of business at 320 Carleton Avenue Suite 3800, and was the employer of defendant ETHAN HALPERN, the Attorney for Children appointed to act on behalf of the children in the Family Court proceedings taking place in Suffolk County, New York, before the Honorable Bernard Cheng.

33.     At all times hereinafter mentioned, defendant MICHAEL VALVA "(Valva") was the biological father of ANTHONY VALVA, THOMAS VALVA and ANDREW VALVA, and the former husband of plaintiff JUSTYNA ZUBKO-VALVA, and resided at 11 Bittersweet Lane, Center Moriches, New York, 11934, and was an NYPD police officer employed by the City of New York.

34.     At all times hereinafter mentioned, defendant ANGELA POLLINA ("Pollina") was the live-in fiancée of defendant MICHAEL VALVA, and resided at 11 Bittersweet Lane, Center Moriches, New York, 11934.

## **FACTS**

35.     On January 17, 2020, Plaintiff JUSTYNA ZUBKO-VALVA's eight (8) year-old child, Thomas Valva ("Tommy") froze to death in garage at the home of his father, Michael Valva, after being subjected to years of severe physical, mental and sexual abuse by Valva and his fiancée Angela Pollina.

36.     Tommy's death was not only foreseeable, but completely preventable.

37.     For over three years leading up to his death, Plaintiff JUSTYNA ZUBKO-VALVA repeatedly warned Defendants that her three young children, including Tommy and his two siblings, Anthony and Andrew, were being tortured, beaten, physically, mentally and sexually abused and starved by Valva and Pollina.

38.     Plaintiff JUSTYNA ZUBKO-VALVA provided Defendants with overwhelming and irrefutable evidence of abuse, including documentary evidence, audio recordings and transcriptions, photographic evidence, and medical evidence.

39.     Plaintiff JUSTYNA ZUBKO-VALVA also provided Defendants with her children's own recorded statements regarding the enormous physical and mental abuse that they were suffering at the hands of Valva and Pollina.

40.     Plaintiff JUSTYNA ZUBKO-VALVA also specifically warned Defendants that her children were in "enormous danger of losing their lives by Michael Valva and Angelina Pollina."

41.     Notwithstanding Plaintiff JUSTYNA ZUBKO-VALVA's repeated warnings, and the overwhelming evidence of abuse that Plaintiff JUSTYNA ZUBKO-VALVA had provided to Defendants, Defendants did absolutely nothing to protect the children.

42.     Rather than taking action to protect the children and stop their severe abuse by their father Michael Valva and his fiancee Angela Pollina – and report the multiple complaints of abuse

that had been made, as they were *required* to do under New York State Social Services Law – Defendants hid the truth about the children's health and fabricated false, misleading and dishonest reports about Plaintiff JUSTYNA ZUBKO-VALVA and her children.

43.     Defendants not only refused to remove Plaintiff JUSTYNA ZUBKO-VALVA's children from the custody of Valva and Pollina, but also, suppressed, destroyed and falsified evidence, thereby ensuring that Plaintiff's three (3) children would remain in Valva's custody, in order to give Valva and Pollina a green light to continue the severe abuse of Plaintiff's children.

44.     In so doing, Defendants flagrantly violated their legal duties under New York State Law, and exhibited a shocking indifference to the health, safety and welfare of Plaintiff JUSTYNA ZUBKO-VALVA's children.

45.     As a result of Defendants' negligent, reckless and intentional acts of misconduct conduct, as set forth above, Plaintiff's JUSTYNA ZUBKO-VALVA's eight-year-old son, Thomas Valva -- a special needs child on the Autism Spectrum Disorder who was otherwise a happy child under Plaintiff's care, before Valva unlawfully gained temporary custody over him in September 2017 -- died of hypothermia on January 17, 2020, after being forced to spend the night in a freezing cold, unheated, locked garage at Valva's home, where temperatures plummeted to 19 degrees Fahrenheit outside.

46.     The origins of Tommy's death can be traced back to a miscarriage of justice which took place on September 6, 2017, when Justice Hope Schwartz Zimmerman unlawfully, and without any due process whatsoever, summarily took away Plaintiff's children and gave temporary custody of them to Valva. Judge Zimmerman did this by issuing a grossly improper and illegal Temporary Full Stay Away Order of Protection against Plaintiff. As detailed below, Judge Zimmerman's unlawful decision was set in motion by Valva and his attorney, defendant Shana

10

Curti, Esq., two months earlier, and was brought to fruition with the active aid, assistance and encouragement of defendant Donna McCabe, Esq., the Attorney for the Children.

**Valva Conspires with Defendant Curti and Defendant McCabe to Manufacture False Claims of Abuse Against Plaintiff in Order to Gain Custody of the Children.**

47.    In the summer of 2017, Defendant Shana Curti, Esq., together with Defendant McCabe, willfully conspired with Michael Valva -- whom Curti was representing in the divorce proceedings -- to fabricate abuse claims against Plaintiff, and thereby help Valva gain substantial benefits in the divorce case, such as custody of the couple's three children, as well as sole possession of the marital residence, and to completely destroy Plaintiff's life.

48.    In furtherance of this conspiracy, Defendant Curti sent a letter dated July 7, 2017 to United Mortgage Corporation, 25 Melvile Park Road, Ste 110, Melville New York, in which she stated -- without any lawful basis for making such a claim -- that Plaintiff would lose custody of her children, and that Valva would be granted full and exclusive custody of the children. (Ex. D).

49.    Specifically, in this letter, Defendant Curti wrote that "based off of the current situation, Mr. Valva will be receiving *close to 100% custody* of his 3 children.  She might be entitled to supervised visits.  His kids will be living with him at 11 Bittersweet Lane, Center Moriches NY 11934."

50.    Thus,  defendant Shana Curti, Esq., as attorney for Michael Valva, *already knew,* two (2) months prior to the issuance of the Temporary Custody Order dated 9/06/17, that Nassau County Supreme Judge Zimmerman was going to unlawfully and immediately take Plaintiff's three (3) children away from her, based on issuing a fictional temporary Full Stay Away Order of Protection against Plaintiff that was not recorded in the Court's minutes during the Court appearance on September 6, 2017, nor was it recorded in the Department of Justice Registry or

Police Registry.

51.     Further, two (2) months prior to the issuance of the Temporary Custody Order dated 9/06/17, defendant Shana Curti, Esq. *already knew* that Plaintiff was not going to be allowed to have ANY contact with her children, and that she might be entitled ONLY to supervised visitations, two (2) months before such a ruling was ever made.  Further, Curti *already knew* that Valva was going to have sole possession of the marital residence at 350 North Corona Avenue, Apt. 25, Valley Stream, N.Y. 11580.

52.     The reason why Shana Curti knew that Valva would receive 100% custody of her 3 children was because she knew that Valva was planning -- with Curti and McCabe's full knowledge, consent and assistance -- on making false allegations of child abuse against Plaintiff with the Suffolk County Child Protective Services bureau, in order to justify the unlawful removal of Plaintiff's children from under her care and custody.

53.     As Valva's attorney, Curti learned of highly irregular financial transactions that Curti knew, or should have known, were a clear indication that Valva was engaged in criminal activities and/or had unlawful sources of income that brought in large sums of  money that were far in excess of what he was actually being paid as an NYPD police officer.

54.     Specifically, Valva's bank statements -- which Curti had in her possession and which she had used to get a new mortgage for Valva -- showed enormously high bank deposits on Valva and Pollina's account from unknown sources, ranging between $30,000.00 to $130,000.00 per month.  This was a clear sign that Valva and/or Pollina, who was unemployed, were engaged in some type of unlawful activities that generated a substantial amount of income.

55.     Notwithstanding this clear evidence of misconduct, Curti turned a blind-eye to these improprieties and made no disclosures to the authorities of these unlawful transactions by

12

Valva and Pollina. Instead, Curti continuously accepted payments from Valva in order to further his plan to "receiv[e] close to 100% custody of his 3 children," and ensure that they would be "living with him at 11 Bittersweet Lane, Center Moriches NY 11934." (Ex. D).

56.     In furtherance of this unlawful plan, on August 31, 2017, Curti filed an Order to Show Cause ("OSC") seeking, inter alia, a change in parental custody rights. The OSC filed by Curti, on behalf of Valva, was rife with blatant lies, misrepresentations, and material omissions of fact.

57.     On the same day, August 31, 2017, Plaintiff also filed an Order to Show Cause seeking a Temporary Restraining Order, asking for temporary custody over Plaintiff's children, since she was becoming increasingly concerned over the health, safety and welfare of her three children when they were in the presence of Valva and Pollina.

**Judge Zimmerman States on the Record that She is "Not Going to Do Anything" on September 6, 2017, but then Changes Her Mind at the Behest of McCabe and Curti**

58.     On September 6, 2017, an appearance was held before the Honorable Hope Schwartz Zimmerman, who was presiding over the divorce proceedings between Plaintiff and Valva, entitled <u>Michael Valva v. Justyna Valva</u>, Index No. 203503/2015. No hearing was scheduled for that day, nor was any oral argument scheduled. In fact, neither Curti's OSC nor Plaintiff's OSC had been fully briefed and submitted to the Court, and opposition papers were still due on both motions.

59.     For this reason, at the outset of the Court of appearance, Judge Zimmerman stated, on the record, "*I am not going to do anything today*." Rather, the purpose of this appearance was simply to set a schedule for the remaining briefing of the parties' respective Orders to Show Cause.

60.     Notwithstanding this statement on the record, Judge Zimmerman would soon make a catastrophic decision regarding Plaintiff's custody right at this conference. This sudden change

in the Court's position was due to outright lies and misrepresentations made by McCabe and Curti.

61.     Specifically, at the behest of defendant Curti, defendant Donna McCabe, Esq. – who was a close personal friend of Curti and/or had prior professional dealings with her, and was also friendly with Valva – made several false, misleading and dishonest statements to the Court regarding Plaintiff, and urged the Court to change parental custody to Valva, thus helping further the plan hatched by Valva, Curti and McCabe several months earlier. Curti also appeared at this conference and likewise made several materially false and misleading statements to the Court.

62.     Plaintiff had provided the Court with a flashdrive containing over 400 files of evidence pertaining to the abuse of the Valva children by Michael Valva and Angela Pollina, as well as the unlawful actions of Donna McCabe toward Plaintiff. Judge Zimmerman completely ignored this evidence.

**Based on False, Misleading and Dishonest Claims by McCabe, Plaintiff's Children Are <u>Unlawfully Removed from Her Custody</u>**

63.     Despite the fact that Judge Zimmerman had said, at the outset of the appearance, "I'm not going to do anything today," McCabe nonetheless implored the Court to take the children away from Plaintiff and give them to Valva, telling the Court "*I believe time for this Court to make a change in custody at this point*." Thus, McCabe set in motion the tragic chain of events that would ultimately lead to Tommy's death, and would lead to the severe physical, mental, and sexual abuse of all three of Plaintiff's children.

64.     In support of this unlawful request, McCabe, acting more like a second attorney for Valva then as an advocate for the children, told the Court, falsely, that Valva "has had very limited time with his children", that "there have been no weekend visitations," and that "there have been no holiday visitations." McCabe failed to disclose the fact that Valva had, in fact, failed to show up for his visitation hours on **<u>29 separate occasions</u>** – as documented by Plaintiff and given to

14

McCabe – without any notice or explanation to Plaintiff.

65.    Moreover, as McCabe well knew, Judge Fran Ricigliano who had previously *barred Valva from overnight visits* after reviewing large amounts of evidence files, documenting disturbing behavior by Valva, including Valva taking pictures of his private parts and sending them to other women while he was putting the kids to bed and they were still awake.

66.    Further, McCabe told the Court, falsely, that Plaintiff had made up stories about her boys crying after being secretly interviewed by McCabe in her office.  In fact, the boys were visibly upset and crying after being intensively grilled by McCabe in her office, at Valva's request, without Plaintiff's knowledge or consent. This *ex parte* interview of the children was in clear violation of the Court's directives, which had required that any such visits be "on notice" to Plaintiff.  In any event, what McCabe represented to the Court was an outright lie. The boys were extremely fearful and intimidated by McCabe and did not want to go back to her again.

67.    McCabe further told the Court, falsely, that Plaintiff had been non-compliant with Court-ordered forensic evaluation of the children by Dr. Peter Favaro. In fact, Plaintiff had been *fully* compliant, but had merely requested that the evaluations be videotaped. The reason for this request was that -- as confirmed by audio recordings and certified transcripts of same -- Valva and Pollina had been repeatedly and steadfastly attempting to brainwash the children, teaching them to say false and hateful things about their mother whenever the children would come over to visit them. The two older children were especially vulnerable to this type of brainwashing, since they both had special needs (Autism) and could easily be manipulated as a result.

68.    Moreover, Plaintiff had previously signed a consent form allowing Dr. Favaro to evaluate her children and videotape this evaluation.  Specifically, on December 2, 2016, Plaintiff had signed the Informed Consent to Participate in a Custody Evaluation with Dr. Peter Favaro

and/or Smart Parenting.  Thus, Plaintiff was *not* refusing to have the children examined by Dr. Favaro.  Rather,  Plaintiff was simply asking for Dr. Favaro's evaluation to be video-recorded.

69.     In presenting the Court with these lies, McCabe improperly vouched for herself as an advocate, telling the Court that "*Your honor has known me for a long time*," thereby attempting to bolster her credibility and lend support to her completely baseless claims.

70.     McCabe lied to the Court not only to promote the unlawful plan of Curti and Valva, but also, to retaliate against Plaintiff for having recently filed a motion remove McCabe as the AFC in the case.

71.     Specifically, on August 21, 2017, Plaintiff had filed a motion with the Nassau County Supreme Court asking the Court to remove Donna McCabe as the children's AFC.

72.     In this motion, Plaintiff highlighted the fact that McCabe, in violation of her duties as the AFC, consistently acted as Valva's second attorney,  repeatedly arguing on his behalf and protecting his interests, instead of protecting the interests of the children.

73.     Plaintiff also pointed out that she had furnished McCabe with audio recordings pertaining to Valva and Pollina's brainwashing of her children, and teaching the children to repeat hateful things and false accusations against her.  Inexplicably, McCabe never presented the Court with the evidence that Plaintiff had presented to her regarding Valva and Pollina's abuse of the children.

74.     Instead of disclosing the evidence of abuse to Judge Zimmerman  -- which she was lawfully *required* to do as the AFC for the Valva children --  McCabe fabricated evidence against Plaintiff and falsely accused her of misconduct and requested to the Court to take the children way. Tragically, McCabe was successful in her efforts to convince the Court to take Plaintiff's children away from her and award custody to Valva.

16

**Without Any Petition, Notice or Hearing, Judge Zimmerman Summarily Takes Away Plaintiff's Children, Flagrantly Violating Plaintiff's Constitutional Rights without Due Process of Law.**

75.     Shockingly, without any notice,  without any formal court-filed accusation of wrongdoing against Plaintiff, without any Family Offense Petition filed against Plaintiff, without any hearing whatsoever – and without *any supporting evidence* against Plaintiff – on September 6, 2017, Judge Zimmerman immediately took away Plaintiff's custody of her children the same day, and issued a fictional temporary Full Stay Away Order of Protection against her that was not recorded in the Court's minutes, Department of Justice Registry or Police Registry.

76.     As set forth below, Judge Zimmerman's actions were unlawful, unconstitutional and a flagrant violation of Plaintiff's Due Process rights.   Moreover, Judge Zimmerman's summary removal of Plaintiff's children was a clear violation of the Family Court Act, which sets for the mandatory conditions which must be met before children can be lawfully removed from a parent's custody based on alleged neglect.

77.     The effect of Judge Zimmerman's unlawful Order was to immediately take away Plaintiff's children, who had been under her care since they were born, and deprive Plaintiff of any contact with her children.  For 6 months, this Order prohibited Plaintiff from contacting her children and their special educational placements that they had attend for a couple of years.

78.     Judge Zimmerman not only took children away from Plaintiff who had been under her care since they were born  but also, immediately removed the children from their medically necessary special educational placements that they had attended for a couple of years.

79.     The same day after Plaintiff's Court appearance, Nassau County Police from the Fifth (5th) Precinct, who were close friends of Michael Valva, came to Plaintiff's house to remove her children based on the unlawful temporary Fully Stay Away Order of Protection issued by Judge

17

Zimmerman. Plaintiff was not even allowed to say goodbye to Tommy, since he was picked up by his father directly from the school bus that same day.

80. In making this ruling, Judge Zimmerman -- who has been featured multiple times on the show "Long Island Backstory," which highlights egregious and unjust rulings made by Long Island judges -- unlawfully overturned the prior ruling of Judge Fran Ricigliano.

81. Judge Ricigliano was the first judge in the divorce proceedings. After reviewing large amounts of evidence files that documented the disturbing behavior by Valva -- including taking pictures of his private parts and sending it to other women while he was putting the kids to bed, and while the kids were still awake -- Judge Ricigliano denied Valva's request to have overnight visits with the children.

82. Notwithstanding this evidence, Donna McCabe, in a flagrant violation of her duties as Attorney for the Children, repeatedly and strenuously fought for Valva's and her request to continue to have unsupervised visits with the children, even overnight visits. In so doing, McCabe willfully and deliberately ignored the evidence of abuse that Plaintiff had presented to her, and directly influenced the decisions of Judge Zimmerman.

83. In awarding immediate custody to Valva, Judge Zimmerman had, just like McCabe, wholly failed and refused to consider the clear evidence of Valva's abuse of the children.

84. Specifically, Plaintiff had provided a flash drive to Judge Zimmerman containing a couple of hundred files that showed the physical, mental and sexual abuse of her children by Valva and Pollina. Judge Zimmerman never bothered to examine this evidence before she issued her ruling.

85. Thereafter, on September 20, 2017, Judge Zimmerman modified the temporary Fully Stay Away Order of Protection from September 6, 2017 to allow Plaintiff unsupervised

visitations with her children, but she still kept the stay away conditions regarding children's place

of living and their school.  However, this Order, just like the original September 6, 2017 Order by

Judge Zimmerman, was not recorded in any court minutes, and was not included in the Department

of Justice Registry or Police Registry.  It was, for all intents and purposes, a completely fictional

Court Order.

**Judge Zimmerman's Decision to Summarily Take Away Plaintiff's Children Violated the**
**Family Court Act,  and was Done in the Complete Absence of Jurisdiction.**

86.     There was no lawful basis for removing Plaintiff's children from her custody, much

less issuing a fully "stay away" order. Simply put, Judge Zimmerman, as the judge presiding over

the *matrimonial* proceedings, had no legal authority to make such a ruling.  Such a monumental

decision could only properly be made by a *Family Court* judge, pursuant to the Family Court Act,

upon proper notice, a petition and hearing.

87.     Specifically, under Family Court Act § 1012(f)(i)(B), "a neglected child is a child

under eighteen … whose physical, mental or emotional condition has been impaired or is in

imminent danger of becoming impaired as a result of the failure of his parent or other person

legally responsible for his care to exercise a minimum degree of care."

88.     Based on this standard, "[a] party seeking to establish neglect must show, by a

preponderance of the evidence first that a child's *physical, mental or emotional condition has been*

*impaired* or is in imminent danger of becoming impaired, and second, that the actual or threatened

harm to the child is a consequence of the *failure of the parent or caretaker to exercise a minimum*

*degree of care* in providing proper supervision or guardianship." (Id.) (emphasis supplied).

89.     The standard of proof in a neglect proceeding is preponderance of the evidence.

Nicholson v. Scoppettta, 3 N.Y.3d 357 (2005).  The burden of proving neglect by a preponderance

of the evidence rests upon the party seeking to establish neglect. Id., 3 N.Y.3d at 368.

19

90.     Judge Zimmerman blatantly disregarded these legal standards.  There was *no evidence* whatsoever that her children were being harmed by Plaintiff.  Further, there was *no evidence* that Plaintiff had failed to exercise proper supervision or guardianship over her children.

91.     Worse still, Judge Zimmerman flagrantly denied Plaintiff's rights to due process. No petition to had been filed to remove custody of Plaintiff's children. No notice had been given to Plaintiff that her children might be taken away from.  No opportunity had been given to Plaintiff to present evidence or cross-examine adverse witnesses. No notice had been given to Plaintiff that she had 30 days to appeal Judge Zimmerman's summary removal of her children.  In short, Judge Zimmerman had taken Plaintiff's children away without *any* due process whatsoever, and in so doing, had acted without any jurisdiction far exceeded her lawful authority as a matrimonial judge.

92.     Apart from the complete absence of due process, Judge Zimmerman made her decision without *any evidence* whatsoever to support removing the children from Plaintiff's custody. Donna McCabe, the Attorney for the Children, had not provided any evidence to the Court that even remotely established "neglect" or "abuse" of the children by Plaintiff. All three children were attending their educational placements, and the school officials did not raise any concerns regard to Plaintiff's care of her children.  There was simply no basis whatsoever for taking Plaintiff's children away from her.

**Valva Files a Blatantly False Child Abuse Claim with CPS to Ensure that Plaintiff Permanently Loses Custody of her Children**

93.     Having succeeded at convincing Judge Zimmerman to unlawfully take away Plaintiff's children and issue a temporary "stay away" order, Valva, McCabe and Curti next embarked on making sure that Plaintiff would permanently lose custody of the children, as well as the marital residence.

94.     Toward this end, Valva, with the full knowledge, consent, guidance and encouragement of Curti and McCabe, filed formal child abuse allegations against Plaintiff. These blatantly false allegations were filed on the CPS hotline on October 31, 2017, which was the same day that Plaintiff had refused to sign the forbearance agreement on the marital residence. Plaintiff had refused to sign this agreement because Valva had violated the Court Order issued by the Nassau County Supreme Court, dated September 30, 2016, by Judge Zimmerman, and had stopped paying the mortgage on the marital residence.

95.     In his patently false complaint to CPS, Valva claimed that Plaintiff had been hitting the children and poisoning them some form of toxic "brown" medicine. Valva also alleged that Plaintiff suffered from mental illness, that her condition was deteriorating and that she was incapable of caring for her children. Valva made these false claims to CPS with the full knowledge, consent and encouragement of Curti and McCabe.

96.     This false CPS complaint would have severe and disastrous consequences for Plaintiff, as set forth more fully below.

**CPS Investigator Michele Clark Becomes Involved in the Case and Readily Accepts Valva's Blatantly False Allegations, While ignoring Plaintiff's Overwhelming Evidence of Abuse**

97.     CPS Investigator Michele Clark first became involved with the case on October 31, 2017, when she received a State Central Registry report alleging that Plaintiff was abusing her children.

98.     From the outset, it was obvious that Valva's claims of abuse were complete and outright fabrications.

99.     On November 1, 2017, Ms. Clark visited Tommy and Anthony at their school. Tommy, who was six years old at the time, told Ms. Clark that he had no concerns at all about visiting his mother. Further, Tommy told Ms. Clark that his mother does not use physical

21

punishment and that and he is not afraid of his mother. To the contrary, Tommy told Ms. Clark that he gets hugs and kisses from his mom when he visits her.

100.    Anthony, who was eight (8) years old at the time, likewise told Clark that he had no concerns at all about visiting his mother. Anthony likewise denied that he was physically punished by his mother or that he was in any way afraid of her. Simply put, Clark never observed or heard anything that could verify or corroborate Valva's claim the children were being mistreated by Plaintiff.

101.    The reason for this is simple: there was *no evidence* whatsoever to support Valva's malicious claims. Had Clark done the bare minimum of an investigation, she would have immediately realized that Valva, who was in the middle of a bitter matrimonial dispute, was manufacturing these fantastic tales of abuse so that he would get "close to 100% custody of his 3 children" -- as Curti had written in her July 7, 2017 letter to United Mortgage -- and to justify, *ex post facto*, the unlawful removal of Plaintiff's children from her custody by Judge Zimmerman. Instead, Clark chose to blindly accept Valva's lies without any supporting evidence whatsoever.

**Plaintiff Files Multiple Reports of Abuse with CPS, But CPS Turns a Blind-Eye to These Complaints and Summarily Closes Out the Reports Without Any Investigation**

102.    The tragic irony of the case is that the children *were*, in fact, being abused at the time. But the abuse was not being done by Plaintiff. Rather, it was being done by Valva and Pollina.

103.    Plaintiff repeatedly tried to alert CPS to Valva and Pollina's abuse but no one would listen. Specifically, Plaintiff filed 3 separate CPS reports, the first on November 7, 2017, the second on January 2, 2018, and the third on January 14, 2018.

104.    In these reports to CPS, Plaintiff tried desperately to alert CPS to the shocking evidence of abuse, torture, beating and starvation that the children had suffered since Valva had been granted custody on September 6, 2017.

22

105.    In the first CPS report, dated November 7, 2017, Plaintiff informed CPS about her children's severe weight loss and starvation while living at their father's house.  In one month alone, Anthony, who was 8 years old at the time, had lost <u>13.2 pounds</u>. In that same period, Tommy, who was 6 years old at the time, had lost <u>4.4 pounds</u>.  Andrew, who was 4 years old at the time, had lost <u>3.7 pounds</u>.

106.    Further, in her first report to CPS, dated November 7, 2017,  Plaintiff also reported that Valva and Pollina were beating the children on their heads, hands and backs, putting the children in extremely long time-outs without food and drink, and making them stay outside in the backyard with no shoes.

107.    After filing her first report to CPS on November 7, 2017, Plaintiff attempted in vain to follow up on this report with CPS.  On November 13, 2017, and then again on December 1, 2018, Plaintiff  called the CPS hotline, since she was extremely concerned that her allegations in her first CPS report, dated November 7, 2017, had not been investigated by CPS.

108.    At the time, Plaintiff was not aware of the fact CPS caseworker Michele Clark and her supervisor Edward Heepe, had literally not done *any* investigation pertaining to Plaintiff's report dated November 7, 2017. In fact, Plaintiff later learned that, according to the State Central Register database, her first CPS report dated November 7, 2017 was, shockingly, marked "CLOSED" after just two days later, on November 9, 2017, by Michele Clark.

109.    In a flagrant dereliction of their duties, Defendants Clark and Heepe, with the express knowledge and consent of their supervisor, Assistant Director Robert Leto,  decided to *close out* the November 7, 2017 CPS complaint without any investigation and without making any effort to see if the children were, in fact, being abused by Valva and Pollina.

**Plaintiff Meets with the CPS Defendants in December 2017 and Provides Them with Direct Evidence of Abuse, But Still CPS Does Nothing.**

23

110.    Thereafter, on December 19, 2017, Plaintiff met in person with CPS caseworker
Michele Clark.  Two of Clark's supervisors, Edward Heepe and Assistant Director Robert Leto
(collectively, the "CPS defendants"),[1] were also present at this meeting. During this meeting,
Plaintiff repeatedly and emphatically told the CPS defendants about Valva and Pollina's abuse and
starvation of the children.  Plaintiff implored CPS to investigate these claims and take action to
protect the children.

111.    Among other things, Plaintiff emphasized to CPS the fact that Tommy and Anthony
were losing weight after they went to live with their father, that the children's educational needs
were not being met, and that the father was leaving the children outside in the cold without shoes
as a form of discipline.

112.    Plaintiff did not rely solely on her own words to convince CPS that the children
were being abused. Instead, Plaintiff provided CPS with actual *proof* of abuse.   Specifically, at
the December 19, 2017 meeting with CPS provided defendants Clark, Heepe and Leto, Plaintiff
provided CPS with a flash drive containing *320 files of direct evidence of abuse* of her children by
Valva and Pollina.

113.    Plaintiff also provided the CPS defendants with certified transcripts of the audio
recordings.  Apart from the evidence of the abuse, these transcripts confirmed that Valva and
Pollina were literally trying to brainwash the children, alienating, forcing the children (including
two children with autism) to repeat extremely hateful and false allegations against Plaintiff. For
example, the children were forced to repeat things such as: "I don't love mommy," "mommy is
mean," "mommy don't hit me," "mommy don't touch me," "I don't want to go home" and "I don't

---

1 To the extent that additional CPS defendants are referred to later in this Complaint -- including but not limited to,
Melissa Estrada, Jennifer Lantz, Lydia Sabosto and Jean Montague -- the term "CPS Defendants" shall refer to all
such defendants when setting forth Plaintiff's legal claims against CPS.

24

want to stay with mommy." These recordings also revealed Valva saying derogatory things about Plaintiff, such as telling them that their mother was a "loser" and "needed to get a job."

**The CPS Defendants Ignore Evidence Provided Plaintiff from The Children's Doctors, All of Whom Attest to the Fact that Plaintiff Had a Very Normal and Loving Relationship with <u>Her Children</u>.**

114.     Apart from confirming the abuse and brainwashing of the children by Valva and Pollina, the recordings also contained evidence which conclusively refuted the false abuse charges made by Valva, and which demonstrated, beyond question, that Plaintiff had a loving and caring relationship with her children.

115.     Specifically, the flash drive provided to the CPS defendants contained letters from the children's pediatrician (Dr. Marc Lashley), neuropsychologist (Dr. Beryl Nightingale), both of whom are specialists who work with kids with Autism, and both of whom confirmed that Plaintiff was, in every possible respect, a loving, caring and devoted parent, and that there were never any signs that the children were being abused from her.

116.     The flash drive also contained a letter from Kimberly Berens, Ph.D, who supervised Anthony's intensive behavioral treatment at Fit Learning in Manhattan. In this letter, Dr. Berens spoke glowingly about Plaintiff and her loving relationship with her children, as well as wrote as the devasting impact that the children's separation from their mother would have:

> I am completely shocked and saddened by the removal of Justyna Valva's children from her custody along with the order of protection that was issued against her. In the two years that I have known her, *I have only seen the most devoted and loving mother attempting to do everything possible for her children.* Anthony adores Justyna and I never observed ANY evidence of abuse or maltreatment that would lead a judge to remove a child from his/her mother and issue an order preventing a mother from even seeing her child. Nothing about this ruling is in the best interests of Anthony or his siblings. *It is highly likely that this ruling will create regression, as well as extreme psychological and emotional distress for all of these children* and I cannot imagine any scenario that justified this course of events.

25

(Id.).

117.    Dr. Berens also documented the fact that Valva had been touching Anthony's bottom. Dr. Berens, as a mandatory reporter, called the CPS hotline and filed a report regarding this improper touching by Valva.  The flash drive also contained the children's progress reports and medical evaluations.

118.    The flash drive also contained evidence that confirmed that when the children lived with Plaintiff, they were happy and joyful when they saw Plaintiff, they were always giving her hugs, kisses, and telling her that they loved her and missed her. By contrast, the children were clearly afraid to go on visitations with their father. After the visitations with Valva, the children were visibly nervous, stressed and frightened.  In fact, the children were wetting themselves at night very often at that point, and they had nightmares.

119.    In short, the flash drive that Plaintiff provided to the CPS Defendants on December 19, 2017, showed beyond any doubt that Valva and Pollina – *not* Plaintiff – had been abusing the children physically, mentally and emotionally, and literally were starving them to death.  More importantly, the evidence presented by Plaintiff utterly eviscerated Valva's false claims of abuse in the October 31, 2017 complaint to CPS.

120.    During the December 19, 2017 meeting with the CPS Defendants, Plaintiff also informed with them that in 2016, she had made a report of sexual abuse by Valva and Pollina to the Nassau County Police, as well as to the F.B.I.   Plaintiff also told the CPS Defendants that she had filed another report of sexual abuse against Valva and Pollina on July 30, 2016.

121.    Among other things, these police reports documented the following acts of sexual abuse against the children: i) Valva would order the children to lick the girls' (Pollina's daughters) bellies below their belly button, and touch their private parts; ii) Valva would order the children to

strip naked and walk around without any clothing; and iii) Valva and Pollina would walk around the house naked, and that Pollina's daughters would walk around the house naked as well.

122.    During this same meeting, Plaintiff further informed the CPS Defendants that she had taken all 3 of her children to Cohen's Children's Hospital, where the children had been examined and where several specimens had been removed.[2]

**Plaintiff Files Two Additional Reports with CPS, But the CPS Defendants Ignore These Reports and Summarily Mark Them "Closed" Without Any Investigation.**

123.    After receiving the flash drive from Plaintiff on December 19, 2017, the CPS Defendants failed to take any action.  Not only did they fail to file a petition against Valva and Pollina -- despite the overwhelming evidence of their abuse and brainwashing of the children that Plaintiff had furnished them -- but they failed to so much as even *question* Valva and Pollina regarding this disturbing evidence. As a result, the abuse against the children not only continued, but actually got worse after Plaintiff's meeting with the CPS defendants on December 19, 2017. Specifically, after the CPS defendants received this flash drive, the children's abuse by Valva and Pollina *increased* in measure, degree, and frequency.

124.    As a result, Plaintiff felt compelled to submit a second report to CPS on January 2, 2018.  In her second report to CPS, Plaintiff reported that the abuse of her children had greatly increased since she had provided CPS caseworker Michele Clark and her supervisors Edward Heepe and Robert Leto with 320 files of direct evidence on December 19, 2017, during her meeting with them on that date.

125.    Shockingly, Plaintiff's second CPS report, dated January 2, 2018 was marked

---

[2] Inexplicably, the CPS Defendants never picked up the specimens and never had them tested at the crime lab.

"CLOSED" only one day later, on January 03, 2018, by Michele Clark's supervisor, Ed Heepe, with the knowledge and consent of Assistant Director Leto. Thus, CPS caseworker Michele Clark and her supervisor Ed Heepe had completely ignored, and immediately closed, Plaintiff's first two CPS reports without conducting *any* investigation whatsoever to Plaintiff's allegations of abuse, even though they were **required** to conduct an investigation in regard to the reports filed on the CPS hotline within 60 days.

126.     Clark and Heepe were able to bypass this mandatory requirement by marking Plaintiff's reports on the CPS hotline as "duplicative," when in fact, they knew that the reports contained separate and distinct allegations, and were not duplicative at all.

**As A Direct Consequence of the CPS Defendants' Gross Negligence and Deliberate Indifference, Tommy is Severely Beaten by Valva.**

127.     Tommy paid a severe price for Clark and Heepe's gross negligence and reckless disregard of their duties. On January 13, 2018, Tommy (7 years of age at the time, with Autism Spectrum disorder), was brutally and severely beaten and assaulted by his father Michael Valva. This assault caused visible physical injuries on his buttocks, coagulated blood spots, bruises in red, yellow, green color, black and blue, dark red marks and broken blood vessels.

128.     One day later, on January 14, 2018, Plaintiff filed her *third* report with CPS. On that day, during her court-ordered visitation with the children, Plaintiff noticed severe physical injuries on Tommy's buttocks, including but not limited to, bruises, coagulated blood spots, dark red spots, and black and blue marks throughout.

129.     After seeing these visible injuries, Plaintiff was shocked. She could not believe that Valva had beaten Tommy so severely, especially after she had just recently provided the CPS defendants with clear evidence of abuse on the flash drive, and she had filed another petition with CPS just two weeks earlier. It was obvious that the CPS Defendants had completely and utterly

28

ignored the evidence of abuse that Plaintiff had provided, thereby enabling Valva to commit this savage beating.

130.    After seeing the obvious signs of abuse, Plaintiff called her neighbor from Townhouse # 22, Kathy Izzo, to independently verify the injuries on Tommy's buttocks. Tommy told both Plaintiff and Ms. Izzo that his father had hit him 12 times with his hand the day before, because Tommy had complained that daddy and Angela were hitting him and putting him on long time-outs.

131.    After this severe beating, Valva had put Tommy on a very long time-out without food and drink. As soon as Plaintiff dropped off Tommy and returned home that day, she called CPS hotline to immediately file another report of abuse.

**Valva Attempts to Hide Evidence of the Beating by Denying CPS Access to See Tommy, and CPS Does Nothing to Stop Him.**

132.    The following day, on January 15, 2018,  Valva refused to produce the children for Plaintiff's court-ordered visitation, even though Valva had sent Plaintiff a text message that confirmed that he and the children were, in fact, at home at that time.

133.    During the period of time that Plaintiff was waiting to see her children (approximately 2.5 hours), another CPS worker, Mr. Ron Mejia, arrived on the scene regarding Plaintiff's CPS report that had been filed the day before. Mejia knocked and rang the doorbell several times, but Valva refused to open the door. Valva did not want the CPS worker to see, with his own eyes, the severe physical injuries that he had inflicted on Tommy.

134.    Rather than directly calling the police himself, as he should have done, Mejia placed the burden on Plaintiff to contact the police. Specifically, Mejia instructed Plaintiff to proceed to the Suffolk County Police Department ("SCPD"), 7th Precinct, and file a police report.

135.    Thereafter, Plaintiff did as she was told by Mejia, and filed a police report with the

7th Precinct. However, the SCPD, after learning that Michael Valva was a police officer, looked the other way and did nothing. The SCPD refused to send over even a single patrol car to check on the well-being of Plaintiff's children, and refused to take any action to compel Valva to produce the children for Plaintiff's Court-Ordered visitation.

136.    Thereafter, the SCPD created a false and misleading police report to justify its inaction. The SCPD created this report to conceal the fact that it had decided to give Valva -- who was "one of their own" -- a complete free pass for his willful disobedience of a Court Order, and for his deliberate obstruction of CPS worker Ron Mejia from performing his duties.

137.    Plaintiff subsequently filed a complaint with Internal Affairs to address the SCPD's complete dereliction of its duties, and its unlawful preferential treatment of Valva. Not surprisingly, no action was taken against any of officers involved in this incident.

138.    Apart from the inaction of the SCPD, neither the CPS Defendants nor defendant Suffolk County Attorney Randall Ratje, Esq., made any attempt to remove the children from Valva's home, despite Valva's flagrant defiance of the Court's Order, and his willful refusal to allow CPS worker Mejia into his home. Nor, for that matter, did these Defendants request that the Court issue a warrant for Michael Valva's arrest.

139.    On January 16, 2017, Plaintiff had reached the endpoint of her willingness to tolerate Clark's gross dereliction of her duties. Not only had Clark done nothing to protect the children, but to the contrary, she had actually *impeded* Plaintiff's efforts to protect them by closing out, with Heepe's and Leto's knowledge, approval and consent, Plaintiff's first two CPS complaints dated November 7, 2017 and January 2, 2018. In a very real sense, Clark and her supervisors had given Valva and Pollina a green light to continue the severe abuse of Plaintiff's children.

30

**Plaintiff Informs Clark that She Intends to File a Complaint against Her, and in Retaliation, Defendant Clark Initiates a Neglect Petition Against Plaintiff Based on Flagrant Lies**

140.    On January 16, 2018, Plaintiff left a voice mail on Clark's phone informing her that she would be filing a complaint against Clark for conducting her CPS investigation in an extremely partial, biased and unfair manner.  Plaintiff further stated that it was Clark who was responsible for the severe beating and assault of her son Thomas by Valva.

141.    After learning of Plaintiff's intention to file a complaint against her, Clark launched a preemptive strike and filed a malicious and utterly baseless Neglect Pre-Petition against Plaintiff on January 17, 2018 under Family Court Act § 1029, requesting an order of protection for Plaintiff to stay away from her children.

142.    Shortly thereafter, the CPS defendants filed a formal child Neglect Petition ("the Petition") against Plaintiff, which falsely accused Plaintiff of neglecting her children. Clark filed this Petition with the full knowledge, consent and encouragement of Heepe and Leto.

143.    Among other things, the Petition alleged, falsely, that Plaintiff had neglected her children by using excessive corporal punishment, and that her impaired mental health placed the children in imminent risk of harm.

144.    At the time Clark filed this Petition in Suffolk County Family Court, she *knew* that the allegations in the Petition were false, misleading and dishonest, and contained many material omissions.  Clark's supervisors, Edward Heepe and Robert Leto, likewise knew that the Petition was completely false and utterly baseless, yet they nonetheless allowed it to be filed.

145.    In filing this Petition, Clark was seeking to retaliate against Plaintiff for stated intention of filing a complaint against Clark.  Clark was further motivated by a desire to deflect attention from her own gross failures in as CPS investigator in this case -- which had led directly to the severe beating inflicted on Tommy on January 13, 2018 – by effectively "flipping the script"

31

and making Plaintiff the focal point of the investigation, while at the same time instantly discrediting her allegations.

146.    Clark was also motivated by ill-will, spite and her palpable dislike of Plaintiff, who was originally from Poland and whom Clark regarded with utter contempt and viewed her as a second-class citizen.

147.    Clark's claim that she believed that Plaintiff posed a danger to the safety of the children was a blatant fabrication. In fact, Clark had previously represented on multiple CPS reports that Plaintiff posed *no danger* whatsoever to the children.  Specifically, on her Clark affirmatively stated on her State Central Register reports dated October 31, 2018, November 7, 2017, November 13, 2017, January 8, 2018 and January 15, 2018, that there were NO safety concerns that placed the children in immediate danger of serious harm, in regards to her investigation against Plaintiff.

148.    As Clark well *knew*, it was Valva, not Plaintiff, who was physically abusing the children.   Clark implicitly conceded as much when she filed, on the same day, a Neglect Pre-Petition against Valva for severely beating up Tommy.

149.    Clark's filing of this petition confirms that she in fact knew that Valva was the *real* culprit, not Plaintiff.  The Petition she filed against Plaintiff was a complete sham, designed to serve as a preemptive strike against Plaintiff for the complaint that she was about to file against Clark.

150.    Clark's desire to protect herself, and cover up her immense failures as a CPS investigator, led her to take actions which had a disastrous impact on the children.  Instead of immediately removing Plaintiff's children form Valva's sadistic abuse,  and asking the Court for a warrant for Valva's arrest, Clark only requested that the Court issue a regular Order of Protection

against Valva.  Clark thus ensured that the children would remain in Valva and Pollina's custody, and would continue to be subjected to their abuse, torture and starvation.

151.    Clark's subsequent actions toward Valva amounted to a slap on the wrist.  Despite the fact that Valva *admitted* that he had severely beat up his son, he merely received an Adjournment in Contemplation of Dismissal for one year, and was required to take some classes at a local library.  In effect, Valva was allowed to get off completely scot-free, with no consequences whatsoever for his egregious actions.

152.    In contrast to her treatment of Valva, Clark vigorously and aggressively went after Plaintiff, doing everything in her power to prove her Neglect Petition and have Plaintiff's children permanently removed from her custody.

**In Support of Her Retaliatory and Baseless Neglect Petition, CPS Investigator Michele Clark Lies to the Court and Suppresses Material Evidence**

153.    In connection with this false Petition, Clark made an appearance in Suffolk County Family Court on January 17, 2018.  Plaintiff was not present at this conference, as Clark had deliberately failed to give her sufficient notice to appear in Court for this conference.

154.    In fact, Plaintiff only found out about the conference from a "Notice of Intent to Apply for Court Order" that had been posted to her door the *same day* that the conference was going to be held. Plaintiff tried in vain to contact the Court and have the conference postponed, but the Court decided to hold a hearing regarding Clark's allegations without Plaintiff present.

155.    During this initial court conference on January 17, 2018, Clark used this opportunity to request from the Court a temporary Full Stay Away Order of Protection against Plaintiff.  Knowing that Plaintiff was not in Court to defend herself,  Clark purposely lied about Plaintiff and the alleged dangers that she posed to her children.

156.    At this hearing, Defendant Clark, with the full knowledge, consent and

encouragement of her supervisors Edward Heepe and Robert Leto, claimed that Plaintiff was "mentally ill" and that her mental health issues were getting worse over time. Clark thus repeated in Court the same false, misleading and dishonest claims that she had made in her Petition.

157. At this same hearing, Clark willfully and deliberately hid the truth from the Court about critical evidence -- which she had been given by Plaintiff only one month before, on December 19, 2017, and which strongly corroborated Valva's abuse, and completely exonerated Plaintiff -- in order to intentionally mislead the Court about Plaintiff's fitness as a mother.

158. Clark's efforts to deceive the Court were successful. Without Plaintiff having a chance to defend herself, since she was not even present at this "hearing," the Court issued a temporary Full Stay Away Order of Protection against Plaintiff, barring Plaintiff from having *any* unsupervised contact whatsoever with her children.

159. On January 23, 2018, Clark filed a full formal Neglect Petition against Plaintiff. This Petition was rife with blatant lies and materially false claims. There was literally *no evidence* whatsoever to support these spurious claims.

160. In this Neglect Petition, Clark made the following patently false statements against Plaintiff, all with the full knowledge, consent and encouragement of her supervisors Edward Heepe and Robert Leto: i) Plaintiff "inflict[s] excessive corporal punishment" on the children when disciplining them; ii) Plaintiff is suffering from an "impaired mental state" which "hinders her ability to provide said children with adequate care and supervision"; iv) Plaintiff often "demonstrates erratic behaviors"; v) the "children are afraid of [Plaintiff]"; and vi) Plaintiff's job as a corrections officer posed an additional "risk for the safety of said children", since she is allowed to carry a gun, and her "impaired mental state" heightens the risk of danger to the children;

161. Based on these false allegations, Clark claimed that Plaintiff's children were in

34

"imminent risk of becoming physically, mentally and emotionally impaired" by Plaintiff

" inflicting excessive corporal punishment upon said children" when "disciplining the children."

162.    In a subsequent Court appearance on January 31, 2018, Clark essentially doubled down on her false claims against Plaintiff, claiming that Plaintiff was "mentally ill" and that her mental health issues had gotten worse since September 2017, when her children were taken away from her by Judge Zimmerman. Defendant Clark made these false claims with the full knowledge, consent and encouragement of her supervisors Edward Heepe and Robert Leto.

163.    As Clark well knew, these allegations were completely false.  In fact, as Clark would later admit, she had *no knowledge* whatsoever of any psychiatric, psychological or mental health disorders afflicting Plaintiff, as no such disorders existed.

164.    To the contrary, in order to work as a Corrections Officer with the New York City Department of Corrections, Plaintiff was required to undergo comprehensive psychiatric and psychological testing before she could become employed.  There was *no evidence* that Plaintiff suffered from any psychiatric disorder or had any mental health issues of any kind, in any of the tests administered by the Department of Corrections. Had Plaintiff been diagnosed with any mental health issues, she never would have been hired to work as a corrections officer in the first instance.

165.    In a failed attempt to bolster her fabricated claims regarding Plaintiff's mental health, Clark contacted Kimberly Berens, PhD,  who had supervised Anthony's intensive behavioral treatment at Fit Learning, and repeatedly asked her about Plaintiff's behavior and mental health.

166.    Dr. Berens would later testify that she found Clark's questions to be odd because, as she explained, Plaintiff had always acted in a completely appropriate manner around her.  She had also never seen Plaintiff act in anything but a warm, loving, caring manner toward her children,

and she had never heard her talk about the father in a derogatory manner

167.    Throughout all phases of her involvement in the Family Court Proceedings, Clark
continued to make false, misleading and dishonest statements to the Court, and hid material
evidence from the Court. In short, Clark did everything in her power to ensure that Plaintiff would
permanently lose custody of her children and that the real culprits, Michael Valva and Angela
Pollina, who had severely abused the children, would be given full, unrestricted custody of the
children.

**CPS Case workers Jessica Lantz and Melissa Estrada Take Over for Clark and Continue
Telling Vicious Lies Against Plaintiff and Falsifying Evidence, so as to Ensure that the
Baseless Neglect Petition Continues.**

168.    In February 2018, Clark was replaced by Defendant Lantz, who was supervised
by June Johnson, and then, by Defendant Estrada, who was supervised by Defendant Heepe.

169.     Just as their predecessor Clark had done, Defendants Lantz and Estrada repeatedly
lied and falsified evidence against Plaintiff -- not only repeating Clark's lies, but embellishing on
them and then inventing new ones as well -- in order to ensure that the baseless Neglect Petition
continued.

170.    For example, Defendants Lantz and Estrada told the following brazen lies
about Plaintiff, despite not having a *shred* of evidence to support these fabricated claims: i)
Plaintiff's mental health had deteriorated since losing custody of her children in September 2017;
ii) Plaintiff's behavior had become increasingly erratic and concerning;  iii) Plaintiff had exhibited
a recent history of violence, and was out of control;   iv) Plaintiff was consistently uncooperative
and unmanageable when dealing with authority;  and v) Plaintiff has a drinking problem.

171.    These lies, as well as many others, were contained in Lantz's and Estrada's CPS
Reports -- with the full knowledge and consent of their respective supervisors -- and were then

forwarded to Defendant Ratje and used against Plaintiff in Family Court, thereby further violating her rights and ensuring that the baseless CPS Neglect Petition against her would continue.

172.    There was no basis whatsoever for any of the false allegations made by Lantz and Estrada.  In fact, neither one of these Defendants never even *spoke* with Plaintiff, much less met her in person.  Neither one of these Defendants had *any* medical evidence whatsoever to support their claims about Plaintiff's "mental health" issues.   They were literally making up facts against her out of whole cloth.

173.    Worse still, both Lantz and Estrada provided a completely false and misleading picture of life for the children in the Valva home.  According to their glowing reports, the children were very happy, well-adjusted and well fed.

174.    In their reports, Lantz and Estrada stated, falsely, inter alia, that:  i) the living environment in the Valva home was stable and provided good to excellent living conditions; ii) Valva was very affectionate to all of the children, and was very accepting of them; iii) Valva used discipline appropriate for the children's age, development and conduct;  iv) Valva provided age appropriate care and supervision of the children; and v) Valva accepts responsibility for problematic behaviors and conditions, and has taken appropriate steps to initiate change. In short, Valva was a very good father and there were no concerns whatsoever about the children's health, safety and welfare.

175.    Upon reading their reports, it is clear that neither Defendant Lantz nor Defendant Estrada had ever even *considered* the possibility  that the children were simply too scared to report the severe abuse that they had received from Valva and Pollina, or to tell the truth about the starvation that they were forced to endure.  Instead, Lantz and Estrada blindly accepted the reports from the children that they were not being abused or starved – see, e.g., Court Ordered CPS 1034

Report dated October 15, 2018, stating that "the children have denied any maltreatment by their father or step-mother Ms. Pollina" -- despite overwhelming evidence to the contrary.

**Assistant County Attorney Randall Ratje Provides Additional False and Misleading Evidence to the Court, and Hides Exculpatory Evidence from Plaintiff**

176.    Apart from the perjured testimony and false evidence of Clark, as well as the fabricated and misleading reports of Lantz and Estrada, Assistant County Attorney Randle Ratje also provided materially false and misleading evidence to the Court, relying in part on the fabricated reports of the CPS case workers on the case -- Defendants Clark, Lantz and Estradad – and then embellishing these reports and inventing new, false claims about Plaintiff.

177.    Throughout all phases of the proceedings, from his investigation into the matter to his closing argument, Ratje repeatedly attempted to justify the baseless Neglect Petition by manufacturing false evidence against Plaintiff.  Specifically, Ratje repeatedly made up false claims regarding Plaintiff's mental health and her alleged "delusions" regarding her belief that Valva and CPS were working together to falsely accuse Plaintiff of child neglect.

178.    Throughout all phases of the proceedings, Ratje repeatedly attempted to justify the baseless Neglect Petition by willfully and deliberately hiding material evidence that was exchanged during the discovery process. Specifically, Ratje repeatedly failed to give Plaintiff full and complete records that he was *obligated* to disclose to her, and then improperly redacted records which he was required to disclose in a fully unredacted format.

179.    In his closing argument during the Neglect proceedings, Ratje devoted almost his entire summation to arguing that Plaintiff was mentally ill and that she was under the delusion that there was a conspiracy between the children's biological father, Valva, and CPS to falsely accuse of her child neglect.  Ratje almost completely ignored the *actual claims* that were purportedly the basis for the Neglect Petition in the first instance.

180.    Ratje's claims about Plaintiff's alleged "mental illness" were not only blatantly false, but also, they were directly contradicted by the results of the extensive psychological testing that Plaintiff had undergone in order to become corrections officer.

181.    As noted above, in order to get and maintain her job at the Department of Corrections, Plaintiff had to pass many psychological tests, and had to undergo many one-on-one interviews with a psychologist.  Plaintiff was, and is, responsible for the care, custody and control of dozens of inmates at the same time.  Ratje willfully disregarded this material evidence and/or concealed same from the Court, in an effort to mislead the Court into to finding that Plaintiff was mentally unfit to have custody of her three children.

182.    As further evidence of Ratje's bad faith conduct, Ratje had included allegations in the Neglect Petition that had no place whatsoever in an Article 10 child neglect case brought under the Family Court Act, including but not limited to, the following misleading and irrelevant "facts": i) Plaintiff had remained at Valva's house after a scheduled visitation pick up; ii) Plaintiff had placed a recording device on the children during their visits with Valva; iii) Plaintiff becomes angry when the children express their love for the father, or the allegation that Plaintiff talks disparagingly about the father and his girlfriend.

183.    As Judge Cheng noted, in discussing the impropriety of such claims in a child neglect petition: "these allegations are more commonly seen in child custody cases."   Simply put, there was no lawful basis for including such allegations in a child neglect petition.

184.    Ratje's obsession with justifying this baseless Neglect Petition against Plaintiff blinded him to the dire harm that the children were suffering at the hands of Valva and Pollina. Instead of focusing on the health, safety and welfare of the children, as he was *required* to do, Ratje zealously attempted to use false "evidence"  prove that the baseless charges against Plaintiff

were, in fact, justified.  In effect, it became more important for Ratje to save face for his office and the CPS Defendants, than it did to protect the children from being abused, tortured and starved by Valva and Pollina.

185.    In his relentless pursuit of this goal,  Ratje egregiously failed in his duties to protect the health safety and welfare of the children.  Instead of taking action to remove the children from the sadistic and abusive care of  Valva and Pollina --  thereby exposing the children to severe harm and ultimately leading to Tommy's death -- Ratje manufactured evidence against Plaintiff during his investigation, and then used this manufactured evidence to attempt to permanently remove the children from Plaintiff's custody.

**Defendant Halpern Flagrantly Disregards His Duties to the Children and Provides Falsified Evidence to the Court, Thereby Ensuring that the Neglect Proceedings Would Continue.**

186.    In conjunction with the unlawful conduct of Ratje, AFC Halpern likewise exhibited a shocking and willful indifference toward the safety of the children, and in so doing, flagrantly disregarded his duties and responsibilities as their AFC.

187.    Halpern consistently failed and refused to consider any of the evidence of abuse that Plaintiff had provided to him, including documentary evidence, audio recordings and transcriptions, photographic evidence, and medical evidence.

188.    After he was appointed AFC by Justice Cheng on January 17, 2018, Halpern failed to meet with any of Plaintiff's children -- even *once* -- over the next several months, despite the plethora of evidence provided to him regarding the enormous physical and mental abuse of Plaintiff's three children including beatings, starvation, abuse, torture, and brainwashing of Plaintiff's children.

189.    Much like McCabe had done during the divorce proceedings, Halpern turned a complete blind-eye to the shocking evidence of abuse against the children, and instead focused on

protecting the rights of Michael Valva and making sure that the Neglect Petition would continue.

190.     Towards this end, Halpern submitted a false, misleading and dishonest Affirmation in opposition to Plaintiff's motion to dismiss the Neglect Petition.  In this Affirmation, dated February 20, 2018, Halpern stated falsely, under penalty of perjury, that Plaintiff herself had *admitted to "*hitting the children."

191.     This was a bald-faced lie by Halpern.  As Halpern well *knew*, Plaintiff never made any such "admission" in court, or anywhere else.  Nor for that matter, did Plaintiff ever, in fact, use corporal punishment against her children.  This was a complete fabrication by Halpern, and it helped influence Justice Cheng's decision to deny Plaintiff's motion to dismiss the Neglect Petition.

192.     Halpern further misled the Court by stating, under oath, that Plaintiff's "own testimony" had "established elements of a neglect finding."  This was another blatant fabrication. In fact, Plaintiff's testimony had establish no such thing. Plaintiff never once, ever, testified to any act or omission on her part that would even remotely constitute "neglect" or "abuse" of her children.  This claim was a complete, outright lie by Halpern.

193.     Worse still, Halpern *knew*, in his role as AFC, that Valva had severely beaten up and assaulted Tommy on January 13, 2018 --  causing visible physical injuries to his buttocks and lower spine -- and that Plaintiff could not have possibly had anything to do with this assault, since the children were in Valva's custody at the time the beating occurred.

194.     Still, Halpern did nothing. Halpern did not request from the Court to remove the children from Valva's custody, nor for that matter, did he ask the Court for a Full Stay Away Order of Protection or, at the very least, for the imposition of some restrictions on Valva's custody of the children.

41

195.     As a direct result of Halpern's deliberate indifference and gross negligence, Valva and Pollina were allowed to continue to abuse, starve and torture the Valva children with impunity for two more years, until Tommy's death at January 17, 2020.

**McCabe Continues to Improperly Interject Herself into the Family Court Proceedings, <u>Despite Having No Legal Authority to Do So.</u>**

196.     Apart from Clark, Ratje and Halpern, defendant McCabe played a significant role in the Neglect Petition against Plaintiff. Even though the Family Court matter was in Suffolk County -- and McCabe had no lawful authority in this jurisdiction -- McCabe implored Justice Cheng to remain on the case as the AFC for the children, despite the fact that a new AFC, defendant Ethan Halpern, had already been appointed by the Court on January 17, 2018. Notwithstanding McCabe's efforts to continue to inject herself into the proceedings, Justice Cheng agreed with Plaintiff that there was a sufficient appearance of bias on McCabe's part to remove her from the Family Court proceedings.


197.     Further, McCabe spoke directly to Clark on multiple occasions, and improperly attempted to influence Clark by making false, dishonest and misleading statements about Plaintiff, including her mental health condition and her ability to act as a mother. McCabe also repeated many of the same lies that she had told during the matrimonial court proceedings against Plaintiff, and willfully concealed the evidence of Valva and Pollina's abuse that Plaintiff had provided to her. McCabe thus helped ensure that the Neglect Petition was continued against Plaintiff instead of being dismissed.

198.     McCabe also continued to tell blatant lies to the Court in the matrimonial proceedings against Plaintiff, even after such proceedings had been *stayed* by Nassau County Supreme Court Judge Lorintz pending the resolution of the Neglect Petition. For example, in an

Affirmation dated August 22, 2018, McCabe stated to Judge Lorintz, under oath, that Plaintiff "has not seen or called the boys since New Year's Eve" and has not "made any effort to receive information from [the children's] school or doctors and has not sent cards or gifts for holidays or birthdays." These claims were outright fabrications – as defendant McCabe well knew -- and were intended by McCabe to mislead and deceive the Court into thinking that Plaintiff was a "bad mother" who didn't care about her children at all.

199.    In fact, contrary to McCabe's lies, during Plaintiff's visitations with her children, she repeatedly gave the children books, toys and clothing. However, the children were extremely fearful of Valva and Pollina, and were afraid to take these gifts back home, because they feared that they would be punished by Valva and Pollina.

200.    In this same Affirmation, McCabe also lied to the Court about the children's fear of their mother and their desire to live with their father instead. Specifically, McCabe told Judge Lorintz, under oath, that "[t]hese young boys individually and private have expressed to me that they do not want to see their mother and they have stated reasons for this position." However, as Mccabe *well knew* – since Plaintiff had provided her proof in the form of audio recordings and certified transcripts -- Valva and Pollina had deliberately and repeatedly attempted to brainwash the children to say bad things about their mother. McCabe failed to disclose this material evidence to Judge Lorintz.  Instead, McCabe suggested that Plaintiff herself had mental health issues and was in need of some type of  "psychological evaluation." (Id.)

201.    McCabe also painted a completely distorted, and wildly inaccurate, portrait of the children's happy lives in Valva and Pollina's home.  For example, in the same Affirmation dated August 22, 2018, McCabe stated that the children were "all performing well in school," were "comfortable and assimilated into the household," "celebrated the holidays" and "enjoyed eating."

In fact, at the *same time* McCabe wrote these words, the children were being starved to death and were being mentally, physically and sexually abused by Valva and Pollina.

**Finding Valva's Allegations to Be "Less than Credible," Judge Cheng Dismisses the Neglect Petition in its Entirety.**

202. Notwithstanding the false, misleading and dishonest testimony by Clark, which was approved and encouraged by her supervisors Heepe and Leto, and the manufactured claims of "mental illness" by Lanz, Estrada and Ratje, on April 12, 2019, Judge Bernard Cheng, J.F.C., dismissed the Neglect Petition against Plaintiff in its entirety, finding that the accusations that had been against Plaintiff were baseless.

203. Specifically, in his Decision and Order ("Order") dated April 12, 2019, Judge Cheng found that there was "*no evidence* to support the father's testimony." (Order at 17) (emphasis supplied). In reaching this conclusion, Judge Cheng explained that he "found Mr. Valva's testimony *less than credible*. His testimony appeared to change when asked for elaboration …. The Court also found it "curious why neither the father nor Ms. Pollina took any pictures of these injuries to document the mother's alleged abuse." (Id. at 17-19).

204. Further, contrary to the manufactured claims of Ratje and Clark, Judge Cheng specifically found that "there is *no evidence* the mother suffers from a mental illness." (Id. at 19) (emphasis supplied). As Judge Cheng noted, "the Court had the opportunity to observe Mrs. Zubko-Valva during the pendency of this case and during her testimony. She [] was focused, goal-directed and clear. There was *no evidence presented that she suffered from mental illness*. There was insufficient evidence to show Mrs. Zubko-Valva's mental health was impaired or that her mental health placed the children at imminent risk of harm." (Id. at 21) (emphasis supplied). Indeed, the testimony of other witnesses, such as Kimberly Berens, PhD, and Kathy Izzo, provided clear and persuasive evidence that Plaintiff was, in fact, a loving, caring and devoted mother. Thus,

Judge Cheng concluded that "in sum, the record as a whole *does not support a finding of neglect*." (Id. at 22) (emphasis supplied).

**Plaintiff is Further Vindicated When an Administrative Law Judge Determines that CPS Should Not Have "Indicated" Plaintiff on Abuse Charges in the First Place.**

205.    Apart from Judge Cheng's dismissal of the Neglect Petition, Plaintiff received further vindication when she was completely cleared of CPS's neglect charges by Administrative Law Judge ("ALJ") Laureen M. Mannino.

206.    In a decision dated July 16, 2019, Judge Mannino specifically found that CPS "*did not meet its burden of presenting a fair preponderance of the evidence that [Plaintiff] committed the maltreatment and/or abuse alleged*." (emphasis supplied).  Accordingly, Judge Mannino found that the original determination made by CPS -- namely, that Plaintiff should be "indicated" on the child abuse and neglect charges filed by Valva on October 31, 2017 (SCR Case ID # 26842035) -- was unfounded and should be amended to vacate this finding.[3]

207.    Stunningly, prior to Judge Mannino's ruling, the CPS Defendants did not even *attempt* to argue to ALJ Manning that there was sufficient evidence to support the abuse and neglect charges that they had filed against Plaintiff. See id. at 2 ("The Agency's representative advised the Administrative Law Judge by email of June 21, 2019 that it was not presenting *any evidence* in support of the indicated report.") (emphasis supplied).

208.    Thus, after having forced Plaintiff to defend herself against a completely baseless Neglect Petition -- and after having succeeded in obtaining a temporary Full Stay Away Order of Protection which barred Plaintiff from having *any* unsupervised visits with her children – the CPS Defendants essentially waived the white flag, and conceded that, in fact, the entire Neglect Petition

---

3 An "indicated report" means a report made "if an investigation determines that some credible evidence of the alleged abuse or maltreatment exists." SSL § 412(7).

should never have been brought in the first place.[4]

209. While Plaintiff was ultimately vindicated by the rulings of Justice Cheng and ALJ Mannino, she suffered greatly as a result of having to defend herself against the baseless charges filed by the CPS Defendants against her.

210. As a direct consequence of the misleading and perjured evidence submitted by Clark, Lanz, Estrada and Ratje, Plaintiff was required to defendant herself in two separate neglect trials. During this time period, which spanned 16 months, Plaintiff was not able to see her children at all, and even after the Neglect Petition was dismissed, she still was deprived of the custody of her children. To this day, Plaintiff is still trying to overcome the damage of the Neglect Petition and regain full and permanent custody of her surviving children Anthony and Andrew.

**Despite Clear and Shocking Evidence of Abuse, the School Defendants Turn a Blind-Eye and Fail to Protect the Children.**

211. Apart from McCabe's lies, and the shocking indifference of the CPS Defendants, there were other parties whose actions caused and contributed to Tommy's death, and the suffering of all three children, and Plaintiff herself.

212. Specifically, defendants East Moriches School District, Principal Edward Schneyer, Individually and in his Official Capacity, and School Superintendent Charles Russo, Individually and in his Official Capacity (collectively, the "School Defendants"), exhibited a shocking and deliberate indifference to the health, safety and welfare of Plaintiff's children.

213. From the time that Valva first took custody of the children in September 2017, until the time of Tommy's death in January 2020, Valva and Pollina repeatedly abused, tortured and

---

4 In light of this concession, the CPS Defendants should be collaterally estopped from relitigating the issue of whether or not there was sufficient evidence to have indicated Plaintiff on abuse and neglect charges. Since Judge Mannino found that there was insufficient evidence to support these charges – and since the CPS Defendants had a full and fair opportunity to contest this issue, but failed to do so – this factual determination has now been resolved in Plaintiff's favor, and should not be relitigated in this action.

starved all three children.

214.     Throughout this time period, Plaintiff Justyna Zubko-Valva provided the School Defendants with overwhelming and irrefutable evidence of abuse -- just as she had done with the CPS Defendants -- including documentary evidence, audio recordings and transcriptions, photographic evidence, and medical evidence.

215.     Further, Plaintiff Justyna Zubko-Valva provided the School Defendants with her children's own recorded statements, which documented and confirmed the physical and mental abuse that Valva and Pollina were inflicting upon them.

216.     In fact, Plaintiff was so worried over the abuse being inflicted upon her children that she actually warned the School Defendants that her children were in "*enormous danger of losing their lives* by Michael Valva and Angelina Pollina."  Tragically, this warning proved to be true with respect to Tommy.

217.     Notwithstanding Plaintiff Justyna Zubko-Valva's repeated warnings, and the overwhelming evidence of abuse that Plaintiff Justyna Zubko-Valva had provided to them, the School Defendants -- just like the CPS Defendants -- did absolutely nothing.

218.     Rather than taking action to protect the children, and report the multiple complaints of abuse that had been made – as they were *required* to do under New York State Social Services Law – the School Defendants hid the truth about the children's health and fabricated false, misleading and dishonest reports about her children.

219.     In so doing, Defendants flagrantly violated their legal duties under New York State Law and exhibited a shocking indifference to the health, safety and welfare of Plaintiff Justyna Zubko-Valva's children.

**The Children are Literally Starving to Death, but the School Defendants Fail to Report Valva to the Authorities or Take Other Meaningful Action.**

220.    Apart from Plaintiff's complaints to the School Defendants – which provided *actual notice* of the abuse of the children – there were multiple and repeated red flags of abuse that the School Defendants deliberately and willfully ignored.

221.    Plaintiff's children were literally starving to death, were coming to school crying, hungry, without breakfast, sick for numbers of weeks without proper medical care and rest, with visible dirt on their bodies, and with no muscle tone whatsoever.

222.    Further, the children were coming to school with urine-soaked clothes and wearing diapers -- having bathroom accidents and not being able to control their bowel movements -- despite having been potty trained since two (2) years of age.  The children often came to school so soiled that school employees could smell urine and feces about their bodies.  In fact, on one occasion, Tommy came to school so soiled that the urine was swishing in his sneakers.   Valva and Pollina either refused to bring clean clothes up to the school, or would wait an excessively long time before doing so.

223.    The children's starvation was painfully obvious to anyone who observed them. In fact, many times during school hours, the children were seen picking up crumbs off of the floor and scrounging through the garbage looking for food.  The situation got so bad that one of the children's teachers, Ms. Nicole Papa, started buying them snacks and juices. Another schoolteacher, school psychologist Renee Emin, spoke to Valva and explained to him that the children were hungry and needed more food.  Valva did nothing in response.

224.    The boys were unbearably thin and cried if they were denied food.  For children who should have been gaining weight as they grew taller, in one year's time, Anthony lost 20 pounds.  And Tommy lost a great deal of weight at well.  The boys were weighed by the school

48

district and thus the School Defendants had actual knowledge of their starvation and undernourishment.

225.     In January 2018, the School Defendants saw clear, irrefutable proof that Tommy had been physically beaten and abused by Valva, with severe bruising in his lower spine and buttocks area.  Despite seeing this evidence, the School Defendants did absolutely *nothing* to help Tommy or his brothers.

226.     In fact, it was not until September 27, 2018 that the East Moriches Elementary School Staff filed its first report on the CPS hotline.   The first CPS report was filed by school psychologist Renee Emin on the CPS hotline.  Thus, for an entire year, from September 2017 to September 2018, *no complaints* had been filed by the School Defendants to help the children.


227.     During this time period, the School Defendants purposely hid the fact that the children were being abused and failed to call the CPS hotline as mandated reporters.  Further, the School Defendants, believing that it would reflect poorly on the School, did not instruct the children's teachers and school personnel to call the CPS hotline and report the abuse.

228.     By the fall of 2018, Valva and Pollina's abuse of the children had become so severe that a number of the children's teachers felt compelled -- despite the complete absence of rules, regulations, procedures, guidelines and/or directives from the School Defendants -- to file their own complaints with CPS.  These complaints were known by CPS, and in fact, were included in the three court-ordered CPS investigations and reports ("1034 Reports") that Justice Cheng had ordered CPS to undertake.

229.     Specifically, East Moriches Elementary School teachers Jennifer Holborow, Jean Rakowski, Michelle Caglianao, and school psychologist Ms. Renee Emin all filed reports with

CPS. The children's pediatrician, Susan Walker, M.D, and their pediatric neurologist, Dr. Tejwant Bindra, also filed complaints with CPS.

**The Court-Ordered Investigative Reports by CPS Confirm that the Children Are Being Severely Abused by Valva and Pollina, but Still Nothing is Done.**

230.    As a result of these multiple complaints, CPS was ordered by the court to conduct an investigation into this matter.    Thereafter, CPS generated investigative 1034 Reports on October 2, 2018,  October 15, 2018,  and on March 5, 2019, which contained a plethora of statements from the children's teachers and doctors that confirmed that the children were, in fact, being abused, tortured and starved by Valva and Pollina.

231.    For example, in the CPS 1034 Report dated October 15, 2018, Defendant Lantz documented the following highly disturbing claims being made by teachers at the children's school: i)  "Ms. Emin (school psychologist) reports that she and the teachers of Anthony and Thomas are all concerned as the children have *lost a noticeable amount of weight* and are both very thin and constantly asking for food"; ii) Ms. Rakowski (Anthony's special education teacher) stated that "she has concerns for Anthony", that he "looks emaciated" and "shoves food in his mouth as fast as he can";  iii) Ms. Cagliano (Thomas' teacher) stated that she had "witness[]  Thomas *eat crumbs off the floor* and *out of the garbage*; iv) Ms. Cagliano further express "concerns that Thomas has been sent to school in a wet pull-up" and that he is "not allowed to go to the nurse's office to take it off."; v) Ms. Holborow (Anthony's teacher) indicated that she is "concerned as Anthony is very thin, has little to no affect, [and] has been observed snatching food off the desks and off the floor."

232.    In the same CPS 1034 Report, dated October 15, 2018, Defendant Lantz further documented evidence from the children's doctors that the children were severely undernourished. Specifically, Dr. Walker reported that he had "concerns" about both Anthony and Thomas, as

"both children [were] underweight with their BMI being in the 1st percentile."

233.    In another Court-ordered 1034 Report, dated March 6, 2019, CPS documented clear and unmistakable evidence that Anthony was being physically abused by Valva and Pollina. Specifically, in this report, Anthony had *visible bruises* on his "buttocks, arms, and upper thighs," which were "unexplained." When asked about these bruises, Valva claimed, incredibly, that "the bruising on Anthony buttocks and upper tights are a result of pimples that Anthony is getting on his bottom due to soiling himself."

234.    With respect to the bruises on Anthony's arms and on other areas, Valva "reported that Anthony picks at himself due to the autism, which leads him to having bruises on his arms and other areas."  (Id.) Despite the fact that Valva had previously been indicated for Excessive Corporal Punishment on Tommy in January 2018 -- which had left Tommy with multiple lacerations, bruises and welts – CPS blindly accepted these lies by Valva, rationalizing this decision by pointing to the fact that "the children have continually denied any use of physical discipline being used in the home...." Despite the clear and obvious evidence of abuse, neither the School Defendants nor the CPS Defendants took any action to protect the children.

235.    In this same report, it was also noted that Thomas gave "contradicting explanations for a black eye" following "an SCR report received on 1/16/19." Still, neither the School Defendants nor the CPS Defendants took any action to protect the children.

236.    In this same 1034 report, it was further noted that on February 27, 2019, another report had been  filed with CPS that alleged that  "Anthony has been coming to school with his clothes and backpack soaked in urine" and that notwithstanding this fact,   Valva and Pollina have "fail[ed] to address the concerns."

237.     Notwithstanding the evidence contained in these court-ordered CPS investigative

reports, the School Defendants, and in particular, Defendant Schneyer and Russo -- who were both fully aware of the facts documented in the reports, but completely disregarded the evidence of abuse that was provided by the school's teachers -- continued to deny that there was anything wrong with the children.

238.    In fact, Defendant Schenyer -- worried about the image of the School, and putting its own interests above the safety of the children -- repeatedly and brazenly lied to Plaintiff, telling her that there was no evidence of abuse and that the children were in good health and safe. The objective evidence proved otherwise.

239.    By November 2018, the children were literally starving to death. Anthony had a Body Mass Index ("BMI") BMI of only .57 percent, Thomas had a BMI of only 1.32 percent and Andrew had a BMI of only 15 percent. Still, the School Defendants, and in particular, Principal Schneyer, willfully continued to ignore the problem and deny that there was anything wrong, and continued to lie to Plaintiff that the children were safe and healthy.

240.    The willful and deliberate indifference of the School Defendants allowed the abuse, torture and starvation of the children to continue unabated, and get worse and worse over time. Despite their status as mandatory reporters, and despite their direct knowledge of the abuse suffered by the children -- as documented by multiple teachers at the East Moriches Elementary School -- neither Schneyer nor Russo ever called the CPS hotline, *even once*, to report the shocking condition of the children to CPS, or to law enforcement authorities.

**Defendants Schneyer and Russo Block Plaintiff From Visiting Her Children in School in the Presence of Their Teachers, Further Impeding Her Efforts to Stop the Abuse**

241.    In an effort to protect her children, and stop the abuse from getting any worse, Plaintiff tried repeatedly to arrange for short visits with her children at East Moriches Elementary School, in the presence of their teachers, as well as to have brief conversations with children's

teachers after seeing her children. Toward this end, Plaintiff sent repeated emails to Defendant Schneyer and Defendant Russo, imploring them to allow her to visit her children at school, under the supervision of their teachers, even for just five minutes.

242. However, both Defendant Schneyer and Defendant Russso repeatedly rebuffed Plaintiff's efforts to meet with her children, under the supervision of their teachers, at the school. At first, they told her, falsely, that Plaintiff had been barred by the Court from visiting her children at school. This was an outright fabrication.

243. In fact, by court Order dated March 6, 2018 -- a copy of which Plaintiff had provided to the school -- Plaintiff was expressly permitted to have unsupervised visitations with her children without any restriction. This order did not contain *any* provision that barred Plaintiff from being around her children at school.

244. Thereafter, Principal Schneyer repeatedly told Plaintiff that, under the rules of the School, parents were not allowed to visit their children during the day. Despite Plaintiff's continuous requests to see documentation of this "rule," Scheneyer refused to do so, implicitly conceding that no such rule actually existed.

245. As a result of the School Defendants' repeated denials of Plaintiff's requests, Plaintiff was never able to see her children at school, even once, in the presence of their teachers. As a result, the School Defendants willfully prevented Plaintiff from taking actions to protect the health, safety and welfare of her children.

246. Further, the School Defendants repeatedly obstructed, and interfered with, Plaintiff's rights to see the medical records that had been generated by school nurse Betty Grunseich. These records, which Defendants subsequently claimed were "lost," would provide further evidence of the physical abuse and starvation suffered by Plaintiff's children.

**The Evidence of Physical Abuse is Readily Visible, But Still the School Defendants do Nothing**

247.    Both Tommy and Anthony were subjected to severe physical punishment by Valva and Pollina.  They were slapped and punched, and were carried by the wrist with their feet not touching the floor.  Tommy was thrown and dragged down a flight of stairs.

248.    The boys would arrive at school with scratches, bruises and cuts.  Tommy, in particular, had a mark on his bottom and lower spine, which he indicated to school officials was inflicted by his father, Michael Valva.

249.    In the early fall of 2019, Tommy had a bump, a bruise and hair pulled from his head at the root.  In mid-November 2019, both Anthony and Tommy came to school with bruises all over their faces and varying explanations from the children and Valva, as to how they were sustained.

250.    Valva had threatened the children with severe punishment if they told the truth about how they sustained their injuries, so the children said nothing and/or made up stories about what had happened when asked.  The School Defendants knew, or should have known, that the children's stories about what had happened were made up out of fear of reprisals by Valva and Pollina should they tell the truth about what had actually happened.

251.    In another instance, Anthony came to school walking in a markedly impaired manner, bent over at the waist, with visible finger marks on his arms, and complaining that his bottom hurts.  The teachers at the school had to place ice on his bottom to help stop the enormous pain that he was experiencing.

252.    Notwithstanding the clear and obvious signs of abuse, the School Defendants did nothing.  Despite their status as mandatory reporters, the School Defendants essentially viewed the children's abuse as "not our problem," and did not take any action whatsoever to protect the

54

children from further abuse, torture and starvation.

253.     Had the School Defendants acted in a timely manner, they could have prevented Tommy's death and could have prevented years of beatings, abuse and starvation for all three children.  But the School Defendants, in a flagrant violation of their duties under the law, chose instead do nothing. The School Defendants *never once* contacted local law enforcement authorities to alert them of the situation and ask them to take action.

## CPS Has One Last Chance to Save Tommy, But Defendant Montague Shuts Down the Investigation and Tommy Dies Less than 10 Days Later.

254.     On January 8, 2020, Defendant Jean Montague, as supervisor of Defendant Lydia Sabosto, decided to unlawfully close out the last CPS report that had been filed on the CPS hotline on November 18, 2019.  This was a disastrous decision.

255.     Plaintiff had spoken on the phone twice to Ms. Montague and begged her to not close down the investigation relating to her children.  Plaintiff reminded Montague of the long history of documented abuse by Valva and Pollina, and told her she was extremely worried about the safety of her children.

256.     Montague ignored Plaintiff's pleas, and decided to shut down the CPS investigation on January 08, 2020, even though the report *should* have remained open for 60 days -- from November 18, 2019 until January 18, 2020 -- pending further investigation by CPS.  This was the last chance to save Tommy's life.  Less than ten days later, Tommy would be dead.

## Tommy Freezes to Death as a Result of Valva and Pollina's Cruel, Callous and Inhumane Punishment

257.     Apart from being beaten and starved, the children were also subject to cruel and barbaric forms of punishment, such as forcing the children to eat hot pepper powder, denying the

children access to the bathroom, and/or leaving them home alone without any food or water.

258.    If the children ever attempted to open the refrigerator to get something to eat or drink without permission, Valva and Polina would severely punish them, making them stand at attention in the freezing cold garage and/or  hosing the children down with water in the backyard in freezing cold temperatures.

259.    Another barbaric form of punishment that Valva and Pollina would often use was to lock the children in the garage and force them to sleep in subfreezing temperatures, on a cold cement slab.

260.    During such lockdowns, Valva and Pollina refused to allow the children access to the bathroom, and did not give them any food or water. Worse still, the children were forced to sleep in this cold garage without a mattress, without sheets, without blankets and without even adequate clothing to try to keep them warm. If the children complained about this form of discipline, then they would be subjected to even longer, and more severe, forms of punishment.

261.    Valva and Pollina used this type of extreme punishment so often that they actually referred to the garage as the "kids room" on their internal security system.

262.    It was extremely foreseeable that the children would suffer grave harm and/or death as a result of being forced to sleep in a subfreezing garage without food, water or proper clothing. Tragically, just as Plaintiff had predicted in one of her emails to Schneyer many months before – when she had warned him that her children were in "*enormous danger of losing their lives* by Michael Valva and Angelina Pollina" – this is exactly what happened.

263.    On January 17, 2020, after being subjected to years of severe physical, mental and sexual abuse by Valva and Angela Pollina, Tommy froze to death in the garage at Valva's home. Tommy, who was by all accounts a warm, loving, sweet and absolutely adorable child, was just 8

56

years old at the time of his death.

**Tommy's Shocking Condition Upon Arrival at the Hospital, and Valva's Lies About What Caused His Death**

264.    Upon his arrival at the hospital, Tommy had an internal temperature of <u>76.1 degrees</u> Fahrenheit, and was completely non-responsive. Tommy had literally frozen to death.

265.    Thereafter, Valva lied about the cause of Thomas' death, telling hospital workers that Tommy, on his way to the school bus, was "running and tripped and struck his head on the cement ground" in the driveway.

266.    However, the hospital workers noted that, in fact, there were "no abrasions to hands or knees indicating that the patient fell."

267.    Thomas was noted to have multiple abrasions on the top of his hairline and middle of his forehead, running down to the bridge of his nose.

268.    Some of these facial abrasions had scabs on them, indicating that they were older injuries.

269.    Further, Tommy was observed to have two large symmetrical bruises on his forehead at the Suffolk County Medical Examiner's Office. He also had multiple abrasions and cuts on his skin, which Plaintiff  and her mother observed herself at the Suffolk County Medical Examiner's Office on January 18, 2020.

**Valva's Horrific Abuse is Further Confirmed at the Arraignment**

270.    At Valva's arraignment, prosecutors revealed that Valva and Pollina had in fact joked about Thomas's condition on the morning that he died, saying that he had "face planted" to the ground due to the cold.

271.    At arraignment, it was also revealed that Valva and Pollina's horrific abuse was partially captured on Nest cameras that had been installed in every room of the house and in the

garage.

272.    Among other things, the videos recovered by police --despite Valva and Pollina's attempts to erase them and change the password – showed heartbreaking and incomprehensible events, including: i) Valva beating one of his children with a closed fist while screaming at him; ii) Tommy begging to be let out of his room to use the bathroom; iii) Tommy shivering and shaking in the garage, and holding himself, because he needed to use the bathroom, looking into the Nest camera with pleading eyes for someone to help him.

273.    On the morning of Tommy's death, security footage captured a conversation between Valva and Pollina, in which she asks him why Tommy fell to the ground. Valva answered, in a shocking display of callous and wanton indifference, "Cuz he was col*d. Boo-fkn-hoo. Now he's a bloody [f\*\*king] mess.*" Valva and Pollina have since been indicted on Second-Degree Murder for Tommy's death.

**The Deliberate Indifference of the CPS Defendants and the School Defendants, and The Gross Negligence and Willful Misconduct of All Other Defendants, Allowed Valva and Pollina to Get Away with Their Severe Abuse of the Children for years, and Directly Led to <u>Tommy's Death.</u>**

274.    Based on Defendants' repeated acts of gross negligence, recklessness, and intentional falsification of evidence, as well their repeated failures to act on documentary evidence of abuse -- such as the January 13, 2018 documented physical abuse of Tommy by Valva and Pollina -- and their failures to act complaints by Plaintiff Justyna Zubko-Valva, Tommy Valva was caused to suffer years of conscious pain and suffering, resulting in his tragic death on January 17, 2020. Tommy's two brothers, Andrew and Anthony, likewise suffered years of abuse, torture and starvation as a result of Defendants' gross negligence, recklessness, falsification of evidence and concealment of evidence.

275. Had Defendants acted on *any* of the evidence and complaints listed above, the children would have been removed from Valva's custody, and Thomas' tragic, needless, and entirely foreseeable death would have been avoided.

276. Further, as a result of Defendants' negligent, reckless and intentional acts of misconduct conduct, as set forth above, Plaintiff Justyna Zubko-Valva's two other minor children, Anthony, who was also diagnosed with Autism Spectrum Disorder, and Andrew, were subjected to years of extreme physical, emotional and sexual abuse, and were also starved, beaten and tortured, and were otherwise caused to suffer severe emotional distress and serious physical injuries.

277. Had Defendants acted on *any* of the evidence and complaints listed above, Andrew, Tommy and Anthony would have been removed from Valva's custody, and would not have endured the years of suffering and torture that they were forced to endure.

278. Based on Defendants' repeated acts of gross negligence, recklessness, and intentional falsification of evidence, as well their repeated failures to act on documentary evidence of abuse, Plaintiff herself suffered severe damages. Not only did she lose Tommy forever and the custody of her children for several years, but also, she was forced to endure two separate trials in order to defend herself against an utterly baseless, and maliciously instituted, Neglect Petition.

279. Had Defendants acted on *any* of the evidence and complaints listed above, the children would never have been removed from Plaintiff's custody in the first instance, Plaintiff would not have been subjected to a such baseless and malicious Neglect Petition by the CPS Defendants, and Tommy would still be alive.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Deliberate Indifference under 42 U.S.C. §1983)
### (The CPS Defendants, the School Defendants, Defendant Donna McCabe,
### Ethan Halpern and Randall Ratje)

280.    Plaintiff JUSTYNA ZUBKO-VALVA repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "279" with the same force and effect as if fully set forth herein.

281.    For a period of over 2 years, Plaintiff JUSTYNA ZUBKO-VALVA repeatedly complained to Defendants, in writing and verbally, about the visible physical injuries on her children, including but not limited to, multiple bruises in green, brown, and red color, dark red marks, coagulated blood spots, broken blood vessels, caused by Valva's severe and brutal beatings.

282.    For a period of over 2 years, Plaintiff JUSTYNA ZUBKO-VALVA repeatedly complained to Defendants, in writing and verbally, that her children were coming to school crying and hungry, and were literally begging for food at school, eating crumbs off of the floor, eating out of garbage cans, and going under the bleachers in the gym to try to find food.

283.    For a period of over 2 years, Plaintiff JUSTYNA ZUBKO-VALVA repeatedly complained to Defendants about the fact that her children were repeatedly coming to school with visible dirt on their bodies, and in urine-soaked clothes.

284.    For a period of over 2 years, Plaintiff JUSTYNA ZUBKO-VALVA repeatedly complained to Defendants that her children had experienced marked and severe weight loss since living with their father, with Anthony and Thomas having a BMI of less than one (1) percent.

285.    For a period of over 2 years, Plaintiff JUSTYNA ZUBKO-VALVA repeatedly complained to Defendants about the fact that her children were coming to school wearing diapers -- having bathroom accidents and not being able to control their bowel movements -- despite having been fully potty trained since two (2) years of age.

60

286.     For a period of over 2 years, Plaintiff JUSTYNA ZUBKO-VALVA repeatedly complained to Defendants that the children were repeatedly forced to sleep in subfreezing temperatures on a cement slab in the garage.

287.     For a period of over 2 years, Plaintiff JUSTYNA ZUBKO-VALVA repeatedly complained to Defendants about that the children were locked in the garage without any food, water, pillows or blankets, and without any access to a bathroom.

288.     For a period of over 2 years, Plaintiff JUSTYNA ZUBKO-VALVA repeatedly complained to Defendants her children appeared to have marked and severe loss of muscle tone throughout their bodies.

289.     For a period of over 2 years, Plaintiff JUSTYNA ZUBKO-VALVA repeatedly implored Defendants to take action and remove the children from the home of Valva and Pollina.

290.     For a period of over 2 years, Plaintiff JUSTYNA ZUBKO-VALVA provided Defendants with overwhelming and irrefutable evidence of abuse, including documentary evidence, audio recordings and transcriptions, photographic evidence, and medical evidence.

291.     Further, Plaintiff JUSTYNA ZUBKO-VALVA provided Defendants with her children's own recorded statements regarding the enormous physical and mental abuse of that they were suffering at the hands of Valva and Pollina.

292.     Plaintiff JUSTYNA ZUBKO-VALVA also specifically warned Defendants, verbally and in writing, that her children were in "enormous danger of losing their lives by Michael Valva and Angelina Pollina."

293.     Notwithstanding Plaintiff JUSTYNA ZUBKO-VALVA's repeated warnings, and the overwhelming evidence of abuse that Plaintiff JUSTYNA ZUBKO-VALVA had provided to Defendants as proof that her children were being severely abused by Valva and Pollina, Defendants

did absolutely nothing.

294.    Rather than taking action to protect the children, and report the multiple complaints of abuse that had been made – as they were *required* to do – Defendants hid the truth about the children's health and fabricated false, misleading and dishonest reports about Plaintiff JUSTYNA ZUBKO-VALVA and her children.

295.    Defendants not only refused to remove Plaintiff JUSTYNA ZUBKO-VALVA's children from the custody of Valva and Pollina, but also, suppressed, destroyed and falsified evidence, thereby ensuring that Claimant's children would remain with Valva.

296.    In so doing, Defendants  a deliberate and willful indifference to the health, safety and welfare of Plaintiff JUSTYNA ZUBKO-VALVA''s children.

297.    As a result of Defendants' deliberate, intentional and and/or reckless acts of misconduct conduct, as set forth above, Plaintiff JUSTYNA ZUBKO-VALVA's eight-year-old son, Tommy, a special needs child on the Autism Spectrum Disorder, died of hypothermia on January 17, 2020, after being forced to spend the night in a freezing cold, unheated garage at Valva's home, where temperatures plummeted to 19 degrees Fahrenheit outside.

298.    As a result of Defendants' deliberate, intentional and and/or reckless acts of misconduct conduct, as set forth above, Plaintiff JUSTYNA ZUBKO-VALVA''s three young children, including Tommy and his two siblings, Anthony and Andrew, were tortured, beaten, physically, mentally and sexually abused, and starved at the hands of Valva and Pollina for over two years, from September 2017 to January 2020.

299.    The aforesaid actions by the Defendants constituted a deprivation of Plaintiff's children's rights, privileges and/or immunities secured by the Constitution and laws of the United States of America, and caused the death of Plaintiff's child Thomas, and caused Plaintiff's children

62

to suffer abuse, neglect, starvation, beatings, emotional distress, anguish and injury. The aforesaid actions by the Defendants further constituted a deprivation of Plaintiff's rights, privileges and/or immunities secured by the Constitution and laws of the United States of America.

### AS AND FOR A SECOND CLAIM FOR RELIEF
**(Malicious Prosecution Under 42 U.S.C. § 1983)**
**(The CPS Defendants, the School Defendants, Donna McCabe,**
**Ethan Halpern, Randall Ratje, Shana Curti)**

300.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "299" with the same force and effect as if fully set forth herein.

301.    Defendants misrepresented and falsified evidence throughout all phases of the matrimonial and family court proceedings (the "Civil Proceedings"), and intentionally misled all of the judges involved with these Civil Proceedings, including but not limited to, Justice Zimmerman, Justice Lorintz, and Justice Cheng.

302.    Defendants were directly and actively involved in the initiation of the Neglect Petition against Plaintiff JUSTYNA ZUBKO-VALVA.

303.    Defendants lacked probable cause, or any cause whatsoever, to initiate the Neglect Petition against Plaintiff JUSTYNA ZUBKO-VALVA.

304.    Defendants acted with malice in initiating the Neglect Petition against Plaintiff. JUSTYNA ZUBKO-VALVA.

305.    Defendants were directly and actively involved in the continuation of the Neglect Petition against Plaintiff JUSTYNA ZUBKO-VALVA.

306.    Defendants lacked probable cause, or any cause whatsoever, to continue the Neglect Petition against Plaintiff JUSTYNA ZUBKO-VALVA.

307.    Defendants acted with malice in continuing the Neglect Petition against Plaintiff JUSTYNA ZUBKO-VALVA.

308.   Defendants misrepresented and falsified evidence throughout all phases of the Neglect Petition proceedings against Plaintiff JUSTYNA ZUBKO-VALVA.

309.   Defendants misrepresented and falsified evidence against Plaintiff JUSTYNA ZUBKO-VALVA, hid the truth about the children's health, and fabricated false, misleading and dishonest reports about Plaintiff JUSTYNA ZUBKO-VALVA and her children, throughout all phases of the Civil Proceedings.

310.   As a result of the aforesaid actions by the Defendants, Plaintiff's children were summarily removed from her JUSTYNA ZUBKO-VALVA's custody without any notice, petition or hearing or Due Process, and thereafter, Plaintiff was subjected to an utterly baseless and unlawful Neglect Petition, which required her to make multiple court appearances and defend herself in two separate trials, spanning a period of 16 months.

311.   Notwithstanding the false, misleading, dishonest and unlawful conduct of Defendants, as described above, on April 12, 2019, Judge Cheng dismissed the Neglect Petition against Plaintiff in its entirety, finding that the accusations against Plaintiff were completely baseless.

312.   The aforesaid actions by the Defendants constituted a deprivation of the Plaintiff's children's rights, privileges and/or immunities secured by the Constitution and laws of the United States of America, and caused Plaintiff to be subjected to a completely baseless Neglect Petition, and to suffer severe emotional distress, anguish and anxiety.

### AS AND FOR A THIRD CLAIM FOR RELIEF
**(Fabrication of Evidence/Denial of the Right to a Fair Trial Under 42 U.S.C. § 1983)**
**(The CPS Defendants, the School Defendants, Donna McCabe and Shana Curti, Ethan Halpern and Randall Ratje)**

313.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "312" as if the same were more fully set forth at length herein.

64

314.     Defendants misrepresented and falsified evidence about Plaintiff, JUSTYNA ZUBKO-VALVA, hid the truth about the children's health, and fabricated false, misleading and dishonest reports about Plaintiff JUSTYNA ZUBKO-VALVA and her children.

315.     Defendants forwarded this false evidence to the Suffolk County Department of Social Services, and also presented this false evidence to multiple judges throughout the Civil Proceedings, including Judge Zimmerman, Judge Lorintz and Judge Cheng.

316.     As a result of the aforesaid unlawful actions by the Defendants, Plaintiff's children were summarily removed from Plaintiff's JUSTYNA ZUBKO-VALVA's custody without any notice, petition, hearing or Due Process, and Plaintiff thereafter was subjected to an utterly baseless and unlawful Neglect Petition, which required her to make multiple mandatory court appearances in order to defend herself in two separate neglect trials, spanning a period of 16 months. Further, as a result of Defendants' unlawful actions, Plaintiff JUSTYNA ZUBKO-VALVA was deprived of the lawful custody and visitation of her children for over two years.

317.     In creating false evidence against Plaintiff JUSTYNA ZUBKO-VALVA, and in forwarding false evidence to the Suffolk County Department of Social Services and/or presenting such false evidence to multiple judges throughout the Civil Proceedings, including Judge Zimmerman, Judge Lorintz and Judge Cheng, and in giving false and misleading testimony throughout the Civil Proceedings, Defendants violated Plaintiff's constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution.

318.     As a result of the foregoing, Defendants violated Plaintiff JUSTYNA ZUBKO-VALVA's federal rights, privileges and/or immunities as secured by the Constitution and laws of

65

the United States of America, and caused Plaintiff to suffer severe emotional distress, anguish and anxiety.

### AS AND FOR A FOURTH CLAIM FOR RELIEF
**(Malicious Abuse of Process Under 42 U.S.C. § 1983)**
**(The CPS Defendants, the School Defendants, Donna McCabe,**
**Ethan Halpern, Randall Ratje, Shana Curti)**

319.    Plaintiff JUSTYNA ZUBKO-VALVA repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "318" with the same force and effect as if fully set forth herein.

320.    The aforementioned individual Defendants issued legal process to remove Plaintiff's children from her custody, and subject JUSTYNA ZUBKO-VALVA Plaintiff to an unlawful and utterly baseless Neglect Petition that was intended to permanently deprive Plaintiff of her parental rights over her children.

321.    The aforementioned individual Defendants undertook these actions in order to obtain a collateral objective outside the legitimate ends of the legal process.  Specifically, Defendants acted in this manner in order to effectuate Valva and Curti's unlawful plan -- as set forth in Curti's letter to United Mortgage dated July 7, 2017 -- to permanently remove the children from Plaintiff's custody, and to ensure that Valva had sole custody of the children and marital residence.

322.    Further, the CPS Defendants also engaged in this plan to curry favor with the local police departments by protecting the rights and interests of "one of their own," Valva, who had been a police officer with the NYPD for 15 years, and to protect their own professional reputations for having failed to take any action to protect the health, safety and welfare of the Valva children.

323.    The aforementioned individual defendants acted with intent to do harm to Plaintiff JUSTYNA ZUBKO-VALVA, without excuse or justification.

66

324.     As a result of the foregoing, Plaintiff JUSTYNA ZUBKO-VALVA sustained, <u>inter alia</u>, mental anguish, shock, fright, apprehension, embarrassment, humiliation, and deprivation of her constitutional rights, and caused Plaintiff to suffer severe emotional distress, anguish and anxiety.

<u>**AS AND FOR A FIFTH CLAIM FOR RELIEF**</u>
**("Stigma Plus" Claim Under 42 U.S.C. § 1983)**
**(The CPS Defendants, the School Defendants, Donna McCabe,**
**Ethan Halpern and Shana Curti)**

325.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "324" as if the same were more fully set forth at length herein.

326.     Defendants misrepresented and falsified evidence Plaintiff JUSTYNA ZUBKO-VALVA, hid the truth about the children's health, and fabricated false, misleading and dishonest reports about Plaintiff JUSTYNA ZUBKO-VALVA and her children, and published these false claims to various third parties, including but not limited to  the Suffolk County Department of Social Services, Judge Zimmerman, Judge Lorintz and Judge Cheng, and to other third parties involved in the matrimonial and family court proceedings.

327.     The false information that Defendants provided to third parties about Plaintiff JUSTYNA ZUBKO-VALVA constituted defamation *per se*, and resulted in a loss of Plaintiff's constitutional rights, the destruction of her parental rights and/or the loss of various other tangible government-created rights that she otherwise would not have loss.

328.     The false allegations against Plaintiff JUSTYNA ZUBKO-VALVA were sufficiently derogatory to injure her reputation.

329.     As a result of defendants' statements to third parties, Plaintiff's JUSTYNA ZUBKO-VALVA reputation was severely and permanently damaged.

330.	To this day, Plaintiff JUSTYNA ZUBKO-VALVA is questioned as to *why* she lost custody of the children, and it is presumed by the public at large that Plaintiff must have been a "bad mother," or done something else wrong, to have had her children taken away by the court system in the first place.

331.	As a result of Defendants' materially false, misleading and dishonest statements to third parties, Plaintiff JUSTYNA ZUBKO-VALVA was deprived of her fundamental constitutional rights, lost custody of her children, was barred from seeing her children, had her parental rights altered, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, was forced to incur substantial expenses, and had her personal and professional reputation destroyed.

## AS AND FOR A SIXTH CLAIM FOR RELIEF
### (Violation of Due Process Under 42 U.S.C. § 1983)
### (Hope Schwartz Zimmerman)

332.	Plaintiff JUSTYNA ZUBKO-VALVA repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "331" as if the same were more fully set forth at length herein.

333.	As a result of Defendant Hope Schwartz Zimmerman's unlawful Order on September 6, 2017, Plaintiff JUSTYNA ZUBKO-VALVA lost custody of her children. Plaintiff would never regain custody of Tommy prior to his death on January 20, 2017, and would not regain custody of her two other children, Andrew and Anthony, until this date as well.

334.	Judge Zimmerman's Order was a flagrant violation of Plaintiff's constitutional rights under Due the Process. Specifically, Plaintiff, who was acting *pro se* throughout the Civil Proceedings and had no legal training whatsoever, was denied each and every one of the fundamental constitutional rights and safeguards that the Due Process Clause was intended to

68

protect, including but not limited to: i) notice; ii) an opportunity to be heard; iii) an opportunity to cross-examine adverse witnesses; iv) an opportunity to present material and exculpatory information; and v) notice of the right to appeal an adverse decision.

335.     Judge Hope Schwartz Zimmerman further violated Plaintiff's constitutional rights by issuing a Full Stay Away Temporary Order of Protection on September 6, 2017, thereby preventing Plaintiff from having *any* contact with her children.  Judge Zimmerman made this decision without any due process and without any evidence whatsoever.

336.     The effect of Judge Zimmerman's unlawful Order was to immediately take away Plaintiff's children, who had been under her care since they were born, and to deprive her of any contact with her children.  For 6 months, this Order prohibited Plaintiff from contacting her children and their special educational placements that they had attend for a couple of years.

337.     Judge Zimmerman's actions were unlawful and unconstitutional in every possible respect.  Judge Zimmerman lacked jurisdiction to summarily deprive Plaintiff of the custody of her children.  Her order was a grave miscarriage of justice, and it set in motion the chain of events that led to Tommy's death, and to all three children being abused,  starved, beaten and neglected for two years by Valva and Pollina.

338.     Based on the foregoing, Plaintiff JUSTYNA ZUBKO-VALVA seeks a Declaration from this Court that Judge Zimmerman violated Plaintiff's constitutional rights to Due Process when she issued an Order on September 6, 2017 -- without notice, without a petition, without a hearing, without an opportunity to be present evidence, without an opportunity to cross-examine adverse witnesses, and without notifying Plaintiff of her right to appeal -- that fully deprived

Plaintiff of the custody of her children and barred Plaintiff from seeing or having any contact with her children.[5]

### AS AND FOR A SEVENTH CLAIM FOR RELIEF
**(Conspiracy to Violate Plaintiffs' Civil Rights Under 42 U.S.C. § 1983)**
**(The CPS Defendants, the School Defendants, Donna McCabe, Shana Curti,**
**Ethan Halpern and Randall Ratje)**

339.     Plaintiff JUSTYNA ZUBKO-VALVA repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "338" as if the same were more fully set forth at length herein.

340.     Defendants conspired and acted in concert to do whatever was necessary, lawful or not, to deprive Plaintiff JUSTYNA ZUBKO-VALVA of her lawful parental rights and custodial rights over her children.

341.     Throughout the period of the conspiracy, Defendants pursued their objectives with actual malice toward plaintiff, with utter and deliberate indifference to and disregard for Plaintiff's rights under the Constitution and laws of the United States, without probable or reasonable cause to believe plaintiff guilty of any crime.

342.     Pursuant to the conspiracy, the conspirators, and their employees, agents and servants, intentionally, recklessly, negligently, and/or with complete indifference to the rights of plaintiff: (a) manufactured false evidence; (b) pressured, intimidated, threatened, coerced and induced the Valva children to give untruthful, erroneous, incomplete and/or misleading statements and testimony; (c) failed to correct such false statements and testimony; and (d) withheld from the courts and/or the Suffolk County Department of Social Services, evidence favorable to Plaintiff

---

5 Since the Complaint in this action seeks declaratory relief against Judge Zimmerman, Plaintiff's claims against Judge Zimmerman are *not* barred by the doctrine of judicial immunity. See Rolle v. Girardi, 689 Fed. Appx. 65 (2d Cir. 2017) ("Because Rolle sought only injunctive and declaratory relief, the district court erred in dismissing on the basis of judicial immunity."), citing Pulliam v.Allen, 466 U.S. 522, 541-43 (1984).

on the issue of her innocence in the Neglect Proceedings.

343. The aforesaid conduct of Defendants operated to deprive Plaintiff JUSTYNA ZUBKO-VALVA of important and well-established rights under the Constitution and the laws of the United States including, but not limited to, her rights:

(a) Not to be deprived of her parental rights, parental rights, parental custody without Due Process of Law under the Fifth and Fourteenth Amendments to the United States Constitution;

(b) Not to be subjected to an unlawful and unconstitutional Order, on September 6, 2017, that took away her children and granted temporary custody of the children to Valva, without any notice, without any formal court-filed accusation of wrongdoing against Plaintiff, without any Family Offense Petition filed against Plaintiff, without any hearing whatsoever and without any supporting evidence against Plaintiff;

(c) Not to be subjected to a completely fictional temporary Full Stay Away Order of Protection against Plaintiff that was not recorded in the Court's minutes, the Department of Justice Registry or the Police Registry;

(d) Not to be deprived of her liberty, in the form of making mandatory court appearances to defend herself against the baseless Neglect Petition, based upon evidence fabricated by a government official; and

(e) Not to be deprived of her right to the timely disclosure of all evidence favorable to the defense on the issues of culpable conduct and/or criminal liability, pursuant to the due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution, and to Brady v. Maryland, 373 U.S. 83 (1963), and its progeny.

344. As a result of the foregoing, Plaintiff JUSTYNA ZUBKO-VALVA was deprived of her parental rights, was deprived of custody of her children, was deprived of her right to freely see and visit her children, was denied her liberty, was denied fundamental constitutional rights, was publicly embarrassed and humiliated, was caused to suffer severe emotional distress, and anxiety.

### AS AND FOR AN EIGHTH CLAIM FOR RELIEF
### <u>MUNICIPAL LIABILITY</u>
### (Suffolk County and the CPS Supervisory Defendants)

345.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "344" as if the same were more fully set forth at length herein.

346.    Defendants knew about the grave risk of harm faced by children who are abused physically, mentally, and/or sexually by their parents and/or other adults, and on whose behalf complaints with CPS have been filed.

347.    Notwithstanding this knowledge, Defendants failed to properly train their CPS workers how to properly detect signs and symptoms of physical, emotional, and sexual abuse of the children that they were supposed to safeguard, especially with respect to autistic children.

348.    Defendants also failed to properly train their CPS workers how to asses when children are making false claims of abuse and/or false denials of abuse.

349.    Defendants also failed to properly train their CPS workers on the full scope of their duties toward children, including but not limited to: i) the duty to make a full and complete disclosure to the Court of all evidence showing abuse;  ii) the duty to avoid concealing and/or misrepresenting the truth about the evidence of abuse;  iii) the duty to avoid giving preferential treatment toward one litigant over the others.

350.    Apart from the foregoing violations,  Defendants further failed to implement rules, regulations, policies, procedures and/or guidelines as to how to properly assess children who are on the Autism spectrum, including but not limited to, how to properly:

        a)      interview autistic children who may be the victim of abuse;

        b)      verify the claims of autistic children who may be the victim of abuse;

        c)      assess the veracity of autistic children who deny that they have been abused;

      d)      determine whether or not a CPS case should be closed out; and

      e)      determine whether or not a CPS case should be investigated further.

351.    Further, Defendants failed to implement rules, regulations, policies, procedures and/or guidelines as to how to take into account allegations of abuse that are made in the context of a matrimonial and/or family court dispute between the parents, including but not limited to, how to properly:

     i.      determine whether a false claim of abuse has been made by one parent or custodian of the children to gain a tactical advantage over the other parent or custodian;

     ii.      determine whether or not a false claim of abuse has been influenced by on ongoing matrimonial dispute;

     iii.      determine whether or not a false claim of abuse has been influenced by on ongoing custody dispute;

     iv.      determine whether or not a CPS complaint should be closed out;

     v.      determine whether or not a CPS should be investigated further; and

     vi.      determine whether or not a CPS Neglect Petition should be filed.

352.    In failing to properly train CPS employees, and in failing to implement necessary and proper rules, regulations, guidelines and procedures, as set forth above, Defendants exhibited a deliberate indifference to the health, safety and welfare of all abuse children who come under the supervision of Suffolk County Child Protective Services, including but not limited to, the Plaintiff and her three children.

353.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as CPS officials and/or employees of defendant COUNTY OF SUFFOLK, with all the actual and/or apparent authority attendant thereto.

354.    The acts complained of were carried out by the aforementioned individual

defendants in their capacities as defendant CPS officials and/or employees of the COUNTY OF SUFFOLK pursuant to the customs, policies, usages, practices, procedures, and rules of defendants COUNTY OF SUFFOLK, all under the supervision of ranking officers of said departments.

355.    The aforementioned customs, policies, usages, practices, procedures and rules of the defendants COUNTY OF SUFFOLK, include, but are not limited to, the unconstitutional practices identified above.

356.    The foregoing customs, policies, usages, practices, procedures and rules of defendant COUNTY OF SUFFOLK constituted a deliberate indifference to the safety, well-being and constitutional rights of Plaintiff and her three children.

357.    The foregoing customs, policies, usages, practices, procedures and rules of defendant COUNTY OF SUFFOLK were the direct and proximate cause of the constitutional violations suffered by Plaintiff and her three children, as alleged herein.

358.    The foregoing customs, policies, usages, practices, procedures and rules of defendant COUNTY OF SUFFOLK were the moving force behind the constitutional violations suffered by Plaintiff and her three children, as alleged herein.

359.    As a result of the foregoing customs, policies, usages, practices, procedures and rules of defendants COUNTY OF SUFFOLK plaintiff's children were physically and mentally abused, were sexually assaulted, starved, beaten and tortured,  and suffered severe emotional distress, and Plaintiff was subjected to an utterly baseless and unlawful Neglect Petition, and was deprived of the custody of her children without any lawful basis.

360.    Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of Plaintiff and her three children.

74

361.     Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate municipal officials and/or employees, and were directly responsible for the violation of the constitutional rights of Plaintiff and her three children.

362.     All of the foregoing acts by defendants deprived Plaintiff and/or her three children herein of their federally protected rights, including, but not limited to, the right:

A.     Not to have parental rights terminated, suspended and/or abridged without Due Process of law;

B.     Not to have children removed from the custody of their biological parents without Due Process of law;

C.     Not to impose a Full Stay Away Order of Protection without Due Process of law;

D.     Not be subjected to excessive force;

E.     Not to have cruel and unusual punishment imposed upon them; and

F.     To receive equal protection under the law.

## AS AND FOR A NINTH CLAIM FOR RELIEF
## MUNICIPAL LIABILITY
### (The School District, Defendant Russo and Defendant Schneyer)

363.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "362" as if the same were more fully set forth at length herein.

364.     Defendants knew about the grave risk of harm faced by children who are abused physically, mentally, and/or sexually by their parents and/or other adults.

365.     Notwithstanding this knowledge, Defendants failed to properly train the School District employees on how to properly detect signs and symptoms of physical, emotional, and sexual abuse of the children that they were supposed to safeguard, especially with respect to autistic children.

75

366.     Defendants also failed to properly train their School District employees how to asses when children are making false claims of abuse and/or false denials of abuse.

367.     Defendants also failed to properly train their School District employees on the full scope of their duties toward children, including but not limited to: i) their duties as mandatory reporters to make a full and complete disclosure to CPS of any abuse of children which they know about or have reason to suspect;  ii) the duty to make a full and complete disclosure to law enforcement authorities when CPS complaints have not stopped the abuse;  iii) the duty to avoid concealing and/or misrepresenting the truth about the evidence of abuse; and iv) the duty to avoid giving preferential treatment toward one parent over the other in assessing whether or not there is evidence of abuse.

368.     Apart from the foregoing violations,  Defendants further failed to implement rules, regulations, policies, procedures and/or guidelines as to how to properly assess children who are on the Autism spectrum, including but not limited to, how to properly:

      a)     interview autistic children who may be the victim of abuse;

      b)     verify the claims of autistic children who may be the victim of abuse;

      c)     assess the credibility of autistic children who deny that they have been abused; and

      d)     determine whether or not law enforcement should be contacted.

369.      Further,  Defendants failed to implement rules, regulations, policies, procedures and/or guidelines as to how to take into account allegations of abuse that are made in the context of a matrimonial and/or family court dispute between the parents, including but not limited to, how to properly:

      a)     determine whether a false claim of abuse has been made by one parent to gain a tactical advantage over the other parent;

76

b)   determine whether or not a false claim of abuse has been influenced by on ongoing matrimonial dispute; and

c)   determine whether or not a false claim of abuse has been influenced by on ongoing custody dispute.

370.   In failing to properly train School District employees, and in failing to implement necessary and proper rules, regulations, guidelines and procedures, as set forth above, Defendants exhibited a deliberate indifference to the health, safety and welfare of all abused children who are under the supervision of the School District.

371.   The acts complained of were carried out by the aforementioned individual defendants in their capacities as School District officials and/or policy makers for the defendant School District, with all the actual and/or apparent authority attendant thereto.

372.   The acts complained of were carried out by the aforementioned individual defendants in their capacities as defendant School District officials, pursuant to the customs, policies, usages, practices, procedures, and rules of the School District, all under the supervision of ranking officers of said School District.

373.   The aforementioned customs, policies, usages, practices, procedures and rules of the defendant School District, include, but are not limited to, the unconstitutional practices identified above.

374.   The foregoing customs, policies, usages, practices, procedures and rules of defendant SCHOOL DISTRICT constituted a deliberate indifference to the safety, well-being and constitutional rights of plaintiffs.

375.   The foregoing customs, policies, usages, practices, procedures and rules of defendant SCHOOL DISTRICT were the direct and proximate cause of the constitutional violations suffered by Plaintiffs as alleged herein.

77

376.     The foregoing customs, policies, usages, practices, procedures and rules of defendant SCHOOL DISTRICT were the moving force behind the constitutional violations suffered by Plaintiffs as alleged herein.

377.     As a result of the foregoing customs, policies, usages, practices, procedures and rules of defendant SCHOOL DISTRICT, Plaintiff's children were physically and mentally abused, were sexually assaulted, starved, beaten and tortured, and suffered severe emotional injuries, and Plaintiff was deprived of the right to see her children.

378.     Defendants, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of Plaintiffs.

379.     Defendants, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate municipal officials and/or employees, and were directly responsible for the violation of Plaintiffs' constitutional rights.

380.     All of the foregoing acts by defendants deprived Plaintiffs herein of their federally protected rights, including, but not limited to, the right:

A.     Not to have parental rights terminated, suspended and/or abridged without Due Process of law;

B.     Not to have children removed from the custody of their biological parents without Due Process of law;

C.     Not to impose a Full Stay Away Order of Protection without Due Process of law;

D.     Not to be deprived of the Equal Protection of the law;

E.     Not be subjected to excessive force;

F.     Not to have cruel and unusual punishment imposed upon them; and

G.     To receive Equal Protection under the law.

78

## THE CLAIMS UNDER NEW YORK STATE LAW

381.    Plaintiff JUSTYNA ZUBKO-VALVA has complied with all the conditions precedent of the bringing of this action, and has complied with all provisions of the Charter of the County of Suffolk, and/or the procedural requirements of the East Moriches Union Free School District,  and Plaintiff has, prior to the bringing of this action and within ninety days after the injuries hereinafter described were received, duly served notice upon the County of Suffolk and the East Moriches Union Free School District of her intention to sue upon the claims set forth therein. More than thirty days have elapsed since the presentation of said Notice of Claims, and that the said claims have remained unadjusted and the said respondents have failed and/or refused to make any adjustment thereof. A hearing pursuant to Municipal Law §50-H will be held at mutually convenient time and place, subject to a request made by the Defendants.  The instant action is being filed within one year and ninety days of the date in which Plaintiffs' state law municipal claims have accrued.

### AS AND FOR A TENTH CLAIM FOR RELIEF
### (Under New York State Law: Wrongful Death)

(Suffolk County, the CPS Defendants, the East Moriches School District, the School Defendants, McCabe, Curti, Halpern, Ratje, Valva and Pollina)

382.     Plaintiff JUSTYNA ZUBKO-VALVA, as Mother and Natural Guardian of Thomas, and as the Administratrix of his Estate,[6] realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

383.     The negligent acts and omissions of the governmental Defendants, including but not limited to, Suffolk County, the CPS Defendants, East Moriches School District and the School

---

6 Plaintiff has retained a probate attorney, Joseph Ledgwick, Esq.,who is in the process of having her formally appointed as an Administratrix of Thomas' estate.  The Petition has been filed in the Suffolk County Surrogate's Court. (Ex. E).

Defendants (collectively, "Municipal Defendants"),   as well as the wrongful acts of McCabe, Curti, Halpern, Ratje, Valva and Pollina, directly led to the tragic death of plaintiff Thomas Valva.

384.    As a direct and proximate result of the Municipal Defendants' negligent acts and omissions, Plaintiff Thomas Valva sustained loss of earnings and other pecuniary damages that are now recoverable by his estate under New York Law.[7] As a consequence, Thomas' distributees have suffered damages in an amount to be determined at trial.


### AS AND FOR A ELEVENTH CLAIM FOR RELIEF
### (Under New York State Law: Conscious Pain & Suffering)

(Suffolk County, the CPS Defendants, the East Moriches School District, the School Defendants, McCabe, Curti, Halpern, Ratje, Valva and Pollina)

385.    Plaintiff JUSTYNA ZUBKO-VALVA, as mother and natural guardian of Thomas, and as putative Administratrix of his Estate, realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

386.    The negligent acts and omissions of the governmental Defendants, including but not limited to, Suffolk County, the CPS Defendants, East Moriches School District and the School Defendants,   as well as the wrongful acts of McCabe, Curti, Halpern, Ratje, Valva and Pollina, directly led to the tragic death of plaintiff Thomas Valva.

387.    The acts of the aforesaid Defendants, as alleged herein, wrongfully caused and permitted Tommy to suffer physical, mental, and emotional pain, for many hours prior to, and continuing until his death on the morning of January 17, 2020.

---

7 In connection with Thomas's death, Plaintiff also seeks to recover all categories of compensatory damages that are under 42 U.S.C.§ 1983 for wrongful death, including damages for the death itself, pain and suffering, and loss of consortium. See Banks v. Yokemick, 177 F. Supp. 2d 239 (S.D.N.Y. 2001).

388.    As a direct and proximate result of this tortious conduct, Plaintiff Thomas Valva sustained substantial conscious pain and suffering up until the moment of his death.

389.    As a direct and proximate result of Defendants' negligent, reckless and/or intentional acts, as set forth above, Tommy's distributees have suffered damages in an amount to be determined at trial.

## AS AND FOR A TWELFTH CLAIM FOR RELIEF
### (Under New York State Law: Assault) (Valva and Pollina)

390.    Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

391.    Defendants Valva and Pollina, without just cause, and without any legal justification whatsoever, willfully, maliciously, and callously threatened to use physical force against Tommy, causing him to fear imminent bodily harm and ultimately causing his death.

392.    Defendants committed the foregoing acts knowingly intentionally, willfully, and with a callous disregard for Tommy's health, safety and welfare, and are therefore liable for punitive damages for their gross misconduct.

## AS AND FOR A THIRTEENTH CLAIM FOR RELIEF
### (Under New York State Law: Battery) (Valva and Pollina)

393.    Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

394.    Defendants Valva and Pollina, without just cause, and without any legal justification whatsoever, willfully and maliciously used physical force against Tommy, causing him to suffer severe harmful, offensive bodily contact, and great pain and suffering.

395.    There was no excuse or justification for Defendants' unlawful use of force against a small, defenseless 8-year-old child, much less one who was on the Autism spectrum.

396.     Defendants committed the foregoing acts knowingly intentionally, willfully, and with a callous disregard for Tommy's health, safety and welfare, and are therefore liable for punitive damages for their gross misconduct.

### AS AND FOR A FOURTEENTH CLAIM FOR RELIEF
### (Under N.Y. State Law: Intentional Infliction of Emotional Distress)
### (Valva, Pollina, McCabe, Curti, Halpern, Ratje and the Municipal Defendants)

397.     Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

398.     The Municipal Defendants, as well as McCabe, Curti, Ratje, Halpern, Valva and Pollina, engaged in extreme and outrageous conduct, which exceeded all reasonable bounds of decency.

399.     The aforementioned conduct was committed by the Municipal Defendants while acting within the scope of their employment by defendant THE COUNTY OF SUFFOLK and/or the EAST MORICHES SCHOOL DISTRICT.

400.     The aforementioned conduct was committed by the Municipal Defendants while acting in furtherance of their employment by defendant THE COUNTY OF SUFFOLK and/or the EAST MORICHES SCHOOL DISTRICT.

401.     The aforementioned conduct was intentional and done for the sole purpose of causing severe emotional distress to Plaintiff JUSTYNA ZUBKO-VALVA, and to her three children, Thomas, Anthony and Andrew.

402.     As a result of the aforementioned conduct, Plaintiff JUSTYNA ZUBKO-VALVA and her three children suffered severe emotional distress, physical and mental injuries, together with tremendous shock and fright.

## AS AND FOR A FIFTEENTH CLAIM FOR RELIEF
### (Under N.Y. State Law: Defamation)
### (The Municipal Defendants, McCabe, Curti, Ratje, Halpern, Valva and Pollina)

403.    Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

404.    The Municipal Defendants, as well as McCabe, Curti, Ratje, Halpern Valva and Pollina misrepresented and falsified evidence Plaintiff JUSTYNA ZUBKO-VALVA, hid the truth about the children's health, and fabricated false, misleading and dishonest reports about Plaintiff JUSTYNA ZUBKO-VALVA and her children, and published these false claims to various third parties, including but not limited to the Suffolk County Department of Social Services, Judge Zimmerman, Judge Lorintz and Judge Cheng, and to other third parties involved in the matrimonial and family court proceedings.

405.    The false information that Defendants provided to third parties about Plaintiff JUSTYNA ZUBKO-VALVA -- to wit, her unfitness as mother, her alleged abuse of her children and her "mental illness" --  constituted defamation *per se,* were sufficiently derogatory to injure her reputation.

406.    As a result of the aforementioned Defendants' statements to third parties, Plaintiff's JUSTYNA ZUBKO-VALVA  reputation was severely and permanently damaged.

407.    To this day, Plaintiff JUSTYNA ZUBKO-VALVA is still questioned as to *why* she lost custody of the children, and it is presumed by the public at large that Plaintiff must have been a "bad mother," or done something else wrong, to have had her children taken away by the court system in the first place.

408.    Defendants acted with malice in making false and misleading statements about Plaintiff JUSTYNA ZUBKO-VALVA.

409.     Defendants acted with a reckless disregard for the truth in making false and misleading statements about Plaintiff JUSTYNA ZUBKO-VALVA.

410.     Defendants made such statements without privilege or authorization from Plaintiff JUSTYNA ZUBKO-VALVA.

411.     As a result of Defendants' malicious lies, Plaintiff has suffered, and will continue to suffer, irreparable harm to her personal and professional reputation and has been subjected to public ridicule.

## AS AND FOR A SIXTEENTH CLAIM FOR RELIEF
### (Under N.Y. State Law: Negligent Hiring/Training/Supervision/Retention – Suffolk County)

412.      Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

413.     Defendant THE COUNTY OF SUFFOLK owed a duty to the public at large, including but not limited to Plaintiff herein, to exercise reasonable care in the selection, hiring and retention of all of its employees, and in particular, those employees with the job responsibility of dealing with the public at large.

414.     Defendant THE COUNTY OF SUFFOLK failed to use reasonable care when it hired the CPS Defendants.

415.     Defendant THE COUNTY OF SUFFOLK failed to make reasonable inquiries into the background of the CPS Defendants, and failed to train them properly with respect to how to: i) properly detect child abuse; ii) properly detect signs of starvation; iii) properly detect signs of abuse; and iv) taking remedial action to protect children from being abused, neglected, starved or tortured.

416.     Had defendant THE COUNTY OF SUFFOLK used reasonable care in inquiring into the background of the CPS Defendants, it would have learned that they were patently unqualified to serve as CPS workers for Suffolk County.

417.     Had defendant THE COUNTY OF SUFFOLK used reasonable care in training its CPS workers, particularly with respect to autistic children, Plaintiff's children would have been promptly removed from the custody of Valva and Pollina, and Tommy would be still alive, and the other two boys would not have been abused, beaten, tortured and starved for over two years.

418.     As a result of the foregoing, defendant THE COUNTY OF SUFFOLK breached its duty to use reasonable care in the selection and hiring, and training, of all of its employees.

419.     As a result of defendant THE COUNTY OF SUFFOLK's negligence in hiring and training of the CPS defendants, Plaintiff Thomas Valva was beaten, starved, abused, tortured and caused to die on January 17, 2020.

420.     As a result of defendant THE COUNTY OF SUFFOLK's negligence in hiring the CPS defendants, Plaintiffs other two children, Anthony and Andrew, were beaten, starved, abused and tortured for over two years.

### AS AND FOR A SEVENTEENTH CLAIM FOR RELIEF
### (Under N.Y. State Law: Negligent Hiring/Training/Supervision/Retention – The School District)

421.     Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

422.     Defendant THE SCHOOL DISTRICT owed a duty to the public at large, including but not limited to Plaintiff herein, to exercise reasonable care in the selection, hiring and retention of all of its employees, and in particular, those employees with the job responsibility of dealing with the public at large.

85

423. Defendant THE SCHOOL DISTRICT failed to use reasonable care when it hired the School Defendants.

424. Defendant THE SCHOOL DISTRICT failed to make reasonable inquiries into the background of the School Defendants, and failed to train them properly with respect to how to: i) properly detect child abuse; ii) properly detect signs of starvation; iii) properly detect signs of abuse; and iv) taking remedial action to protect children from being abused, neglected, starved or tortured.

425. Had defendant THE SCHOOL DISTRICT used reasonable care in inquiring into the background of the School Defendants, it would have learned that they were patently unqualified to serve as school workers for the School District.

426. Had defendant THE SCHOOL DISTRICT used reasonable care in training its school workers, particularly with respect to autistic children, Plaintiff's children would have been promptly removed from the custody of Valva and Pollina, and Tommy would be still alive, and the other two boys would not have been abused, beaten, tortured and starved for over two years.

427. As a result of the foregoing, defendant THE SCHOOL DISTRICT breached its duty to use reasonable care in the selection and hiring, and training, of all of its employees.

428. As a result of THE SCHOOL DISTRICT'S negligence in hiring and training of the CPS defendants, Plaintiff Thomas Valva was beaten, starved, abused, tortured and caused to die on January 17, 2020.

429. As a result of THE SCHOOL DISTRICT'S negligence in hiring the School Defendants, Plaintiffs other two children, Anthony and Andrew, were beaten, starved, abused and tortured for over two years.

86

## AS AND FOR A EIGHTEENTH CLAIM FOR RELIEF
### (Under N.Y. State Law: Negligence – Suffolk County)

430.    Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

431.    Defendant THE COUNTY OF SUFFOLK, owed a duty of care to Plaintiff's children to  protect them from physical and mental abuse, torture and starvation at the hands of Valva and Pollina.

432.    Defendant THE COUNTY OF SUFFOLK, through the affirmative actions and words of the CPS Defendants, undertook a special duty to protect Plaintiff's children from harm and keep them safe from Valva and Pollina's abuse.

433.    Defendant THE COUNTY OF SUFFOLK, through the affirmative actions and words of the CPS Defendants,  assured Plaintiff that they would keep Plaintiff's children safe from harm and protect them from Valva and Pollina's abuse.

434.    Plaintiff JUSTYNA ZUBKO VALVA relied upon the promises of  THE COUNTY OF SUFFOLK,  as expressed the through words and actions of the CPS Defendants, to protect her children from physical and mental abuse, torture and starvation at the hands of Valva and Pollina.

435.    Defendant THE COUNTY OF SUFFOLK breached the duty of cared that it owed to Plaintiff and her children, and allowed  her children to be physically and mentally abused, tortured and starved by Valva and Pollina for several years.

436.    As a direct and proximate result of defendant THE COUNTY OF SUFFOLK's negligence, Plaintiff Thomas Valva was beaten, starved, abused, tortured and caused to die on January 17, 2020.

437.    As a direct and proximate result of defendant THE COUNTY OF SUFFOLK's negligence, Plaintiff's other two children, Anthony and Andrew, were beaten, starved, abused and tortured for several years.

### AS AND FOR A EIGHTTEENTH CLAIM FOR RELIEF
**(Under N.Y. State Law: Negligence – the School District and the School Defendants)**

438.    Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

439.    THE SCHOOL DISTRICT owed a duty of care to Plaintiff's children to  protect them from physical and mental abuse, torture and starvation at the hands of Valva and Pollina.

440.    THE SCHOOL DISTRICT, through the affirmative actions and words of the School Defendants, undertook a special duty to protect Plaintiff's children from harm and keep them safe from Valva and Pollina's abuse.

441.    THE SCHOOL DISTRICT, through the affirmative actions and words of the School Defendants,  assured Plaintiff that they would keep Plaintiff's children safe from harm and protect them from Valva and Pollina's abuse.

442.    Plaintiff JUSTYNA ZUBKO VALVA relied upon the promises of  THE SCHOOL DISTRICT,  as expressed the through words and actions of the School Defendants, to protect her children from physical and mental abuse, torture and starvation at the hands of Valva and Pollina.

443.    Defendant THE SCHOOL DISTRICT breached the duty of cared that it owed to Plaintiff and her children, and allowed  her children to be physically and mentally abused, tortured and starved by Valva and Pollina for several years.

444.    The SCHOOL DEFENDANTS knew, or should have known, that the three Valva children were being physically and mentally abused, sexually abused, tortured and starved.

445.     The SCHOOL DEFENDANTS were repeatedly told by Plaintiff her three children were being physically and mentally abused, sexually abused, tortured and starved by Valva and Pollina.

446.     The SCHOOL DEFENDANTS knew, from their own observations, that the Valva children were coming to school with visible bruises and scratch marks, and gave inconsistent and implausible explanations for such injuries.

447.     The SCHOOL DEFENDANTS knew, from their own observations, that the Valva children were coming to school in a severely emaciated and weakened condition, were extremely underweight, and were seen repeatedly trying to scrounge food off the floor and from garbage cans in the school.

448.     The SCHOOL DEFENDANTS knew, from their conversations with the children, that Valva and Pollina had given them explicit orders to <u>not</u> go to the school nurse under any circumstances.

449.     The SCHOOL DEFENDANTS knew, from conversations with their own employees, including multiple teachers and the school psychologist, about the serious concerns that they had regarding the Valva children.

450.     Notwithstanding the clear and obvious signs of abuse, the Defendant SCHOOL DEFENDANTS did absolutely nothing to protect the children from Valva and Pollina's abuse.

451.     As a direct and proximate result of defendant THE SCHOOL DISTRICT's negligence, based on the negligent acts and omissions of the School Defendants, Plaintiff Thomas Valva was beaten, starved, abused, sexually abused, tortured and caused to die on January 17, 2020.

452.     As a direct and proximate result of defendant THE SCHOOL DISTRICT's negligence, based on the negligent acts and omissions of the School Defendants,  Plaintiff's other two children, Anthony and Andrew, were beaten, starved, abused, sexually abused and tortured for several years.


## AS AND FOR AN NINETEENTH CLAIM FOR RELIEF
**(Under New York State Law:  Negligence)  (the AFC Defendants -- McCabe and Halpern).**

453.     Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

454.     Defendant Donna McCabe, in her capacity as AFC, and Defendant Ethan Halpern, in his capacity as AFC (collectively, the "AFC DEFENDANTS"), owed a duty of care to Plaintiff's children to  protect them from physical and mental abuse, torture and starvation at the hands of Valva and Pollina.

455.     The AFC DEFENDANTS, through the affirmative actions and words of  McCabe and Halpern, undertook a special duty to protect Plaintiff's children from harm and keep them safe from Valva and Pollina's abuse.

456.     The AFC DEFENDANTS, through the affirmative actions and words of McCabe and Halpern,  assured Plaintiff that they would keep Plaintiff's children safe from harm and protect them from Valva and Pollina's abuse.

457.     Plaintiff JUSTYNA ZUBKO VALVA relied upon the promises of  the AFC DEFENDANTS,  as expressed the through words and actions of  McCabe and Halpern, to protect her  children from physical and mental abuse, torture and starvation at the hands of Valva and Pollina.

458.    The AFC DEFENDANTS breached the duty of cared that they owed to Plaintiff and her children, and allowed  her children to be physically and mentally abused, tortured and starved by Valva and Pollina for several years.

459.    As a direct and proximate result of the AFC DEFENDANTS' negligence, Plaintiff Thomas Valva was beaten, starved, abused, tortured and caused to die on January 17, 2020.

460.    As a direct and proximate result of the AFC DEFENDANTS' negligence, Plaintiffs other two children, Anthony and Andrew, were beaten, starved, abused, sexually abused and tortured for several years.

## AS AND FOR A TWENTIETH CLAIM FOR RELIEF
### (Under New York State Law: Violation of Social Services Law § 413 -- the CPS Defendants, the School Defendants, and the AFC Defendants).

461.    Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

462.    Social Services Law § 413 provides, inter alia, that when there is "reasonable cause to suspect that a child coming before them in their professional or official capacity is an abused or maltreated child ….", such "persons and officials" are "**required to report a cause a report to be made in accordance with this title** …". (emphasis supplied).

463.    The CPS Defendants, the School Defendants and the AFC Defendants were all Mandatory Reporters under Social Services Law § 413.

464.    For several years leading up to his death, Plaintiff JUSTYNA ZUBKO-VALVA repeatedly warned Defendants that her three young children, including Tommy and his two siblings, Anthony and Andrew, were being tortured, beaten, starved and abused at the hands of Valva and Pollina.

465.    Plaintiff JUSTYNA ZUBKO-VALVA provided the above Defendants with

91

overwhelming and irrefutable evidence of abuse, including documentary evidence, audio recordings and transcriptions, photographic evidence, and medical evidence.

466.    Further, Plaintiff JUSTYNA ZUBKO-VALVA provided Defendants with her children's own recorded statements regarding the enormous physical, mental abuse and brainwashing that they were subjected to by Valva and Pollina.

467.    Plaintiff JUSTYNA ZUBKO-VALVA also specifically warned Defendants, verbally and in writing,  that her children were in "enormous danger of losing their lives by Michael Valva and Angelina Pollina."

468.    Notwithstanding Plaintiff JUSTYNA ZUBKO-VALVA's repeated warnings, and the overwhelming evidence of abuse that Plaintiff had provided to Defendants, Defendants did absolutely nothing to protect the children.

469.    Rather than taking action to protect the children, and report the multiple complaints of abuse that had been made -- as they were *required* to do under New York State Social Services Law § 413 -- Defendants hid the truth about the children's health and fabricated false, misleading and dishonest reports about Plaintiff JUSTYNA ZUBKO-VALVA aand her children.

470.    Defendants not only refused to remove Plaintiff JUSTYNA ZUBKO-VALVA's children from the custody of Valva and Pollina, but also, suppressed, destroyed and falsified evidence, thereby ensuring that Claimant's children would remain with Valva.

471.    In so doing, Defendants  flagrantly violated their legal duties under New York Social Services Law  § 413, and exhibited a shocking indifference to the health, safety and welfare of Plaintiff JUSTYNA ZUBKO-VALVA''s children.


472.    As a direct and proximate result of Defendants' violation of Social Services Law §

413, all three (3) Valva children were repeatedly beaten, abused, tortured, sexually abused and starved by defendants Valva and Pollina.

473.    As a direct and proximate result of Defendants' violation of Social Services Law § 413, Tommy was caused to endure a slow, painful and agonizing death on January 17, 2020, when he froze to death inside of his father's subfreezing garage without any food, water, clothing or access to a bathroom.

### AS AND FOR A TWENTY FIRST CLAIM FOR RELIEF
**(Under New York State Law: Legal Malpractice -- Defendant McCabe and The Law Office of Donna McCabe)**

474.    Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

475.    Defendant McCabe was appointed to act as AFC for all three (3) Valva children by Judge Fran Ricigliano in 2016.

476.    As AFC for the Valva children, McCabe owed them a duty to act in their best interests at all times, and to use reasonable care to protect their health, safety and welfare at all times.

477.    Defendant McCabe negligently breached her duty of cared owed to the Valva children.

478.    Plaintiff JUSTYNA ZUBKO-VALVA had provided McCabe with overwhelming and irrefutable evidence of abuse, including documentary evidence, audio recordings and transcriptions, photographic evidence, and medical evidence.

479.    Further, Plaintiff JUSTYNA ZUBKO-VALVA had provided McCabe her children's own recorded statements regarding the enormous physical, mental abuse and brainwashing that they had been subjected to by Valva and Pollina.

480.     Notwithstanding Plaintiff JUSTYNA ZUBKO-VALVA's repeated warnings, and the overwhelming evidence of abuse that Plaintiff JUSTYNA ZUBKO-VALVA had provided to Defendants that proved that her children were being severely abused by Valva and Pollina, Defendant McCabe did absolutely nothing.

481.     Notwithstanding the overwhelming evidence of abuse that Plaintiff had given McCabe, Defendant McCabe failed to take any action whatsoever to protect the children from Valva and Pollina's abuse.

482.     Rather than taking action to protect the children, McCabe hid the truth about the children's health and fabricated false, misleading and dishonest reports about Plaintiff JUSTYNA ZUBKO-VALVA and her children.

483.     Rather than prioritizing the health, safety and welfare of the children, as she was *required* to do as their AFC, McCabe repeatedly acted as a "second attorney" for Valva, arguing on his behalf throughout the Civil Proceedings, and protecting his interests over those of the children.

484.     In so doing, McCabe flagrantly violated her legal duties as an AFC, and departed from good and accepted practices as an attorney licensed to practice in the State of New York.

485.     In negligently failing to take any measures to protect the Plaintiff's children from Valva and Pollina's abuse, McCabe breached her duty of care owed to the Valva children as their court-appointed AFC.

486.     As a direct and proximate result of McCabe's legal malpractice and negligence, all three (3) of the Valva children suffered grievous injuries, and were repeatedly subjected to abuse, torture, sexual abuse and starvation for two years, and Tommy was caused to freeze to death on January 17, 2020.

**AS AND FOR A TWENTY SECOND CLAIM FOR RELIEF**
**(Under New York State Law: Legal Malpractice -- Defendant Halpern and t**he Legal
Aid Society of Suffolk County, Inc., Children's Law Bureau**)**

487.    Plaintiff JUSTYNA ZUBKO-VALVA realleges and incorporates by reference the

allegations set forth in the foregoing paragraphs as if fully set forth herein.

488.    Defendant McCabe was appointed to act as AFC for all three (3) Valva children by

Family Court Justice Bernard Cheng.

489.    As AFC for the Valva children, Defendant Halpern owed them a duty to act in their

best interests at all times, and to use reasonable care to protect their health, safety and welfare at

all times.

490.    Defendant Halpern negligently breached his duty of cared owed to the Valva

children.

491.     Plaintiff JUSTYNA ZUBKO-VALVA had provided Halpern with overwhelming

and irrefutable evidence of abuse, including documentary evidence, audio recordings and

transcriptions, photographic evidence, and medical evidence.

492.     Further, Plaintiff JUSTYNA ZUBKO-VALVA had provided Halpern with her

children's own recorded statements regarding the enormous physical, mental abuse and

brainwashing that they had been subjected to by Valva and Pollina.

493.    Notwithstanding Plaintiff JUSTYNA ZUBKO-VALVA's repeated warnings, and

the overwhelming evidence of abuse that Plaintiff JUSTYNA ZUBKO-VALVA had provided to

Defendants that proved that her children were being severely abused by Valva and Pollina,

Defendant Halpern did absolutely nothing.

494.     Notwithstanding the overwhelming evidence of abuse that Plaintiff had given him, Defendant Halpern  failed to take any action whatsoever to protect the children from Valva and Pollina's abuse.

495.     Rather than taking action to protect the children, Halpern hid the truth about the children's health and fabricated false, misleading and dishonest reports about Plaintiff JUSTYNA ZUBKO-VALVA and her children.

496.     Rather than prioritizing the health, safety and welfare of the children, as he was *required* to do as their AFC, Halpern effectively acted as a "second attorney" for Valva, arguing on his behalf throughout the Family Court Proceedings, and protecting Valva's interests over those of the children.

497.     In so doing, Halpern  flagrantly violated his legal duties as an AFC, and departed from good and accepted legal practices as an attorney licensed to practice in the State of New York.

498.     In negligently failing to take any measures to protect the Plaintiff's children from Valva and Pollina's abuse, Halpern breached his duty of care owed to the Valva children as their court-appointed AFC.

499.     As a direct and proximate result of Halpern's legal malpractice and negligence, all three (3) of the Valva children suffered grievous injuries, and were repeatedly subjected to abuse, torture, sexual abuse and starvation for two years, and Tommy was caused to freeze to death on January 17, 2020.

## AS AND FOR A TWENTY-THIRD CLAIM FOR RELIEF
### (Under New York State Law: Breach of *Loco Parentis* – The School Defendants)

500.     Plaintiff repeats and realleges each and every allegation set forth in the above paragraphs as if fully set forth herein.

501.     Plaintiff JUSTYNA ZUBKO VALVA entrusted her three children to the control and supervision of the School District.

502.     The SCHOOL DEFENDANTS owed a duty to all students entrusted to them, including Plaintiff herein to act *in loco parentis* and to prevent foreseeable injuries.

503.     The SCHOOL DEFENDANTS repeatedly and fragrantly breached its duty to act *in loco parentis.*

504.     The SCHOOL DEFENDANTS knew, or should have known, that the three Valva children were being physically and mentally abused, tortured and starved.

505.     The SCHOOL DEFENDANTS were repeatedly told by Plaintiff her three children were being physically and mentally abused, tortured and starved by Valva and Pollina.

506.     The SCHOOL DEFENDANTS knew, from their own observations, that the Valva children were coming to school with visible bruises and scratch marks, and gave inconsistent and implausible explanations for such injuries.

507.     The SCHOOL DEFENDANTS knew, from their own observations, that the Valva children were coming to school in a severely emaciated and weakened condition, were extremely underweight, and were seen repeatedly trying to scrounge food off the floor and from garbage cans in the school.

508.     The SCHOOL DEFENDANTS knew, from their conversations with the children, that Valva and Pollina had given them explicit orders to <u>not</u> go to the school nurse under any circumstances.

509.     The SCHOOL DEFENDANTS knew, from conversations with their own employees, including multiple teachers and the school psychologist, about the serious concerns that they had regarding the Valva children.

97

510.     Notwithstanding the clear and obvious signs of abuse, the Defendant SCHOOL DEFENDANTS did absolutely nothing to protect the children from Valva and Pollina's abuse. While Defendants Schneyer and Russo informed Valva and Pollina about some of their concerns, they took no *actions* to address these concerns after it became clear that Valva and Pollina were continue to severely abuse, beat and starve the children.

511.     The SCHOOL DEFENDANTS knew, or should have known, that willfully ignoring the clear and persistent signs of child abuse and starvation constituted a violation of its *in loco parentis* duty, and resulted in direct harm to the Valva children.

512.     At all times material hereto, the SCHOOL DEFENDANTS were willful, wanton, malicious, reckless, grossly negligent, and/or negligent in their disregard for the rights and safety of Plaintiff, and demonstrated such moral turpitude as to cause substantial harm to the Valva children, and, as such, their conduct gives rise to punitive damages.

513.     As a direct and proximate result of the SCHOOL DEFENDANTS' violation of its *loco parentis* duties, Tommy was beaten, starved, abused, tortured and sexually abused, and was caused to die on January 17, 2020.

514.     As a direct and proximate result of the THE SCHOOL DEFENDANTS' violation of its *loco parentis* duties, Plaintiffs other two children, Anthony and Andrew, were beaten, starved, abused, sexually abused and tortured for several years.

## **DEMAND FOR RELIEF**

**WHEREFORE**, Plaintiff JUSTYNA ZUBKO-VALVA, as Mother and Natural Guardian of Anthony Valva and Andrew Valva, and as Administratrix of the Estate of Thomas Valva, and JUSTYNA ZUBKO-VALVA, Individually, demands judgment against all defendants, *except* Judge Hope Schwartz Zimmerman, as follows:

(1)       On all causes of action, compensatory damages in the amount of $100,000,000.00;

(2)       On all causes of action, punitive damages in the amount of $100,000,000.00; and

(3)       Costs and disbursements of this action, including attorney's fees, and for such other and further relief as to this Court may deem just and proper.

      With respect to the cause of action against Judge Hope Schwartz Zimmerman, violation of Due Process under 42 U.S.C.§ 1983 (Sixth Claim for Relief), Plaintiff JUSTYNA ZUBKO-VALVA, in her individual capacity, demands judgment as follows:

(1)       A Declaration that Judge Zimmerman's Order dated September 6, 2017, removing Plaintiff's children from her custody without any notice, petition, or hearing, violated Plaintiff's Due Process rights under the 5th and 14th Amendments to the United States Constitution;

(2)       A Declaration that Judge Zimmerman's Order, dated September 6, 2017, issuing a Full Stay Away Temporary Order of Protection, barring Plaintiff from having any contact from her children whatsoever, and issued without any notice, petition, or hearing, violated Plaintiff's Due Process rights under the 5th and 14th Amendments to the United States Constitution; and

(3)       Costs and disbursements of this action, including attorney's fees, and for such other and further relief as to this Court may deem just and proper.

Dated: New York, New York
      June 16, 2020

**JON L. NORINSBERG, ESQ., PLLC**

JON L. NORINSBERG, ESQ.
*Attorney for Plaintiff*
225 Broadway, Suite 2700
New York, New York 10007
Tel. No.: (212) 791-5396

99

Case 2:20-cv-02663-ERK-ART   Document 14-2   Filed 10/15/20   Page 106 of 146 PageID #:
Case 2:20-cv-02663-OM-AST   Document 1-12   Filed 06/16/20   Page 1 of 20   PageID #: 201
782

# EXHIBIT A



THOMAS JUSTIN VALVA

Case 2:20-cv-02663-ERK-ART   Document 44-2   Filed 10/15/20   Page 108 of 146 PageID #:
784
Case 2:20-cv-02663-JMA-ST   Document 1-22   Filed 06/16/20   Page 108 of 146 PageID #: 203

# EXHIBIT B







Case 2:20-cv-02663-ERK-ART   Document 44-2   Filed 10/15/20   Page 112 of 146 PageID #:
Case 2:20-cv-02663-SMA-ST   Document 1-32   Filed 06/16/20   Page 1 of 3 PageID #: 207
788

# EXHIBIT C





# EXHIBIT D



Case 2:20-cv-02663-JMA-ST Document 1-4 Filed 06/16/20 Page 1 of 3 PageID #: 210

**Orsetti & Curti**, PLLC
Attorneys and Counselors at Law

July 7, 2017

Re: Michael Valva

Dear Sir/Madam:

Please be advised that Michael Valva is in the middle of divorce proceedings and the home at 350 N. Corona Avenue, Valley Stream will be subject of equitable distribution in the aforementioned proceedings. Upon closing of his new primary house at 11 Bittersweet Lane Center Moriches, NY 11934 – Mr. Valva will list his Corona, NY property for sale immediately after closing of his new primary home.

Based off of the current situation, Mr. Valva will be receiving close to 100% custody of his 3 children. She might be entitled to supervised visits. His 3 kids will be living with him at 11 Bittersweet Lane, Center Moriches NY 11934.

On information and belief Mr. Valva will be residing at 11 Bittersweet Lane Center Moriches, NY 11934. This home will be is ONLY primary house.

If you have any other further questions please feel free to contact me.

Very truly yours,
Orsetti & Curti, PLLC

Shana L. Curti, Esq.
scurti@oclawny.com

SLC/gp

Get breaking news and all your emails instantly. M: ... OL your homepage now.

## Valva 68627NYR

✉ **Shannon McMullen** (smcmullen@unitedmortgage.com)

To: you   Details ⌄

68627NYR Valva B1 - LOE for Se...pdf (271 KB)

Hi Justyna,

Please see attached.

Thank you,

**Shannon McMullen**
**Servicing Assistant**
United Mortgage Corp.
25 Melville Park Road, Ste 110
Melville, NY 11747
631-683-8126 **direct**
631-861-3035 **fax**

↩ Reply    ↩↩ Reply All    ➡ Forward

Get breaking news and all your emails instantly. Make AOL your homepage now.    Get Started ✕

COMPOSE

↩  ↩↩  ↪  🗑  More ▾

### Re: Valva 68627NYR

🏴 **JUSTYNA Zubko (justynazub@aol.com)**

To: **smcmullen**    Details ▾

Dear Shannon,

Thank you so much for the letter that you forwarded to me. My husband planned to take everything away from me: my cl...
my job, and in order to fulfill his vicious plans of completely destroying me, he filed false allegations against me with Chil...
to help him achieve his goal. For the past few years, my life is complete nightmare, but I strongly believe that God will he...
this difficult situation because He is above everyone.

Thank you so much and God Bless You,

Justyna.

-----Original Message-----
From: Shannon McMullen <smcmullen@unitedmortgage.com>
To: justynazub@aol.com <justynazub@aol.com>
Sent: Wed, Jul 11, 2018 5:53 pm
Subject: Valva 68627NYR

Hi Justyna,

Please see attached.

# EXHIBIT E

Case 2:20-cv-08668-ERK-ARL   Document 14-2 Filed 06/15/20 Page 120 of 146 PageID #:
Case 2:20-cv-02963-JMA-ST   Document 14-5 Filed 06/16/20 Page 1 of 97 PageID #:
796

# Thank You

| | | | |
|---|---|---|---|
| File #: | **Unassigned** | Create Date: | **06/03/2020** |
| Court: | **Suffolk County Surrogate's Court** | Created By: | **JOSEPH ALPHONSO LEDW** |
| Type: | **Administration** | | |
| Decedent: | **THOMAS JUSTIN VALVA** | | |

The NYSCEF site has successfully received your e-filed documents and any requests for Certific
Pursuant to Uniform Rule 207.4-aa, a party commencing a mandatory proceeding electronically
all other parties with a NOTICE OF COMMENCEMENT OF PROCEEDING SUBJECT TO MANDATOR
ELECTRONIC FILING.

Date Filings Received: **06/03/2020**

Filing User: **JOSEPH ALPHONSO LEDWIDGE**

Payment: **VISA/MC** (Transaction Id: 030620A42-C74D7684-74C2-49F9-AB86-0D2A99A8883D

Authorization Code: 02676G)

## File Record

Date of Death: **01/17/2020**

Domicile: **11 BITTERSWEET LANE, CENTER MORICHES, NY 11934**

Estate Value: **Less than $10,000**>

## Documents Filed/Certificates Requested

| Qty | Document/Certificate | Fee | T |
|---|---|---|---|
| 1 | ADMINISTRATION PETITION<br>*PETITION FOR LETTERS OF LIMITED ADMINISTRATION* | $45.00 | |
| 1 | OTHER DOCUMENT<br>*BOND AFFIDAVIT* | $0.00 | |
| 1 | OTHER DOCUMENT<br>*HEIRSHIP AFFIDAVIT AND FAMILY TREE* | $0.00 | |
| 1 | DEATH CERTIFICATE<br>*DEATH CERTIFICATE THOMAS VALVA* | $0.00 | |
| | | **Total Fees:** | |

Print     Main Menu

**New York State Surrogate's Court**
**New York State Bar Association Official OCA Forms**

Form A-1
Petition for Letters of Administration

## SURROGATE'S COURT OF THE STATE OF NEW YORK
## COUNTY OF _____ **SUFFOLK** _____

| | |
|---|---|
| Filing Fee Paid $ | 45.00 |
| Certificates Paid $ | |
| Trustee Certs. Paid $ | |
| Prelim. Certs. Paid $ | |
| $_____ Bond, Fee: $_____ | |
| Receipt No.:_____ No.:_____ | |

ADMINISTRATION PROCEEDING, ESTATE OF

**THOMAS JUSTIN VALVA**

a/k/a

**THOMAS J VALVA, THOMAS VALVA, THOMAS JUSTIN**

Deceased.

### PETITION FOR LETTERS OF:

- [ ] Administration
- [X] Limited Administration
- [ ] Administration with Limitations
- [ ] Temporary Administration

File No. _____

TO THE SURROGATE'S COURT, COUNTY OF _____ **SUFFOLK** _____

It is respectfully alleged:

1. The name, domicile and interest in this proceeding of the petitioner, who is of full age, is as follows:

**Petitioner Information:**

| Name | Citizenship |
|---|---|
| **Justyna Zubko-Valva** | **United States** |

| Domicile Address: Street and Number |
|---|
| **350 N. Corona Avenue, Apt 25** |

| City, Village or Town | State | ZIP Code | Country |
|---|---|---|---|
| **Valley Stream** | **New York** | **11580** | **United States** |

| County | Telephone |
|---|---|
| **Nassau** | |

| Mailing Address: Street and Number *(If different from domicile)* |
|---|
| |

| City, Village or Town | State | ZIP Code | Country |
|---|---|---|---|
| | | | |

Interest: (*Check One*)  [X] Distributee **Mother**          [ ] Other

Is proposed Administrator an attorney?  [ ] Yes  [X] No  [If yes, submit statement pursuant to 22 NYCRR 207.16(e); see also 207.52 (Accounting of attorney-fiduciary).]

The proposed Administrator  [ ] is  [X] is not  a convicted felon nor is he/she otherwise ineligible, pursuant to SCPA 707 to receive letters. If the proposed Administrator is a convicted felon, submit a copy of the Certificate of Relief from Civil Disabilities.

2. The name, domicile, date and place of death, and national citizenship of the above-named decedent are as follows:

**Decedent Information:**

| Name | Citizenship |
|---|---|
| **THOMAS JUSTIN VALVA** , a/k/a **THOMAS J VALVA, THOMAS VALVA, THOMAS JUSTIN** | **United States** |

| Domicile Address: Street and Number | | | |
|---|---|---|---|
| **11 Bittersweet Lane** | | | |

| City, Village or Town | State/Province | ZIP Code | Country |
|---|---|---|---|
| **Center Moriches** | **New York** | **11934** | **United States** |

| County | Date of Death | Place of Death |
|---|---|---|
| **Suffolk** | **January 17, 2020** | **ER Long Island Community Hospital, Brookhaven Town, NY** |

**The Death Certificate must be filed with this proceeding.** If the decedent's domicile is different from that shown on the death certificate, check box ☐ and attach an affidavit explaining the reason for this inconsistency.

3. The estimated gross value of: *[Do not include any assets that are jointly held in trust for another, or have a named beneficiary.]*

| | | |
|---|---|---|
| (a) The decedent's personal property passing by intestacy is less than | $ | 0.00 |
| (b) The decedent's real property, in this state, which is | | |

| | | | |
|---|---|---|---|
| Improved, passing by intestacy, is less than | $ | 0.00 | |
| Description of each parcel: **N/A** | | | |
| Unimproved, passing by intestacy, is less than | $ | 0.00 | |
| Description of each parcel: **N/A** | | | |
| | | | $ | 0.00 |
| Total | | | $ | 0.00 |

| | | |
|---|---|---|
| (c) The estimated gross rent for a period of eighteen (18) months is the sum of | $ | 0.00 |

(d) In addition to the value of the personal property stated in paragraph (3) the following right of action existed on behalf of the decedent and survived his/her death, or is granted to the administrator of the decedent by special provision of law, and it is impractical to give a bond sufficient to cover the probable amount to be recovered therein: *[Briefly state the cause of action and the person against whom it exists, including names and carrier.]*  ☐ None

**The Decedent is a minor, who was murdered, Decedent's mother is applying for Letters of Limited Administartion to pursue a wrongful death claim and all other matters and/or claims flowing from the wrongful death of the minor against the following possible Defendants including but not limited to: Michael Valva [minor's father], Angela Pollina [father's fiancee], County of Suffolk, Family Court Officials, Social workers, the New York State Municipality and other relevant governmental agencies and/or quasi-governmental agencies and other persons or institutions [individually or otherwise] who are potentially liable for the wrongful death of the minor. The amount to be claimed is currently unknown at this time. See Affirmation of Joseph A. Ledwidge dated 3.20.2020 for further details.**

(e) If decedent is survived by a spouse and a parent, or parents but no issue, and there is a claim for wrongful death, check here ☐ and furnish name(s) and address(es) of parent(s) in Paragraph 7. *[See EPTL 5-4.4.]*

4. A diligent search and inquiry, including a search of any safe deposit box, has been made for a will of the decedent and none has been found. Petitioner(s) has/have been unable to obtain any information concerning any will of the decedent and therefore allege(s), upon information and belief, that the decedent died without leaving any last will.

5. A search of the records of this Court shows that no application has ever been made for letters of administration upon the estate of the decedent or for the probate of a will of the decedent, and your petitioner is informed and verily believes that no such application ever has been made to the Surrogate's Court of any other county of this state.

6. The decedent left surviving the following who would inherit his/her estate pursuant to EPTL 4-1.1 and 4-1.2: *[Information is required only as to those classes of surviving relatives who would take the property of decedent pursuant to EPTL 4-1.1. State "number" of survivors in each class. Insert "No" in all prior classes. Insert "X" in all subsequent classes.]*

a. **NO** Spouse (husband/wife).

b. **NO** Child or children or descendants of predeceased child or children. *[Must include marital, nonmarital, and adopted.]*

c. **NO** Any issue of the decedent adopted by persons related to the decedent (DRL Section 117).

d. **2** Mother/Father.

e. **X** Sisters or brothers, either of whole or half blood, and issue of predeceased sisters or brothers.

f. **X** Grandmother/Grandfather.

g. **X** Aunts or uncles, and children of predeceased aunts or uncles (first cousins).

h. **X** First cousins once removed (children of first cousins).

7. The decedent left surviving the following distributees, or other necessary parties, whose names, degrees of relationship, domiciles, post office addresses and citizenship are as follows: *[Show clearly how each person is related to decedent. If relationship is through an ancestor who is deceased, give name, date of death and relationship of the ancestor to the decedent. See Uniform Rules 207.16(b). If person is a nonmarital person, or descended from a nonmarital person, attach a copy of the order of filiation or Schedule A. If person was adopted by any persons related by blood or marriage to decedent or descended from such persons, attach Schedule B.]*

7. (a) The following are of full age and under no disability:

☐ Schedule A — Nonmarital Persons (Persons Born Out of Wedlock) is Attached

☐ Schedule B — Issue of the Decedent Who Were the Subject of an Adoption is Attached

| Name | | | Citizenship |
|---|---|---|---|
| **Justyna Zubko-Valva** | | | **United States** |
| Domicile Address: Street and Number | | | |
| **350 N. Corona Avenue, Apt 25** | | | |
| City, Village or Town | State | ZIP Code | Country |
| **Valley Stream** | **New York** | **11580** | **United States** |
| Mailing Address: Street and Number | | | |
| | | | |
| City, Village or Town | State | ZIP Code | Country |
| | | | |
| Relationship | | | |
| **Mother** | | | |

| Name | | | Citizenship |
|---|---|---|---|
| | | | |
| Domicile Address: Street and Number | | | |
| | | | |
| City, Village or Town | State | ZIP Code | Country |
| | | | |
| Mailing Address: Street and Number | | | |
| | | | |
| City, Village or Town | State | ZIP Code | Country |
| | | | |
| Relationship | | | |

| Name | | | Citizenship |
|---|---|---|---|
| | | | |
| Domicile Address: Street and Number | | | |
| | | | |
| City, Village or Town | State | ZIP Code | Country |
| | | | |
| Mailing Address: Street and Number | | | |
| | | | |
| City, Village or Town | State | ZIP Code | Country |
| | | | |
| Relationship | | | |

| Name | | | Citizenship |
|---|---|---|---|
| | | | |
| Domicile Address: Street and Number | | | |
| | | | |
| City, Village or Town | State | ZIP Code | Country |
| | | | |
| Mailing Address: Street and Number | | | |
| | | | |
| City, Village or Town | State | ZIP Code | Country |
| | | | |
| Relationship | | | |

**Continued on next page.**

7. (b) The following are infants and/or other persons under disability:

☐ Schedule A — Nonmarital Persons (Persons Born Out of Wedlock) is Attached

☐ Schedule B — Issue of the Decedent Who Were the Subject of an Adoption is Attached

☐ Schedule C — Infants is Attached

☒ Schedule D — Persons Under Disability Other than Infants is Attached

| Name<br>**Michael Valva** | | | Citizenship<br>**United States** |
|---|---|---|---|
| Domicile Address: Street and Number<br>**11 Bittersweet Lane** | | | |
| City, Village or Town<br>**Center Moriches** | State<br>**New York** | ZIP Code<br>**11934** | Country<br>**United States** |
| Mailing Address: Street and Number | | | |
| City, Village or Town | State | ZIP Code | Country |
| Relationship<br>**Father** | | | |
| Name | | | Citizenship |
| Domicile Address: Street and Number | | | |
| City, Village or Town | State | ZIP Code | Country |
| Mailing Address: Street and Number | | | |
| City, Village or Town | State | ZIP Code | Country |
| Relationship | | | |
| Name | | | Citizenship |
| Domicile Address: Street and Number | | | |
| City, Village or Town | State | ZIP Code | Country |
| Mailing Address: Street and Number | | | |
| City, Village or Town | State | ZIP Code | Country |
| Relationship | | | |
| Name | | | Citizenship |
| Domicile Address: Street and Number | | | |
| City, Village or Town | State | ZIP Code | Country |
| Mailing Address: Street and Number | | | |
| City, Village or Town | State | ZIP Code | Country |
| Relationship | | | |

8. There are no outstanding debts or funeral expenses, except: [X] None

9. There are no other persons interested in this proceeding other than those hereinbefore mentioned.

WHEREFORE, your petitioner respectfully prays that:

☐ a. Process issue to all necessary parties to show cause why letters should not be issued as requested;

☐ b. An order be granted dispensing with service of process upon those persons named in Paragraph (7) who have a right to letters prior or equal to that of the person nominated, and who are nondomiciliaries or whose names or whereabouts are unknown and cannot be ascertained;

[X] c. A decree award Letters of:

    ☐ Administration to _____

    [X] Limited Administration to **Justyna Zubko-Valva** _____

    ☐ Administration with Limitation to _____

    ☐ Temporary Administration to _____

    or other such person or persons having prior right as may be entitled thereto, and;

☐ d. That the authority of the representative under the foregoing Letters be limited with respect to the prosecution or enforcement of a cause of action on behalf of the estate, as follows: the administrator(s) may not enforce a judgment or receive any funds without further order of the Surrogate.

[X] e. That the authority of the representative under the foregoing Letters be limited as follows:
**Limited to all matters and claims pertaining to the discovery and prosecution of a wrongful death claim and all other matters and/or claims flowing from the wrongful death of the minor against the following possible Defendants including but not limited to: Michael Valva [minor's father], Angela Pollina [father's fiancee], County of Suffolk, Family Court Officials, Social workers, the New York State Municipality and other relevant governmental agencies and/or quasi-governmental agencies and other persons or institutions [individually or otherwise who are potentially liable for the wrongful death of the minor.**
☐

    f. Further relief sought (if any):

Dated: _March 21, 2020_

_J. Zubko-Valva_
Signature of Petitioner
**Justyna Zubko-Valva**
Print Name

_____
Name of Corporate Petitioner

By _____
Signature

_____
Print Name

_____
Title

_____
Signature of Petitioner

_____
Print Name

_____
Signature of Petitioner

_____
Print Name

_____
Signature of Petitioner

_____
Print Name

**Schedule D — Persons Under Disability Other than Infants**

SURROGATE'S COURT OF THE STATE OF NEW YORK

COUNTY OF __SUFFOLK__

ADMINISTRATION PROCEEDING, ESTATE OF

**THOMAS JUSTIN VALVA**

a/k/a

**THOMAS J VALVA, THOMAS VALVA, THOMAS JUSTIN**

**Deceased.**

**SCHEDULE D
PERSONS UNDER DISABILITY
OTHER THAN INFANTS**

File No. _____

| Name | | | | |
|---|---|---|---|---|
| **Michael Valva** | | | | |
| Residence Address: Street and Number | | | | |
| **11 Bittersweet Lane** | | | | |
| City, Village, or Town | State | ZIP Code | Country | |
| **Center Moriches** | **New York** | **11934** | **United States** | |
| Relationship | | | | |
| **Father** | | | | |

| Incompetent/Incapacitated | With Whom Does this Person Reside? |
|---|---|
| | **Angela Pollina** |

| | Court-Appointed Fiduciary? | Fiduciary Name |
|---|---|---|
| | ☐ Yes | |
| | ☐ No | Fiduciary Address |

Fiduciary Title

Describe Nature of Disability

**Michael Valva is currently detained at the Suffolk County Correctional Facility. Angela Pollina is his fiancée who is also incarcerated. They lived together at 11 Bittersweet Lane, Center Moriches NY 11934**

Name of Relative/Friend with Interest in Welfare

**Stephanie Valva (Mother of Michael Valva)**

Address

**1109 E Magnum Road, San Tan Valley, AZ 85140-5423**

**Prisoner**

Prison Name

**Suffolk County Correctional Facility
100 Center Drive, Riverhead, New York 11901**

**Unknown**

Description (if known, give name and relationship to decedent)

## COMBINED VERIFICATION, OATH AND DESIGNATION
### *For use when petitioner is to be appointed administrator*

STATE OF __**NEW YORK**__
COUNTY OF __*Nassau*__ } ss.: *Lynbrook*

I, the undersigned, the petitioner named in the foregoing petition, being duly sworn, say:

1. VERIFICATION: I have read the foregoing petition subscribed by me and know the contents thereof, and the same is true of my own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters I believe it to be true.

2. OATH OF ADMINISTRATOR as indicated above: I am over eighteen (18) years of age and a citizen of __**the United States**__; and I will well, faithfully and honestly discharge the duties of Administrator of the goods, chattels and credits of said decedent according to law. I am not ineligible, pursuant to SCPA 707, to receive letters and will duly account for all moneys and other property that will come into my hands.

3. DESIGNATION OF CLERK FOR SERVICE OF PROCESS: I do hereby designate the Clerk of the Surrogate's Court of __**Suffolk**__ County, and his/her successor in office, as a person on whom service of any process, issuing from such Surrogate's Court may be made in like manner and with like effect as if it were served personally upon me, whenever I cannot be found and served within the State of New York after due diligence used.

My domicile is: __**350 N. Corona Avenue, Apt 25, Valley Stream, New York  11580**__

_____
**Signature of Petitioner**

**Justyna Zubko-Valva**
Print Name

On the __21__ day of __*March*__ in the year __2020__ before me, the undersigned, personally appeared, __**Justyna Zubko-Valva**__ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Sworn to before me this
__21__ day of __*March, 2020*__

_____
**Notary Public**
Commission Expires:
(Affix Notary Stamp or Seal)

LINDA STEPHENSON
Notary Public, State of New York
No. 01ST6141778
Qualified in Nassau County
Commission Expires 2/27/20~~~~22~~~~

_____
Signature of Attorney

**The Law Office of Ledwidge and Associates**
Firm Name

**170 - 26 Cedarcroft Road, Jamaica Estates, New York 11432**
Address

**Joseph A. Ledwidge Esq.**
Print Name of Attorney

**(718) 276-6656**
Telephone

**joseph@ledwidge1.com**
Email *(optional)*

© 2020 Matthew Bender & Company, Inc., a member of LexisNexis.

DOH-1951 (8/2011)

**NEW YORK STATE**
**DEPARTMENT OF HEALTH**
## CERTIFICATE OF DEATH

RECORDED DISTRICT: 5151
REGISTER NUMBER: 0229

131-2020-00006827
**STATE FILE NUMBER**

| 1. NAME: FIRST | MIDDLE | LAST | 2. SEX: MALE ☒1 FEMALE ☐2 | 3A. DATE OF DEATH: MONTH 01 DAY 17 YEAR 2020 | 3B. HOUR: 10:28 AM |
|---|---|---|---|---|---|

Thomas Justin Valva

| 4A. PLACE OF DEATH: (Check one) HOSPITAL DOA ER ☐ / HOSPITAL OUTPATIENT ☐ / HOSPITAL INPATIENT ☐ / NURSING HOME ☐ / PRIVATE RESIDENCE ☐ / HOSPICE FACILITY ☐ / OTHER (Specify): ☒ | 4B. IF FACILITY, DATE ADMITTED: MONTH DAY YEAR |
|---|---|

4C. NAME OF FACILITY: (If not facility, give address)
Long Island Community Hospital

4D. LOCALITY: (Check one and specify) CITY ☐ VILLAGE ☐ TOWN ☐ Brookhaven Town

4E. COUNTY OF DEATH: Suffolk

4F. MEDICAL RECORD NO.

4G. WAS DECEDENT TRANSFERRED FROM ANOTHER INSTITUTION (If yes, specify institution name, city or town, county and state) NO ☒ YES ☐

| 5. DATE OF BIRTH: MONTH 09 DAY 14 YEAR 2011 | 6A. AGE IN YEARS: 8 yrs. | 6B. IF UNDER 1 YEAR ENTER: months days | 6C. IF UNDER 1 DAY ENTER: hours minutes | 7A. CITY AND STATE OF BIRTH: (If not USA, Country and Region/Province) Mineola Village, New York | 7B. IF AGE UNDER 1 YEAR, NAME OF HOSPITAL OF BIRTH: |
|---|---|---|---|---|---|

8. SERVED IN U.S. ARMED FORCES? (Specify years) NO ☒0 YES ☐1

9. DECEDENT OF HISPANIC ORIGIN? Check the boxes that best describe whether the decedent is Spanish/Hispanic/Latino.
A ☒ No; not Spanish/Hispanic/Latino | B ☐ Yes, Mexican, Mexican American, Chicano | C ☐ Yes, Puerto Rican | D ☐ Yes, Cuban | E ☐ Yes, Other Spanish/Hispanic/Latino

10. DECEDENT'S RACE: Check one or more races to indicate what the decedent considered himself or herself to be:
A ☒ White/Caucasian | B ☐ Black or African American | C ☐ Asian Indian | D ☐ Chinese
F ☐ Filipino | J ☐ Japanese | K ☐ Korean | N ☐ Vietnamese
I ☐ Native Hawaiian | K ☐ Guamanian or Chamorro | M ☐ Samoan
N ☐ American Indian or Alaska Native (specify)
P ☐ Other Asian (specify) | R ☐ Other Pacific Islander (specify)
S ☐ Other (specify)

11. DECEDENT'S EDUCATION: Check the box that best describes the highest degree or level of school completed at the time of death:
1 ☒ ≤ 8th grade | 2 ☐ 9th-12th grade; no diploma | 3 ☐ High school graduate or GED
4 ☐ Some college credit, but no degree | 5 ☐ Associate's degree | 6 ☐ Bachelor's degree
7 ☐ Master's degree | 8 ☐ Doctorate/Professional degree

12. SOCIAL SECURITY NUMBER: 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

13. MARITAL STATUS: NEVER MARRIED ☒1 MARRIED ☐2 WIDOWED ☐3 DIVORCED ☐4 SEPARATED ☐5

14. SURVIVING SPOUSE: Enter birth name of spouse if married or separated.

15A. USUAL OCCUPATION: (Do not enter retired) Grade School Student

15B. KIND OF BUSINESS OR INDUSTRY: School

15C. NAME AND LOCALITY OF COMPANY OR FIRM: Center Moriches School District, New York

| 16A. RESIDENCE: (State or Country if not USA) NY | 16B. County or Region/Province if not USA: Suffolk | 16C. LOCALITY: (Check one and specify) CITY ☐ VILLAGE ☐ TOWN ☐ Brookhaven Town | 16F. IF CITY OR VILLAGE, IS RESIDENCE WITHIN CITY OR VILLAGE LIMITS? ☐YES ☐NO IF NO, SPECIFY TOWN: |
|---|---|---|---|

16D. STREET AND NUMBER OF RESIDENCE: 11 Bittersweet Lane

16E. ZIP CODE: 11934

17. BIRTH NAME OF FATHER / PARENT: FIRST Michael MI LAST Valva

18. BIRTH NAME OF MOTHER / PARENT: FIRST Justyna MI LAST Zubko

19A. NAME OF INFORMANT: Justyna Zubko

19B. MAILING ADDRESS: (include zip code) 350 N Corona Avenue, Valley Stream Village, NY 11580

20A. 1 ☒ BURIAL 2 ☐ CREMATION 3 ☐ REMOVAL 4 ☐ HOLD 5 ☐ DONATION 6 ☐ ENTOMBMENT MONTH 01 DAY 30 YEAR 2020

20B. PLACE OF BURIAL, CREMATION, REMOVAL OR OTHER DISPOSITION: St. Charles Cemetery

20C. LOCATION: (City or town and state) East Farmingdale Hamlet, Suffolk, New York

21A. NAME AND ADDRESS OF FUNERAL HOME: Mangano Funeral Home Inc
1701 Deer Park Avenue, Deer Park Hamlet, NY 11729

21B. REGISTRATION NUMBER: 01099

22A. NAME OF FUNERAL DIRECTOR: Joseph S Mari

22B. SIGNATURE OF FUNERAL DIRECTOR: ▶ Joseph S Mari Electronically Signed

22C. REGISTRATION NUMBER: 12230

23A. SIGNATURE OF REGISTRAR: ▶ Donna Lent Electronically Signed

23B. DATE FILED: MONTH 01 DAY 27 YEAR 2020

24A. BURIAL OR REMOVAL PERMIT ISSUED BY: Donna Lent

24B. DATE ISSUED: MONTH 01 DAY 27 YEAR 2020

**ITEMS 25 THRU 33 COMPLETED BY CERTIFYING PHYSICIAN -- OR -- CORONER/CORONER'S PHYSICIAN OR MEDICAL EXAMINER**

25A. CERTIFICATION: To the best of my knowledge, death occurred at the time, date and place and due to the causes stated.
Certifier's Name: Michael Jeffrey Caplan MD, ME
License No.: 188131
Signature: Michael Jeffrey Caplan MD, ME ▶ Electronically Signed
MONTH 01 DAY 18 YEAR 2020

25B. Certifier's Title: ☐ Attending Physician ☐ Physician acting on behalf of Attending Physician
1 ☐ Coroner 2 ☒ Medical Examiner / Deputy Medical Examiner
Address: 725 Veterans Memorial Highway Bldg 487, Hauppauge, NY 11788

25B. If coroner is not a physician, enter Coroner's Physician's name & title: License No.: Signature: ▶ MONTH DAY YEAR

25C. If certifier is not attending physician, enter Attending Physician's name & title: License No.: Address:

26A. Attending physician attended deceased: Month Day Year FROM TO Month Day Year

26B. Deceased last seen alive by attending physician: Month Day Year

26C. Pronounced dead: ☐ Month Day Year 01 17 2020 AT 10:28 AM

27. MANNER OF DEATH: NATURAL CAUSE ☐1 ACCIDENT ☐2 HOMICIDE ☐3 SUICIDE ☐4 UNDETERMINED CIRCUMSTANCES ☐5 PENDING INVESTIGATION ☒6

28. WAS CASE REFERRED TO CORONER OR MEDICAL EXAMINER? NO ☐0 YES ☒1

29A. AUTOPSY? YES ☒1 NO ☐0 REFUSED ☐2

29B. IF YES, WERE FINDINGS USED TO DETERMINE CAUSE OF DEATH? NO ☐0 YES ☐1

**CONFIDENTIAL**  SEE INSTRUCTION SHEET FOR COMPLETING CAUSE OF DEATH  **CONFIDENTIAL**

30. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR (A), (B), AND (C).)

APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH

PART I. IMMEDIATE CAUSE:
(A) PENDING FURTHER STUDY <<<>>>
DUE TO OR AS A CONSEQUENCE OF:
(B) <<<>>> <<<>>>
DUE TO OR AS A CONSEQUENCE OF:
(C) <<<>>> <<<>>>

PART II. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN PART I (A): <<<>>>

DID TOBACCO USE CONTRIBUTE TO DEATH? 0 ☒ NO 1 ☐ YES 2 ☐ PROBABLY 3 ☐ UNKNOWN

31A. IF INJURY, DATE: MONTH DAY YEAR HOUR:
31B. INJURY LOCALITY: (City or town and county and state)
31C. DESCRIBE HOW INJURY OCCURRED:
31D. PLACE OF INJURY:
31E. INJURY AT WORK? NO ☐0 YES ☐1

31F. IF TRANSPORTATION INJURY, SPECIFY: 1 ☐ Driver/Operator 2 ☐ Passenger 3 ☐ Pedestrian 4 ☐ OTHER (specify)

32. WAS DECEDENT HOSPITALIZED IN LAST 2 MONTHS? NO ☒0 YES ☐1

33A. IF FEMALE: 0 ☐ Not pregnant within last year 1 ☐ Pregnant at time of death 2 ☐ Not pregnant, but pregnant within 42 days of death 3 ☐ Not pregnant, but pregnant 43 days to 1 year before death 4 ☐ Unknown if pregnant within past year

33B. DATE OF DELIVERY: MONTH DAY YEAR

Case 2:20-cv-02663-ERK-ARL Document 44-2 Filed 10/15/20 Page 130 of 146 PageID #:
806
Case 2:20-cv-02663-JMA-SIL Document 1-7-2 Filed 06/16/20 Page 1 of 1 PageID #: 225

THIS IS TO CERTIFY THAT THIS IS A TRUE
AND ACCURATE CERTIFIED COPY OF THE
OFFICIAL DOCUMENT ON FILE IN THE
TOWN CLERK'S OFFICE OF THE TOWN OF
BROOKHAVEN, SUFFOLK COUNTY, NY

*Donna Lent*

DONNA LENT, TOWN CLERK & REGISTRAR DATED:  01/28/2020
DO NOT ACCEPT UNLESS THE RAISED SEAL OF
THE TOWN OF BROOKHAVEN IS AFFIXED HEREON

147268

**SURROGATE'S COURT FOR THE STATE OF NEW YORK**
**COUNTY OF NASSAU**

---

ADMINISTRATION PROCEEDING, ESTATE OF

THOMAS JUSTIN VALVA
a/k/a

THOMAS J VALVA, THOMAS VALVA, THOMAS JUSTIN

                                        Deceased.

---

File No.:

**BOND AFFIDAVIT**

---

**STATE OF NEW YORK** )
                                 ) ss.:
**COUNTY OF** )

1.     I, **JUSTYNA ZUBKO-VALVA**, being duly sworn, deposes and says that I

am over the age of 21 years and resides at 350 N. Corona Avenue, Apt 25, Valley

Stream, New York 11580.

2.    I am the Decedent's mother and the petitioner in the above-entitled proceeding.

3.    Describe        The Decedent died possessed of no personal asset that form part of his estate.
      in Detail

Describe            The Decedent died possessed of no real property that formed part of his estate.
in Detail

If Retired State     At the time of his death, the Decedent was An 8 year old minor.
How Long

4.    The Decedent had no medical bills at the time of dead.

1

5.                       The Decedent's funeral was graciously sponsored by the Mangano Funeral Home Inc. Therefore, there is no outstanding funeral expences.

6.   The Decedent left no unpaid bills, debts or claims.

7.                        There are no executions or judgments against the Decedent's estate, nor was he a principal or surety on any unpaid or undischarged bond, undertaking or other obligation.

8.                        The Decedent, distributee, nor your deponent herein were ever recipients of any Federal, State or Municipal Relief;

9.   There are no Federal or State Income or Estate Taxes payable by the estate except.

10.                    The Petitioner herein is applying for Letters of Limited Administration for the purpose of  pursuing a wrongful death claim and all other matters and/or claims flowing from the wrongful death of the Decedent against the following possible Defendants including but not limited to: Michael Valva [minor's father], Angela Pollina [father's fiancee], County of Suffolk, Family Court Officials, Social workers, the New York State Municipality and other relevant governmental agencies and/or quasi-governmental agencies and other persons or institutions [individually or otherwise] who are potentially liable for the wrongful death of the minor.

11. The amount to be recovered from the wrongful death claim and/or all other matters flowing from the wrongful death of the Decedent is virtually impossible to determine in advance.

**WHEREFORE**, your deponent prays, that the filing of a bond by JUSTYNA ZUBKO-VALVA as administrator be dispensed with and that the court grants the deponent's Petition for Limited Letters of Administration in the Estate of Thomas Justin Valva.

_____
**JUSTYNA ZUBKO-VALVA**

**STATE OF** New York )
**COUNTY OF** Nassau ) ss.: Lynbrook )

On March 21, 2020 before me, the undersigned personally appeared **Justyna Zubko-Valva,** personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument in the city of Lynbrook.

Sworn to before me this
21 Day of March, 2020

_____
Notary Public

LINDA STEPHENSON
Notary Public, State of New York
No. 01ST6141778
Qualified in Nassau County
Commission Expires 2/27/2022

3

**SURROGATE'S COURT FOR THE STATE OF NEW YORK**
**COUNTY OF SUFFOLK**

| | |
|---|---|
| ADMINISTRATION PROCEEDING, ESTATE OF | File No.: |
| THOMAS JUSTIN VALVA<br>a/k/a | |
| | **HEIRSHIP** |
| | **AFFIDAVIT** |
| THOMAS J VALVA, THOMAS VALVA, THOMAS JUSTIN | |
| Deceased. | |

**STATE OF NEW YORK**      )
                           ) ss.:
**COUNTY OF** Nassau      )

I, Ewa Pienkowski being duly sworn, depose and say that:

- I am over the age of 21 years and I reside at 2010 Freeman Ave, East Meadow, NY 11554.

- I am the close friend of Justyna Zubko-Valva who is the mother of Decedent Thomas Valva.

- I have known Thomas' parents for more than 13 years and have known Thomas and his brothers Andrew and Anthony for their entire life, therefore, I am qualified to give the information contained in this affidavit.

- Thomas passed away January 17, 2020 and at the time of his death he was an infant,

1

eight (8) years of age. He was therefore an unmarried minor without children natural or adopted, predeceased or surviving.

• He was survived by his parents, Michael Valva [father] and Justyna Zubko-Valva [mother].

• Thomas' parents had a civil marriage ceremony on or about August 20, 2004 and a religious ceremony on or about June 19, 2005.

• Michael Valva [father] filed for divorce from Justyna Zubko-Valva [mother] in December 2015.

EWA PIENKOWSKI

STATE OF NEW YORK )
                      ) ss.:
COUNTY OF Nassau )

On March ___, 2020 before me, the undersigned personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted and executed the instrument.

Sworn to before me this
21 Day of March, 2020

Notary Public

ELKE BEDER
Notary Public - State of New York
No. 01BE6392833
Qualified in Nassau County
My Commission Expires June 03, 2023

2

Case 2:20-cv-02663-ERK-ARL Document 44-2 Filed 10/15/20 Page 136 of 146 PageID #:
Case 2:20-cv-02663-JMA-SIL Document 1-7 Filed 06/16/20 Page 137 of 146 PageID #:
812

## FAMILY TREE

**Cross Out Class
That Is Not
Applicable**

**Parents**

Justyna Zubko-Valva  [mother]

**THOMAS JUSTIN VALVA**
Decedent
[8 year old minor]

Michael Valva [Father]

Name of Spouse

☐ Deceased _____ Date

☐ Divorced _____ Date

☒ Never Married

STATE OF _____ **NEW YORK**
COUNTY OF _____ Nassau

_____ being duly sworn, states that the charts contained on this paper are correct.

Ewa Pientowski

Sworn to before me on 21 March 2020

_____
NOTARY PUBLIC
NYSBA's Surrogate's Court Forms FT-1

ELKE BEDER
Notary Public - State of New York
No. 01BE6392833
Qualified in Nassau County
My Commission Expires June 03, 2023

*NOTE: Complete reverse side of family tree form also.*
© 2020 Matthew Bender & Company, Inc., a member of LexisNexis.

# EXHIBIT B

# JON L. NORINSBERG, ESQ., PLLC

ATTORNEY AT LAW
110 EAST 59TH STREET
SUITE 3200
NEW YORK, NEW YORK 10022
www.norinsberglaw.com

| | |
|---|---|
| White Plains Office | Queens Office |
| 777 Westchester Avenue | 6906 Grand Avenue |
| Suite 101 | 3rd FL PH |
| White Plains, New York 10604 | Maspeth, New York 11378 |
| | |
| Jon L. Norinsberg | Tel. (212) 791-5396 |
| | Fax (212) 406-6890 |
| ————— | Email: jon@norinsberglaw.com |
| John J. Meehan | |

September 14, 2020

**VIA FEDERAL EXPRESS OVERNIGHT**
Barket Epstein Kearon Aldea & LoTurco LLP
666 Old Country Road, Suite 700
Garden City, New York 11530
Attn: John LoTurco, Esq.

Re:     ***Zubko-Valva v. County of Suffolk, et al.***
        ***Docket No.: 20 Civ. 02663 (JMA) (ST)***

Dear Mr. LoTurco:

We represent plaintiff Justyna Zubko-Valva in the above referenced civil rights action. On August 4, 2020, we served your client with the Complaint in this action. (Ex. A, Proof of Service). To date, we have not received an Answer, nor have we received any request for an extension.

According to the Docket Sheet,  Mr. Valva was required to respond to the Complaint on or before August 28, 2020 (Docket No.35).  His failure to do so constitutes a default in this action. Please be advised that if we do not receive an Answer from Mr. Valva by Friday, September 18, 2020, we will have no choice but to file a motion for a default judgment against him. Please guide your actions accordingly.

Sincerely,

Jon L. Norinsberg, Esq.

# EXHIBIT A

Form 2 - AFFIDAVIT OF SERVICE

P3538733

**JON L NORINSBERG ESQ**   Gio Beato
US DISTRICT COURT

ZUBKO-VALVA ET AL

PLAINTIFF

- vs -

THE COUNTY OF SUFFOLK ET AL

DEFENDANT

index No.  **20-cv-02663**
Date Filed
Office No.
Court Date.

STATE OF **NEW YORK**, COUNTY OF **NASSAU**      :SS:

**KENNETH VEGA** being duly sworn, deposes and says; I am over 18 years of age, not a party to this action, and reside in the State of New York. That on the **04TH** day of **AUGUST 2020, 11:36AM** at **C/O SUFFOLK COUNTY CORRECTIONAL FACILITY 100 CENTER DRIVE SOUTH, RIVERHEAD, NY 11901** I served the **CIVIL CASE INFORMATION STATEMENT, SUMMONS IN A CIVIL ACTION, COMPLAINT, JURY TRIAL DEMANDED** upon **MICHAEL VALVA - ID # 758283, the DEFENDANT**, therein named by delivering and leaving a true copy or copies of the aforementioned documents with **SGT. BORRUSO (REFUSED FULL NAME), AUTHORIZED TO ACCEPT**, a person of suitable age and discretion.
Deponent describes the person served as aforesaid to the best of deponent's ability at the time and circumstances of the service as follows:

SEX: **MALE**      COLOR: **BROWN** HAIR: **BLACK**
APP.AGE: **35-40** APP. HT: **5''9** APP. WT: **185**
OTHER IDENTIFYING FEATURES

On **08/07/2020** I deposited in the United States mail another true copy of the aforementioned documents properly enclosed and sealed in a post-paid wrapper addressed to the said **DEFENDANT** at the above address. That being
**the place of business of the DEFENDANT.**

Copy mailed 1st class mail marked personal and confidential not indicating on the outside thereof by return address or otherwise that said notice is from an attorney or concerns an action against the person to be served.

COMMENTS:

That at the time of service, as aforesaid, I asked the **person spoken to** whether the DEFENDANT was in the military service of the United States Government, or of the State of New York, and received a negative reply. Upon information and belief based upon the conversation and observation as aforesaid I aver that the **DEFENDANT** is not in the military service, and is not dependent on anyone in the military service of the United States Government or the State of New York, as that term is defined in statutes of the State of New York, or of the Federal Soldiers and Sailors Civilian Relief Act.

Sworn to before me this
07TH day of AUGUST, 2020

TIFFANY THOMPSON
Notary Public, State of New York
NO. 01TH6368449
Qualified in KINGS COUNTY
Commission Expires 12/11/2021

KENNETH VEGA
PM Legal LLC
75 MAIDEN LANE 11TH FLOOR
NEW YORK, NY 10038
Reference No: 7-JLN-3538733

2a



ORIGIN ID:RBA (212) 791-5396
JON L. NORINSBERG, ESQ.
JON L. NORINSBERG, ESQ., PLLC
110 EAST 59TH STREET
SUITE 3200
NEW YORK, NY 10022
UNITED STATES US

TO JOHN LOTURCO, ESQ.
BARKET EPSTEIN KEARON ALDEA & LOTUR
666 OLD COUNTRY ROAD, SUITE 700

GARDEN CITY NY 11530
(516) 745-1500
REF: ZUBKO-VALVA
INV
PO
DEPT

SHIP DATE: 14SEP20
ACTWGT:
CAD: 2500710614/NET4280

BILL SENDER

TRK# 7715 2158 1950
0201

E4 ELZA

TUE - 15 SEP 3:00P
STANDARD OVERNIGHT

11530
NY-US JFK

56BJ6/1545/B766

FedEx Express

After printing this label:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.







# EXHIBIT C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X    Dkt. No.: 20 Civ. 02663

JUSTYNA ZUBKO-VALVA, as Mother and Natural
Guardian of ANTHONY VALVA and ANDREW
VALVA, and as Administratrix of the Estate of THOMAS
VALVA, and JUSTYNA ZUBKO-VALVA individually,

**CERTIFICATE OF DEFAULT**

                              Plaintiff,

      -against-

THE COUNTY OF SUFFOLK, et al.

                           Defendants.

------------------------------------------------------------------------X

        I, DOUGLAS C. PALMER, Clerk of the United States District Court for the Eastern District

of New York, do hereby certify that the Defendant Michael Valva has not filed an answer or otherwise

moved with respect to the Complaint herein.

        The default of Defendant Michael Valva is hereby noted pursuant to Rule 55(a) of the Federal

Rules of Civil Procedure.

Dated: New York, New York
         September 23, 2020

                               **DOUGLAS C. PALMER**
                               Clerk of the Court

               By:      /s/ James J. Toritto
                             Deputy Clerk

Clerk's Certificate/Notation of Default

1

# EXHIBIT D

# JON L. NORINSBERG, ESQ., PLLC

ATTORNEY AT LAW
110 EAST 59TH STREET
SUITE 3200
NEW YORK, NEW YORK 10022
www.norinsberglaw.com

White Plains Office
777 Westchester Avenue
Suite 101
White Plains, New York 10604

Jon L. Norinsberg
——
John J. Meehan

Queens Office
6906 Grand Avenue
3rd FL PH
Maspeth, New York 11378

Tel. (212) 791-5396
Fax (212) 406-6890
Email: jon@norinsberglaw.com

September 25, 2020

**VIA PRIORITY USPS MAIL**
Michael Valva
Inmate No.: 758283
Suffolk County Correctional Facility
100 Centre Drive South
Riverhead, New York 11901

Re:     ***Zubko-Valva v. County of Suffolk, et al.***
***Docket No.: 20 Civ. 02663 (JMA) (ST)***

Dear Valva:

Enclosed please find a Certificate of Default that was issued by the Clerk in the Eastern District of New York, on September 23, 2020. Please be advised that if we do not receive an answer from you in this action by October 9, 2020, we will have no choice but to make a motion for a default judgment in this action. Please guide your actions accordingly.

Sincerely,

Jon L. Norinsberg, Esq.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------X    Dkt. No.: 20 Civ. 02663

JUSTYNA ZUBKO-VALVA, as Mother and Natural
Guardian of ANTHONY VALVA and ANDREW
VALVA, and as Administratrix of the Estate of THOMAS
VALVA, and JUSTYNA ZUBKO-VALVA individually,

**CERTIFICATE OF DEFAULT**

                                  Plaintiff,

     -against-

THE COUNTY OF SUFFOLK, et al.

                                  Defendants.
-----------------------------------------------------------------------------X

       I, DOUGLAS C. PALMER, Clerk of the United States District Court for the Eastern District

of New York, do hereby certify that the Defendant Michael Valva has not filed an answer or otherwise

moved with respect to the Complaint herein.

       The default of Defendant Michael Valva is hereby noted pursuant to Rule 55(a) of the Federal

Rules of Civil Procedure.

Dated: New York, New York
       September 23, 2020

                                 **DOUGLAS C. PALMER**
                                  Clerk of the Court

                           By:     /s/ James J. Toritto
                                    Deputy Clerk

Clerk's Certificate/Notation of Default

1