**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

JUSTYNA ZUBKO-VALVA, as Mother and
Natural Guardian of ANTHONY VALVA
and ANDREW VALVA, and as
Administratrix of the Estate of THOMAS
VALVA, and JUSTYNA ZUBKO-VALVA
individually,

               *Plaintiff*,

v.


THE COUNTY OF SUFFOLK, *et. al.*,

               *Defendants*.

---

Case No. 20-Civ-2663(JMA)(ARL)


**PLAINTIFF'S OPPOSITION TO THE COUNTY DEFENDANTS'**
**<u>MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**


Jon L. Norinsberg, Esq.
John J. Meehan, Esq.
**JON L. NORINSBERG, ESQ., PLLC**
110 East 59th Street, Suite 3200
New York, New York 10022
T: (212) 791-5396
F: (212) 406-6890

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**Cases**

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ........................................................................................ 2

STANDARD OF REVIEW ..................................................................................... 11

ARGUMENT ........................................................................................................... 12

I.  PLAINTIFF HAS STATED A VIABLE DUE PROCESS CLAIM ................................ 12

   A.  State Actors May Be Held Liable When They Affirmatively Increase the Danger of Private Violence ..................................................................... 12

      i.  Defendants Increased the Danger to the Children by Exhibiting a "Dismissive and Indifferent Attitude" Towards the Allegations of Valva's Abuse .......................................................................... 13

      ii.  Defendants Increased the Danger to the Children by Ensuring that Valva Would Retain Custody Over The Children .................................. 14

II.  PLAINTIFF HAS STATED A CLAIM FOR MALICIOUS PROSECUTION .............. 16

   A.  The Groundless Initiation of a Case in Family Court May Give Rise to a Malicious Prosecution Claim .................................................................. 16

   B.  The Cases Cited By Defendants Are Wholly Inapposite and Do Not Support Defendants' Position .................................................................. 17

   C.  Plaintiff Has Sufficiently Pled a Constitutional Violation.................................... 18

      i.  The Requirement of Attending Court Proceedings Establishes a "Seizure" under the Fourth Amendment.................................... 18

      ii.  Parental Custody over Children is a Constitutionally Protected Right..... 19

      iii.  Defendants Misread the Supreme Court's Decision in Albright v. Oliver .................................................................................. 20

      iv.  Defendants Affirmatively Interfered with Plaintiff's Constitutional Right to Raise Her Children.................................... 21

   D.  Defendants' Conduct Shocked the Conscience. .......................................... 22

      i.  Defendants Waived Their "Probable Cause" Argument By Conceding That Plaintiff Should Not Have Been "Indicated".................................... 22

      ii.  The Complaint is Rife with Highly Detailed Factual Allegations Establishing that Defendants Acted in Bad Faith and Without Probable Cause.................................................................... 22

   E.  Defendants Are Not Entitled to Absolute Immunity. ........................................... 25

i

      i.    Defendants Committed Misconduct During the Investigative Phase by Concealing Exculpatory Evidence ............................................................. 26

      ii.   CPS Case Workers Do Not Have Immunity for Initiating A Groundless Petition Based on Fabrications ........................................ 26

      iii.  Extending Absolute Immunity to Caseworkers Who Fabricate Evidence Would Be a Wholly Unwarranted Expansion of the Doctrine ................. 28

  F.    Defendants are Not Entitled to Qualified Immunity ................................................. 30

III.   THE COMPLAINT PLEADS A § 1983 ABUSE OF PROCESS CLAIM ..................... 32

  A.   Plaintiff Has Sufficiently Alleged a "Collateral Objective" ................................. 32

IV.  THE COMPLAINT STATES VIABLE CLAIMS FOR FAIR TRIAL, STIGMA-PLUS AND CONSPIRACY ......................................................................................................... 33

  A.   Plaintiff Suffered a Sufficient "Deprivation of Liberty" to Establish a Fair Trial Claim ...................................................................................................... 33

  B.   Alteration of Custody Status is Sufficient to Establish a State-Imposed Burden for a Stigma Plus Claim ............................................................................... 34

V.    THE COMPLAINT ESTABLISHES *MONELL* LIABILITY .......................................... 34

  A.   Plaintiff Has Made Detailed Factual Allegations Regarding Defendant County's Deliberate Indifference to Training its CPS Workers ........................... 34

  B.   Defendant's Position is Belied by the Admissions made by Suffolk County Officials Following Tommy's Death. ................................................................ 35

VI.  THIS COURT SHOULD RETAIN JURISDICTION OVER PLAINTIFFF'S STATE LAW CLAIMS. ........................................................................................................... 36

  A.   Plaintiff Complied with Gen. Mun. Law § 50 ..................................................... 36

  B.   The Complaint States a Claim for Negligence ..................................................... 37

      i.    CPS Owed a Duty of Care Based on Statutory Reporting Requirements under    N.Y. Soc. Serv. Law §§ 413-22 .................................................. 37

      ii.   The CPS Workers Are Not Entitled to Absolute Immunity Under State Law, Since They Were Legally Obligated to Take Action to Protect the Children ...................................................................................... 39

      iii.  The Filing of the Neglect Petition was an Act of Willful Misconduct, and Cannot be Accorded Immunity under State Law .............................. 40

CONCLUSION ........................................................................................................................ 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Ashcroft v. Iqbal,*
  556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ................................. 11
*Ashley v. Civil,*
  No. 14 Civ. 5559, 2019 U.S. Dist. LEXIS 56006 (E.D.N.Y. Apr. 1, 2019) ........................... 18
*Albright v. Oliver,*
  510 U.S. 266 (1994) ................................................................................ 19, 20
*Allen v. WestPoint-Pepperell, Inc.,*
  945 F.2d 40, 44 (2d Cir. 1991) ................................................................... 40
*Anilao v. Spota,*
  774 F. Supp. 2d 457 (E.D.N.Y. 2011) ........................................................ 24, 25, 27
*Bailey v. City of N.Y.,*
  79 F. Supp. 3d 424 (E.D.N.Y. 2015) .............................................................. 33
*Balentine v. Tremblay,* 554 Fed. Appx. 58
  (2d Cir. Feb. 11, 2014) ............................................................................. 33
*Begley v. City of N.Y.,* 111 A.D.3d 5
  (App. Div. 2nd Dept. 2013) ......................................................................... 37
*Bennett v. Jeffreys,*
  40 N.Y.2d 543, 545 (1976) .......................................................................... 17
*Bertuglia v. City of New York,*
  839 F.Supp.2d 703 (S.D.N.Y.2012)................................................................ 29
*Brandon v. City of New York,*
  705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) ................................................... 34
*Bristol v. Queens Cty.,*
  No. 09 Civ. 5544 (JFB) (AKT), 2013 U.S. Dist. LEXIS 41655 (E.D.N.Y. Feb. 27, 2013) ..... 24
*Brokaw v. Mercer Cty.,*
  235 F.3d 1000 (7th Cir. 2000) ................................................................. 20, 23
*Buckley v. Fitzsimmons,*
  509 U.S. 259 (1993)........................................................................ 25, 26, 27, 28
*Callahan v. City of New York,*
  90 F.Supp.3d 60 (E.D.N.Y. 2015) ................................................................. 19
*Carcasole-Lacal v. Am. Airlines, Inc.,*
  02 Civ. 4359 (DGT), 2003 U.S. Dist. LEXIS 11507 (E.D.N.Y. July 8, 2003) ...................... 36
*Castro v. East End Plastic, Reconstructive & Hand Surgery, P.C.,*
  47 A.D.3d 608 (2008) ................................................................................ 16
*Chainani v Board of Educ. of City of N.Y.,*
  87 NY2d 370 (1995) .................................................................................. 37
*Chambers v. N. Rockland Cent. Sch. Dist.,*
  815 F. Supp. 2d 753 (S.D.N.Y. 2011)............................................................. 15
*Chambers v. Time Warner, Inc.,*
  282 F.3d 147 at 153 (2d Cir. 2002)................................................................ 40
*Chi Chao Yuan v. Rivera,*
  48 F. Supp. 2d 335 (S.D.N.Y. 1999)............................................................ 16, 30

*Compare O'Brien v. Alexander*,
   101 F.3d 1479 (2d Cir. 1996)..................................................................16
*Cook v. Sheldon*,
   41 F.3d 73 (2d Cir. 1994) .......................................................................31
*Cornwall-on-Hudson Police Dep't*,
   577 F.3d 415 (2d Cir. 2009)....................................................................12
*Croft v. Westmoreland County Children and Youth Services*,
   103 F.3d 1123 (3d Cir. 1997)...................................................................19
*Cuffy v. New York*,
   69 N.Y.2d 255 (1987) .............................................................................37
*De Long v. Cty. of Erie*,
   60 N.Y.2d 296 (1983) .............................................................................38
*Deshaney v. Winnebago County Dep't of Soc. Servs.*,
   489 U.S. 189 (1989) ................................................................................12
*Dietz v. Damas*,
   932 F. Supp. 431 (E.D.N.Y. 1996) .........................................................17
*Doe v. Phillips*,
   81 F.3d 1204 (2d Cir. 1996).....................................................................28
*Dwares v. City of New York*,
   985 F.2d 94, 99 (2d Cir. 1993).................................................................12
*E.E.O.C. v. Port Auth. of N.Y. & N.J.*,
   768 F.3d 247 (2d Cir. 2014).....................................................................11
*Emerson v. City of New York*,
   740 F.Supp.2d 385 (S.D.N.Y. 2010).................................................19, 28
*Engel v. C.B.S., Inc.*,
   145 F.3d 499 (2d Cir. 1998).....................................................................16
*Estate of Keenan v. Hoffman-Rosenfeld*,
   No. 16 Civ. 0149 (SFJ)(AYS), 2019 U.S. Dist. LEXIS 126330, (E.D.N.Y. July 29, 2019)....28
*Estiverne v. Esernio-Jenssen*,
   833 F. Supp. 2d 356 (E.D.N.Y. 2011) ....................................................24
*EvidenBristol v. Queens Cty.*,
   No. 09 Civ. 5544 (JFB) (AKT), 2013 U.S. Dist. LEXIS 41655 (E.D.N.Y. Feb. 27, 2013).....29
*Fogle v. Sokol*,
   957 F.3d 148 (3d Cir. 2020)....................................................................27
*Garnett v. Undercover Officer C0039*,
   838 F.3d 265, 279 (2d Cir. 2016).............................................................32
*Gedrich v. Fairfax Cty. Dep't of Family Servs.*,
   282 F. Supp. 2d 439 (E.D. Va. 2003) ......................................................23
*Groat v. Town Board of the Town of Glenville*,
   73 A.D.2d 426 (3rd Dept. 1980) ..............................................................17
*Haddock v. New York*,
   75 N.Y.2d 478 (1990) .............................................................................39
*Hill v. City of N.Y.*,
   45 F.3d 653 (2d Cir. 1995)...........................................................25, 28, 29
*Hirsch v. Otsego Cnty. Dep't of Soc. Servs.*,
   1992 U.S. Dist. LEXIS 3052, 1992 WL 59178 (N.D.N.Y. Mar. 12, 1992) ..........................24

*In Re Rachel S.D.*,
   113 A.D.3d 450 (1st Dept. Sept. 2014)..................................................................17

*J.B. v. Washington County*,
   127 F.3d 919 (10th Cir. 1997) .............................................................................19

*Jones v. Westchester County*,
   182 F. Supp. 3d 134 (S.D.N.Y. 2016)..................................................................34

*Jovanovic v. City of N.Y.*,
   2006 U.S. Dist. LEXIS 59165 (S.D.N.Y. Aug. 17, 2006) ...................................32

*Kaytor v. Elec. Boat Corp.*,
   609 F.3d 537 (2d Cir. 2010)...........................................................................22, 32

*Kulwicki v. Dawson*,
   969 F.2d 1454 (3d Cir. 1992)...............................................................................25

*Lennon v. Miller*,
   66 F.3d 416 (2d Circ. 1995) ................................................................................19

*Li v. City of New York*,
   246 F.Supp.3d 578 (E.D.N.Y. 2017) ...................................................................19

*Littlejohn v. City of New York*,
   795 F.3d 297 (2d Cir. 2015).................................................................................11

*Magnotti v. Kuntz*,
   918 F.2d 364 (2d Cir. 1990).................................................................................30

*Malley v. Briggs*,
   475 U.S. 335 (1986).............................................................................................26

*Marisol A. by Forbes v. Giuliani*,
   929 F. Supp. 662 (S.D.N.Y. 1996).......................................................................37

*McLennon v. City of New York*,
   171 F. Supp. 3d 69, 89 (E.D.N.Y. 2016) .............................................................40

*Mejia v. City of N.Y.*,
   119 F. Supp. 2d 232 (E.D.N.Y. 2000) ......................................................26, 30, 31

*Meyer v. Nebraska*,
   262 U.S. 390 (1923).............................................................................................19

*Morris v. Dearborne*,
   181 F.3d 657 (5th Cir. 1999) .........................................................................23, 30

*Murphy v. Lynn*,
   118 F.3d 938 (2d Cir. 1997).................................................................................18

*Okin v. Vill. of Cornwall-on-Hudson Police Dep't*,
   577 F.3d 415 (2d Cir. 2009)...........................................................................12, 13

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979).............................................................................................22

*Pena v. Deprisco*,
   432 F.3d 98 (2d Cir. 2005).............................................................................12, 15

*Perez v. Duran*,
   962 F. Supp. 2d 533 (S.D.N.Y. 2013)..................................................................18

*Prince v. Massachusetts*,
   321 U.S. 158 (1944).............................................................................................19

*Ray v. Basa*,
   No. 11 Civ. 02923-YGR (PR), 2015 U.S. Dist. LEXIS 39697 (N.D. Cal. Mar. 27, 2015)......34

*Ricciuti v. New York City Transit Authority*,
  124 F.3d 123 (2d Cir. 1997)...................................................................... 24, 30, 32
*Salim v. Proulx*,
  93 F.3d 86 (2d Cir. 1996) ................................................................................. 30
*Santosky v. Kramer*,
  455 U.S. 745 (1982).......................................................................................... 19
*Sapienza v. Notaro*,
  172 A.D.3d 1418 (2nd Dept. 2019) ................................................................. 16
*Sorichetti v. New York*,
  65 N.Y.2d 461 (1985) ....................................................................................... 37
*Southerland v. City of N.Y.*,
  680 F.3d 127 (2d Cir. 2011)............................................................................. 21
*Sugar v. Greenburgh Eleven Union Free Sch. Dist.*
  2018 Civ. 67 (VB), 2018 U.S. Dist. LEXIS 217507 (S.D.N.Y. Dec. 28, 2018) ..................... 40
*Sundbye v. Oguleye*,
  3 F.Supp.2d 254 (E.D.N.Y. 1998) ................................................................... 17
*Tango v. Tulevech*,
  61 N.Y.2d 34 (1983) .................................................................................. 38, 40
*Thomas v. G2 FMV, LLC*,
  147 A.D.3d 700 (1st Dept. 2017)..................................................................... 16
*Troxel v. Granville*,
  530 U.S. 57 (2000)............................................................................................ 17
*United States v. McGeoch*,
  546 F. App'x 44, 48 (2d Cir. 2013) .................................................................. 21
*Valdez v. City of New York*,
  18 N.Y.3d 69 (2011) ......................................................................................... 40
*Van Emrik v. Chemung Cty. Dep't of Soc. Servs.*,
  220 A.D.2d 952 (3rd Dept. 1995) .................................................................... 39
*Walden v. Wishengrad*,
  745 F.2d 149 (2d Cir. 1984)............................................................................. 29
*Wellner v. City of N.Y.*,
  393 F. Supp. 3d 388 (S.D.N.Y. 2019)............................................................. 33
*Whelehan v. County of Monroe*,
  558 F. Supp. 1093 (W.D.N.Y. 1983) ............................................................... 16
*White v. Frank*,
  855 F.2d 956 (2d Cir. 1988)............................................................................. 26
*Wilkinson v. Russell*,
  182 F.3d 89 (2d Cir. 1999)............................................................................... 24
*Zahrey v. Coffey*,
  221 F.3d 342 (2d Cir. 2000)........................................................... 24, 25, 26, 30

## PRELIMINARY STATEMENT

Plaintiff, Justyna Zubko-Valva ("Plaintiff") hereby submits this Opposition to the Motion to Dismiss filed by the County of Suffolk, Suffolk County Department of Social Services employees Michele Clark, Edward Heepe, Robert Leto, Jennifer Lantz, Melissa Estrada, Lydia Sabosto, Jean Montague and Assistant Suffolk County Attorney Randall Ratje (collectively, "County Defendants").[1]

This case arises from the starvation, torture, and death of an 8-year-old boy, Thomas Valva ("Tommy"), due to other utter incompetence and vindictiveness on the part of Suffolk County officials.  For more than two years, Plaintiff literally begged the CPS Defendants to do something to protect her children against Valva's escalating abuse.  She presented then with incontrovertible evidence that Valva and Pollina were beating the children; she filed report after report.  Yet, despite their duty under New York law to investigate these allegations, the CPS Defendants closed the reports – sometimes within 24 hours of their being filed. When a particularly vicious beating by Valva prompted Plaintiff to threaten a complaint against CPS for failing to investigate the reports of abuse, CPS did something incredible: it filed an abuse and neglect petition against *Plaintiff*, using Valva and Pollina as two of their "star witnesses."   At no point did CPS Defendants sincerely believe that Plaintiff was a threat to the children. Rather, their goal was to silence her and deflect attention from their incompetent investigation.

This malicious and retaliatory filing not only resulted in a deprivation of Plaintiff's custody rights; it affirmatively signaled to Valva and Pollina that they could escalate their abuse with impunity.  That is precisely what they did, with tragic, yet entirely foreseeable consequences.

---

[1] This motion refers to Defendants Clark, Heepe, Leto, Lantz, Estrada, Sabosto, Montague and Ratje, collectively as "Child Protective Services Defendants" or "CPS Defendants."

## STATEMENT OF FACTS[2]

On January 17, 2020, Tommy was found frozen to death in his father's garage. Compl. ¶ 35.  His death was the tragic coda to a two-year struggle by his mother to persuade County officials to remove Tommy and his siblings from their father's custody.  *Id.* ¶ 37.

**Plaintiff Loses Custody of her Children without Notice or An Opportunity to be Heard.**

The origins of Tommy's death can be traced back to a miscarriage of justice that took place on September 6, 2017, when Justice Hope Schwartz Zimmerman summarily issued an Order, without notice or an opportunity to be heard,  taking Plaintiff's children away from her and granting Valva custody over Tommy and his siblings. *Id.* ¶ 46.  That order itself was unlawful: it was spontaneously issued before the parties fully briefed the custody dispute, based on blatant misrepresentations by Valva's counsel, and at a "hearing" whose only scheduled item was setting a briefing schedule for custody papers. *Id.* ¶¶ 59-75. That same day, Nassau County Police – who were close friends of Valva – came to Plaintiff's house to remove the children.  *Id.* ¶ 78-79. On September 20, 2017, Justice Zimmerman modified the Order by allowing unsupervised visits, but she kept in place portions of the stay away order regarding the children's place of living and their school.  *Id.* ¶ 85.

**Valva Files False Child Abuse Charges Against Plaintiff to Secure Full Custody.**

On October 31, 2017, in an effort to secure permanent full custody, Valva filed false child abuse allegations against Plaintiff with Child Protective Services ("CPS").  *Id.* ¶ 94.  From the outset, it was obvious to any objective observer that the allegations were complete fabrications. On November 1, 2017, Defendant CPS Investigator Michele Clark ("Defendant Clark") visited two of the children, both of whom assured her that they were never abused by nor were afraid of

---

[2] The statement of facts here is limited to those allegations which are relevant to the claims against the County Defendants.

their mother. *Id.* ¶¶ 99-100.  Defendant Clark knew – or would have known had she done the bare minimum investigation – that Valva was in a bitter matrimonial dispute and had every incentive to make false charges against Plaintiff.  *Id.* ¶ 101.

**Plaintiff Files 3 Separate Complaints with CPS, But CPS Completely Ignores These Reports.**

While Defendant Clark was undertaking her "investigation," Plaintiff repeatedly tried to alert CPS that Valva and his girlfriend, Pollina, were abusing the children.  She filed three separate CPS reports. *Id.* ¶¶ 103-104.  In the first report, dated November 7, 2017, Plaintiff informed CPS that her children were being starved by Valva and provided proof of startling weight loss by each of the children.  *Id.* ¶ 105. Plaintiff also reported that Valva and Pollina were beating the children and making them stay outside in the backyard without shoes. *Id.* ¶ 106.

After filing this report, Plaintiff repeatedly attempted to follow up with CPS.  *Id.* ¶ 107.  She would later learn that Defendant Clark and her supervisor, Defendant Heepe, had not done *any* investigation into the November 7, 2017 report, and that they had marked it "CLOSED" two days after it had been filed. *Id.* ¶ 108.

**Plaintiff Meets with the CPS Defendants and Provides Conclusive Evidence of Abuse, But Defendants Ignore this Evidence.**

On December 19, 2017, Plaintiff met in person with Defendants Clark, Heepe, and Leto and implored them to take action to protect the children.  *Id.* ¶ 110.  Plaintiff furnished a flash drive containing 320 files documenting abuse by Valva and Pollina.  *Id.* ¶ 112.  These files consisted of certified audio recordings in which Valva forced the children to rehearse lines like "I don't love mommy," "mommy don't hit me," and "I don't want to stay with mommy." *Id.* ¶ 113.  The transcripts also documented Valva telling the children that their mother was a "loser" and that she "needed to get a job." *Id.* ¶ 113. The flash drive contained letters from the children's pediatrician and psychologist who confirmed that Plaintiff was a loving and devoted parent and there were no

signs that she abused them. *Id.* ¶ 115. It also contained a letter from one of the children's behavioral therapists, Dr. Kimberly Berens, who stated that she never observed any indication of abuse by the mother, and that removing the children from her custody was likely to cause "regression, as well as extreme psychological and emotional stress for all of these children." *Id.* ¶ 116. Dr. Berens further documented that Valva had been inappropriately touching Anthony's bottom, and that she had previously called the CPS hotline to report the improper touching. *Id.* ¶ 117.   Finally,   the flash drive contained evidence that children were terrified to visit their father, that they were wetting themselves and suffering nightmares after visitations. *Id.* ¶ 118.

At that same meeting, Plaintiff asked the CPS investigators to look at several sexual abuse reports that she had filed against Valva and Pollina, as well as police reports, that documented that: i) Valva would order the children to lick the girls' (Pollina's daughters) bellies below their belly button, and touch their private parts; ii) Valva would order the children to strip naked and walk around without any clothing; and iii) Valva and Pollina would walk around the house naked, and that Pollina's daughters would walk around the house naked as well.   *Id.* ¶ 121.   Plaintiff also informed them that she had taken her children to Cohen's Children's Hospital where they were examined for signs of abuse and that "several specimens had been removed" from their bodies for testing. *Id.* ¶ 122.

Incredibly, not only did CPS fail to file a petition against Valva and Pollina after this meeting – they failed to even *question* them.   *Id.* ¶ 123. Emboldened by CPS's unwillingness to take action against them, Valva and Pollina actually escalated the abuse after the December 19, 2017 meeting. *Id.*

On January 2, 2018, Plaintiff submitted a second report to CPS documenting the increase in abuse.  Unbeknownst to her, that report was marked "CLOSED" one day later by Defendants

Heepe and Leto. *Id.* ¶¶ 124-125. By law, CPS was required to conduct an investigation within 60 days, but Defendants sidestepped this requirement by marking the report as "duplicative," even though they knew it contained separate and distinct allegations of abuse. *Id.* ¶ 126.

**Valva Viciously Beats Tommy and Then Refuses to Let CPS Enter his House, But CPS Takes No Action.**

On January 13, 2018, Valva brutally beat Tommy, causing visible injuries. *Id.* ¶ 127. The following day, Plaintiff noticed the injuries during a court-ordered visitation and called a neighbor, who verified that Valva had assaulted Tommy and put him in long time-outs without food and drink. This led Plaintiff to file her *third* report of abuse to CPS. *Id.* ¶¶ 128-31.

On January 15, 2018, Valva refused to produce the children for Plaintiff's court-ordered visitation, even though Valva had sent her a text message confirming that he and the children were home at the time. *Id.* ¶ 132. While Plaintiff waited in front of Valva's house, CPS Defendant Mejia arrived to investigate the report that Plaintiff had filed the previous day. Intent on hiding Tommy's injuries, Valva refused to open the door for Defendant Mejia. *Id.* ¶ 133. In a breathtaking dereliction of duty, Defendant Mejia simply departed and left it to Plaintiff to call the police. *Id.* ¶ 134. Plaintiff then went to the nearest Suffolk County Police Department ("SCPD") precinct and filed a report. However, once the SCPD realized that Valva was a fellow police officer, they opted to do nothing: they refused to send over a single patrol car to check on the well-being of the children, and refused to take any action to compel Valva to produce the children for Plaintiff's court-ordered visitation. *Id.* ¶ 135. Plaintiff subsequently filed a complaint with Internal Affairs to address SCPS's complete dereliction of duty; unsurprisingly, no action was taken. *Id.* ¶ 137. CPS Defendants, for their part, offered no further assistance: they made no attempt to remove the children, force Valva to comply with the court-ordered visitation, nor requested that the Court intervene in the matter. *Id.* ¶ 138

**Plaintiff Informs Clark that She Will be Filing a Complaint against Her, and Clark Responds by   Filing a Malicious and Baseless Neglect Pre-Petition Against Plaintiff**.

On January 16, 2018, Plaintiff left Defendant Clark a voicemail stating that she would be filing a complaint against CPS for failing to investigate the reports.  Plaintiff also expressed her opinion that responsibility for Tommy's most recent beating rested squarely on Defendant Clark's shoulders. *Id.* ¶ 140. Rather than spur CPS to do its job and investigate the allegations against Valva, however, Plaintiff's message prompted Defendant Clark to launch a preemptive strike by filing a malicious and utterly baseless Neglect Pre-Petition the next day against *Plaintiff*.   In that Pre-Petition, Clark requested an order of protection for Plaintiff to stay away from her children. *Id.* ¶ 141.

On January 17, 2018, Defendant Clark made an appearance in Suffolk County Family Court on the Pre-Petition.  Defendant Clark deliberately gave Plaintiff only a few hours' notice of the hearing to ensure that Plaintiff would not be able to attend. *Id.* ¶¶ 153-54.  Defendant Clark took advantage of Plaintiff's absence to tell a series of lies to the Court in support of her request for a temporary Full Stay Away Order of Protection. *Id.* ¶ 155.  Defendant Clark lied about Plaintiff being "mentally ill" and deliberately concealed the evidence that Plaintiff had provided at the December 19, 2017 meeting showing that Valva, not Plaintiff, was the abuser.  *Id.* ¶¶ 156-57. Defendant Clark's efforts were successful: the Court issued an Order of Protection against Plaintiff, barring Plaintiff from having any unsupervised contact whatsoever with her children.  *Id.* ¶ 158. Shortly thereafter, CPS Defendants filed a formulaic child Neglect Petition that accused Plaintiff of using excessive corporal punishment and being of unsound mind.  *Id.* ¶ 143.

Defendants Clark, Heepe, and Leto were well aware that the allegations in the Petition were false. *Id.* ¶ 144.  In fact, Defendant Clark had previously represented in five separate CPS reports, over the prior three months, that Plaintiff did *not* pose a safety threat to the children. *Id.* ¶ 147.

The only thing that changed in the interim was Plaintiff's threat to file a complaint against CPS. Defendant Clark also knew that Valva was the one responsible for beating the children.  In fact, CPS Defendants had brought a Neglect Petition against Valva around the same time, but they never sought a reduction in custody: instead, Valva received an Adjournment in Contemplation of Dismissal and was ordered to take some classes at a local library.  Meanwhile, the CPS Defendants vigorously pursued their neglect allegations against Plaintiff and sought to permanently deprive her of custody over her children. *Id.* ¶¶ 148-152.  Not only did CPS drop the Neglect Petition against Valva, they would ultimately use him and his girlfriend as *witnesses* in Plaintiff's Neglect Petition proceedings. *See* Family Court Decision and Order of April 12, 2019, attached to Defendants' Motion.

CPS Defendant did not file the Neglect Petition against Plaintiff to protect the children. Rather, they did so to *retaliate* against Plaintiff for daring to complain about CPS's gross incompetence, and to deflect attention from their failure to investigate Valva by casting Plaintiff as the villain.  Compl. ¶¶ 145, 150.

**The CPS Defendants File a Full, Formal Neglect Petition Against Plaintiff based on Patently False Claims About Her.**

On January 23, 2018, Defendant Clark filed a full, formal Neglect Petition that was rife with statements that she and her supervisors knew were untrue – among them, that Plaintiff inflicted excessive corporal punishment on the children, that she was suffering from an "impaired mental state," that her behaviors were "erratic," that the children were "afraid of her," and that she was a safety danger to the children because she was allowed to carry a gun for her job as a corrections officer.[3] *Id.* ¶ 160.

---

[3] As the Family Court noted in its Decision and Order of April 12, 2019, attached to Defs' Memo, Plaintiff neither used nor owned a firearm, at work or at home. *Id.* at 15.

Again, Defendant Clark herself believed none of these statements. She would later admit that she had no knowledge whatsoever of any psychiatric, psychological, or mental health disorders afflicting Plaintiff.  *Id.* ¶ 163. In a failed attempt to bolster her claims, she sought testimony from Dr. Berens, who would later testify that Defendant Clark's questions were "odd" and that she had never witnessed Plaintiff act in anything but a warm and caring manner toward her children. *Id.* ¶¶ 165-66.

**Defendants Lantz and Estrada Make Several New False Claims Against Plaintiff, and Paint a Glowing Picture of the Children's Lives in the Valva Home.**

In February 2018, Defendant Lantz and Estrada replaced Defendant Clark.  Both of these individuals continued the practice of  writing their CPS Reports with blatant falsehoods – including the claim that Plaintiff was erratic, prone to violence, uncooperative in dealing with authority, and suffering from a drinking problem.  *Id.* ¶¶ 170-71.  These allegations were invented out of whole cloth: neither Defendant Lantz nor Estrada even spoke with Plaintiff, much less met her in person. Neither possessed any medical evidence to support their claims about Plaintiff's supposed mental health issues.[4]  *Id.* ¶ 172.

 In the same Reports, Defendants Lantz and Estrada painted a glowing picture of the children's lives in the Valva home. Specifically, in these reports, they falsely stated that: i) the living environment in the Valva home was stable and provided good to excellent living conditions; ii) Valva was very affectionate to all of the children, and was very accepting of them; iii) Valva used discipline appropriate for the children's age, development and conduct; iv) Valva provided age appropriate care and supervision of the children; and v) Valva accepts responsibility for problematic behaviors and conditions, and has taken appropriate steps to initiate change. *Id.* ¶ 174.

---

[4] In fact, Plaintiff had undergone psychological evaluations in order to get her job as a corrections officer and "passed without any findings of mental illness." Decision and Order of April 12, 2019 at 15.

Assistant County Attorney, Defendant Ratje, knew these Reports were false but nonetheless presented them as fact to the Family Court. *Id.* ¶ 176. He, too, hid the exculpatory evidence Plaintiff had provided CPS from the Court, and devoted his entire summation to arguing that Plaintiff was under the delusion that there was a conspiracy between Valva and CPS to falsely accuse her of child neglect. *Id.* ¶¶ 178-79.  Defendants Ratje's sole priority was ensuring that his office and the CPS Defendants were able to save face, not to protect Plaintiff's children from harm. *Id.* ¶ 184.

**Notwithstanding the CPS Defendants' Blatant Lies about Plaintiff, Justice Cheng Dismisses the Neglect Petition in its Entirety.**

Ultimately, the Family Court saw through Defendants' distortions.  On April 12, 2019, the Family Court dismissed the Neglect Petition in its entirety. *Id.* ¶ 202.  In an epic understatement, it called the County's closing arguments "noteworthy": "The Assistant County Attorney's closing arguments did not concentrate on the allegations in the petition.  The Assistant County Attorney briefly argued there was enough evidence for a *prima facie* case, however he concentrated most of his closing on arguing that the mother was mentally ill and that she believes there is a conspiracy between the father and Child Protective Services to falsely accuse her of child neglect."  Decision and Order of April 12, 2019 at 15. The court then stated that CPS had, in fact, falsely accused the mother. It found that there was "no evidence to support the father's testimony," "*no evidence that the mother suffers from a mental illness*," and numerous credible witnesses who testified that Plaintiff was a loving and devoted mother.  *Id.* ¶¶ 203-04 (emphasis supplied).

**ALJ Mannino Finds the Original Charges Against Plaintiff to be Completely Unfounded.**

On July 16, 2019, Plaintiff was further vindicated when ALJ Laureen Mannino found that the original CPS determination that Plaintiff should be "indicated" on the October 31, 2017 abuse and neglect charges filed by Valva was unfounded.  *Id.* ¶¶ 205-06. Incredibly, the CPS Defendants

did not even *attempt* to argue to the ALJ that there was sufficient evidence to support those abuse and neglect charges. *Id.* ¶ 207. In other words, after having forced Plaintiff to defend herself against completely baseless neglect allegations and after depriving her of unsupervised visits for months, the CPS Defendants folded, effectively conceding that the charges should never have been brought in the first place. *Id.* ¶ 208.

**Despite Plaintiff's Exonerations, Valva is Allowed to Retain Custody and Continues to Abuse Them.**

These twin exonerations, however, did not end Plaintiff's ordeal. Valva still retained primary custody over the children and continued to abuse them. CPS would ultimately generate three court-ordered reports from October 2018 to March 2019 documenting statements from the children's doctors and teachers confirming that Valva and Pollina were torturing and starving them. *Id.* ¶¶ 230-33. In one report, Defendant Lantz documented the following claims made by the teachers at the children's school:

> i) "Ms. Emin (school psychologist) reports that she and the teachers of Anthony and Thomas are all concerned as the children have *lost a noticeable amount of weight* and are both very thin and constantly asking for food"; ii) Ms. Rakowski (Anthony's special education teacher) stated that "she has concerns for Anthony", that he "looks emaciated" and "shoves food in his mouth as fast as he can"; iii) Ms. Cagliano (Thomas' teacher) stated that she had "witness[] Thomas *eat crumbs off the floor* and *out of the garbage*; iv) Ms. Cagliano further express "concerns that Thomas has been sent to school in a wet pull-up" and that he is "not allowed to go to the nurse's office to take it off."; v) Ms. Holborow (Anthony's teacher) indicated that she is "concerned as Anthony is very thin, has little to no affect, [and] has been observed snatching food off the desks and off the floor."

*Id.* ¶ 231 (emphasis added). Another report noted that Anthony had *visible bruises* on his "buttocks, arms, and upper thighs," which were "unexplained." When asked about these bruises, Valva gave the credulity-defying answer that "the bruising on Anthony buttocks and upper tights are a result of pimples that Anthony is getting on his bottom due to soiling himself." *Id.* ¶ 233. In yet another report, it was documented that "Anthony has been coming to school with his clothes

and backpack soaked in urine" and that notwithstanding this fact, Valva and Pollina have "fail[ed] to address the concerns." *Id.* ¶ 236.

By November 2018, the children were literally starving to death. *Id.* ¶ 239.  Still, CPS did nothing.  Plaintiff literally begged CPS Supervisor Defendant Montague to investigate the reports filed on the CPS hotline.  Instead, on January 8, 2020, Defendant Montague closed out the last CPS report, even though the law required that report to remain open for 90 days – *i.e.,* until January 18, 2020. *Id.* ¶¶ 254-56.  Less than ten days later, Tommy would freeze to death in Valva's garage. *Id.* ¶ 256.

**Only After Tommy Freezes to Death in Valva's Garage do Defendants Finally Take Action.**

Only after Tommy's highly publicized death did the County take any action.  Valva and Pollina were arrested and charged with Second-Degree Murder.  The investigation confirmed what Plaintiff had told CPS Defendants all along.  Among other things, investigators uncovered horrific abuse captured on the Nest cameras that had been installed in every room of the Valva house.  *Id.* ¶ 271.  Those videos showed Valva beating one of his children with a closed fist, Tommy begging to be let out of his room to use the bathroom, and Tommy shivering and shaking in the garage, looking into the Nest camera with pleading eyes for someone to help him. *Id.* ¶ 272.  Security footage captured a conversation between Valva and Pollina on January 17, 2020, in which Pollina asks him why Tommy fell to the ground. Valva answers, "Cuz he was cold. *Boo-fkn-hoo. Now he's a bloody [f\*\*king] mess*." *Id.* ¶ 273.  Hours later, Tommy was dead.

<u>**STANDARD OF REVIEW**</u>

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Littlejohn v. City of New York*, 795 F.3d 297, 307 (2d Cir. 2015). In order to survive a

motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (internal quotations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Id.* The complaint need only allege enough facts to "nudge its claims across the line from conceivable to plausible to proceed." *E.E.O.C. v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (internal quotations omitted).

## ARGUMENT

### I.   PLAINTIFF HAS STATED A VIABLE DUE PROCESS CLAIM.

#### A.   State Actors May Be Held Liable When They Affirmatively Increase the Danger of Private Violence.

Although "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause," *Deshaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989), state actors may be liable under section 1983 if they affirmatively created or enhanced the danger of private violence. *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993), *overruled on other grounds by Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). To state such a claim, a plaintiff need only show that the state engaged in some sort of behavior that "ratchet[ed] up the threat of danger." *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 430 (2d Cir. 2009) (finding state created danger where "officer's dismissive and indifferent attitude toward [plaintiff's] complaints . . . nullifie[d] the deterrent capacity of police response" and may have "galvanized [an abuser] to persist in violent encounters with [plaintiff]").

12

The Second Circuit had held that "repeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances,' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin*, 577 F.3d at 428 (quoting *Dwares*, 985 F.2d at 99) (finding state created danger where police responded to domestic complaints without filing a domestic incident report, interviewing the accused, or making an arrest); *accord Pena v. Deprisco*, 432 F.3d 98, 111 (2d Cir. 2005) ("[W]hen, as the plaintiffs allege, state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983.").

### i.   Defendants Increased the Danger to the Children by Exhibiting a "Dismissive and Indifferent Attitude" Towards the Allegations of Valva's Abuse.

Here, as in *Okin*, the CPS Defendants displayed a "dismissive and indifferent attitude" toward the allegations of abuse by Valva and, in so doing, clearly communicated that Valva's violence "would go unpunished." Id., 577 F.3d at 430.  CPS Defendants closed out every report that Plaintiff filed against Valva. Compl. ¶¶ 103-108.[5]  After Valva brutally beat Tommy and refused to produce him for Plaintiff's court-ordered visitation, CPS's response was disturbingly feeble: Mejia paid Valva a visit, but when Valva refused to open the door, Mejia simply walked away, leaving Plaintiff with instructions to call the police. *Id.* ¶¶ 133-134. And when it became evident that the SCPD was not going to take action against "one of its own," CPS made no attempt

---

[5] Defendants note that the Complaint does not explicitly plead that Valva and Pollina were aware that CPS had closed out these reports.  But given that Valva actively participated in the Neglect Petition hearing – which contained extensive testimony and evidentiary productions from both CPS and Plaintiff, *see* April 12, 2019 Decision and Order, attached to Defendants' Memo – it is impossible that Valva would not have learned that Plaintiff had filed reports alleging that he and Pollina had abused the children. Certainly, at the pleading stage, Plaintiff is entitled to have this inference drawn in her favor.

to remove the children or require Valva comply with the court-ordered visitation.  *Id.* ¶¶ 133-18. In the nine months between the dismissal of the Neglect Petition and Tommy's death, Valva and Pollina repeatedly sent the children to school with visible bruises and in a state of *starvation* – yet, CPS Defendants still refused to take any action.  *Id.* ¶¶ 230-73.  It is little wonder then, that notwithstanding the ostensible scrutiny by CPS and the courts, Valva and Pollina felt comfortable abusing the children until one of them tragically froze to death.

True, CPS Defendants went through the motions of filing a Neglect Petition against Valva, but this gesture ultimately confirmed CPS's indifference toward Valva's abuse: while CPS sought a Full Stay Away Order in connection with the Neglect Petition against Plaintiff, they never sought to reduce Valva's custody rights.  And where CPS pursued the Neglect Petition against Plaintiff to its conclusion, they dropped the Neglect Petition against Valva six weeks after filing it.  *Id.* ¶¶ 148-152.  Worse, CPS Defendants relied extensively on Valva and Pollina's testimony in the Neglect Petition proceedings against Plaintiff.  This, plus CPS's glowing reports about the children's life in the Valva household, clearly signaled that they regarded those two as credible, trustworthy witnesses and as lesser threats to the children.  *Id.* ¶¶ 174, 203.

### ii.     Defendants Increased the Danger to the Children by Ensuring that Valva Would Retain Custody Over The Children.

By bringing the Neglect Petition, CPS Defendants enhanced the danger to the children in an additional way: they almost certainly ensured that Valva would retain custody over the children. The Complaint alleges that CPS Defendants fabricated abuse and neglect charges against Plaintiff, Compl. ¶¶ 43, 147, 169-170, and painted an idealized picture of the children's life in the Valva household.  *Id.* ¶¶ 173-74.  These falsifications not only led to the January 18, 2018 Family Court order prohibiting Plaintiff from having unsupervised visits with her children, *id.* ¶ 158, they undoubtedly impacted the custody proceedings before the matrimonial court.   After the

14

matrimonial judge granted Valva primary custody in September 2017, Plaintiff continuously fought to regain her custodial rights.  Those proceedings, however, were stayed pending CPS's retaliatory Neglect Petition, which took three months to resolve.  *Id.* ¶ 198.  Had CPS not actively concealed evidence that Valva was the abuser, not sided with Valva in the Family Court proceedings, and not falsified evidence that Plaintiff was unfit to parent, Plaintiff would have had an incomparably greater chance of securing full custody rights in the matrimonial proceedings. And Tommy would still be alive.

If the conduct described in the Complaint does not "shock the conscience," it is hard to fathom what conduct would meet that bar. CPS Defendants were not facing split-second decisions; they had two years to act on the mounting evidence of abuse.  *Pena v. Deprisco*, 432 F.3d at 113 ("In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'"); *Chambers v. N. Rockland Cent. Sch. Dist.*, 815 F. Supp. 2d 753, 770 (S.D.N.Y. 2011) ("where the alleged behavior of . . . defendants [took place] over an extended period of time and in the face of action that presented an obvious risk of severe consequences and extreme danger, the Second Circuit has found that official inaction can shock the conscience").

In *Pena*, the Second Circuit found that officers who simply allowed a colleague to drive drunk, resulting in the death of several pedestrians, were guilty of "conscience shocking" behavior. 432 F.3d at 113-14. This case is incomparably worse.  Here, CPS Defendants not only covered for a man who was torturing and starving his children to death, they deliberately concealed evidence showing that the children would be safe with their mother; and when CPS's failures were about to be exposed, they sought to deflect attention by portraying the mother as the real villain.  At no point did they act in the best interests of the children.  CPS Defendants' actions were, in short,

15

layer-upon-layer of conscience-shocking behavior. Accordingly, Defendants' motion to dismiss Plaintiff's due process claim must be denied.

## II. PLAINTIFF HAS STATED A CLAIM FOR MALICIOUS PROSECUTION.

### A. The Groundless Initiation of a Case in Family Court May Give Rise to a Malicious Prosecution Claim.

Defendants argue that Plaintiff's malicious prosecution claim must be dismissed because "she was not criminally prosecuted …." (Def. Mem. at 11).   However, federal courts have acknowledged that the baseless commencement of a case in Family Court can, in fact, give rise to a malicious prosecution claim. *See, e.g.*, *Chi Chao Yuan v. Rivera*, 48 F. Supp. 2d 335, 349 (S.D.N.Y. 1999) ("[T]he groundless initiation of a case in Family Court may give rise to a claim for malicious prosecution."); *Whelehan v. County of Monroe*, 558 F. Supp. 1093, 1098 (W.D.N.Y. 1983) (same). Thus, contrary to Defendants' claims, a plaintiff need *not* be subject to criminal process to state a malicious prosecution claim.

In fact, New York law explicitly authorizes such claims on the basis of civil actions so long as the plaintiff demonstrates the following: "(1) prosecution of a civil action against the plaintiff, (2) by or at the instance of the defendant, (3) without probable cause, (4) with malice, (5) which terminated in favor of the plaintiff, and (6) causing special injury." *Castro v. East End Plastic, Reconstructive & Hand Surgery, P.C.*, 47 A.D.3d 608, 609 (2008).[6]  "Special injury," in turn, simply means "some interference with the plaintiff's person or property beyond the ordinary burden of defending a lawsuit." *Engel v. C.B.S., Inc.*, 145 F.3d 499, 502 (2d Cir. 1998).

---

[6] The only difference between the elements of a malicious prosecution predicated on criminal versus civil proceedings is that the latter adds a "special injury" requirement.  *Compare O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d Cir. 1996), *with Castro*, 47 A.D.3d at 609.

Here, the malicious Neglect Petition had two consequences – first, it directly led to the Order depriving Plaintiff of unsupervised visitation, Compl. ¶ 158; and second, it led to the matrimonial court proceedings being stayed, thereby preventing Plaintiff from making her case for full custody.  *Id.* ¶ 198.  Either one of these satisfies the "special injury" requirement.  Indeed, New York courts have routinely recognized that ordinary economic damages resulting from a civil lawsuit (*e.g.*, lost income and terminating employment agreements) will satisfy the "special injury" requirement. See, e.g., *Sapienza v. Notaro*, 172 A.D.3d 1418, 1420 (2nd Dept. 2019) (finding "special injury" where plaintiff alleged that the civil lawsuit led his employed not to renew his employment agreement); *Thomas v. G2 FMV, LLC*, 147 A.D.3d 700, 700 (1st Dept. 2017) (finding "special injury" where lawsuit led to the termination of a consultancy arrangement); *Groat v. Town Board of the Town of Glenville*, 73 A.D.2d 426 (3rd Dept. 1980) ("withholding of pay constitute[s] a special injury').

It is inconceivable that malicious prosecution law would recognize these lesser species of injuries, yet ignore impairments of the "*fundamental right* of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66 (2000) (emphasis added); *Bennett v. Jeffreys*, 40 N.Y.2d 543, 545 (1976) (custodial rights are so fundamental in nature that they may only be impinged upon in "extraordinary circumstances").

## B.    The Cases Cited By Defendants Are Wholly Inapposite and Do Not Support Defendants' Position.

Defendants misrepresent the holding of *In Re Rachel S.D.*, 113 A.D.3d 450 (1st Dept. 2014). That case did not say that a plaintiff could not state a malicious prosecution claim in connection with custody proceedings; rather, the Appellate Division merely stated that the lower court "properly drew a negative inference against appellant based on his failure to testify, which did not violate his Fifth Amendment rights because Family Court proceedings are civil in nature."

*Id.* at 451.  Needless to say, the application of the Fifth Amendment privilege to civil cases has no bearing on whether an injury is cognizable under malicious prosecution law.  Likewise, Defendants misrepresent *Sundbye v. Oguleye*, 3 F.Supp.2d 254, 262 n.4 (E.D.N.Y. 1998), which said *nothing* about the "special injury" requirement but, rather, dismissed a malicious prosecution claim because the plaintiff failed to show that the proceedings were terminated in her favor. The same is true for *Dietz v. Damas*, 932 F. Supp. 431, 447 (E.D.N.Y. 1996), which merely stated what that custody hearings are civil in nature. Accordingly, the cases relied upon by Defendants are readily distinguishable, and do not support their position.

### C.    Plaintiff Has Sufficiently Pled a Constitutional Violation.

Defendants also argue that Plaintiff has not stated a constitutional claim because she was "not arrested or or otherwise taken into custody" and did not suffer "the violation of a constitutionally protected interest." (Def. Mem. at 13-14). Defendants are incorrect on both counts.

### i.    The Requirement of Attending Court Proceedings Establishes a "Seizure" under the Fourth Amendment.

Defendants cite a number of cases holding that a § 1983 malicious prosecution will only be found where the plaintiff has suffered a restrain on her physical liberty in violation of the Fourth Amendment.  (Def. Mem. at 12-13).  However, Plaintiff alleges that as a result of the false CPS charges, she was required "*make multiple court appearances and defend herself in two separate trials*, spanning a period of 16 months." Compl. ¶ 310 (emphasis supplied). This allegation, by itself, is sufficient to establish a Fourth Amendment "seizure" for purposes of a malicious prosecution claim. *See Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997) (holding that a defendant who faced travel restrictions and was compelled to appear in court multiple times was seized within the meaning of the Fourth Amendment); *Ashley v. Civil*, No. 14 Civ. 5559, 2019 U.S. Dist. LEXIS 56006, 2019 WL 1441124, at *7 (E.D.N.Y. Apr. 1, 2019) (holding that appearing in court on seven

18

occasions could constitute a deprivation of liberty); _Perez v. Duran_, 962 F. Supp. 2d 533, 540-43 (S.D.N.Y. 2013) (holding that requiring the plaintiff to make two court appearances and comply with travel restrictions could constitute a "sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights").

### ii.  Parental Custody over Children is a Constitutionally Protected Right.

In any event, Defendants are incorrect that the case law requires a Fourth Amendment seizure. Defendants' cases all involve plaintiffs who asserted malicious prosecution claims predicated on _criminal_ prosecutions. To be sure, in the criminal context, courts found that a post-arraignment deprivation of liberty is required to state a § 1983 malicious prosecution claim. _See, e.g._, _Li v. City of New York_, 246 F.Supp.3d 578 (E.D.N.Y. 2017); _Callahan v. City of New York_, 90 F.Supp.3d 60, 71 (E.D.N.Y. 2015). But Plaintiff's case is neither criminal nor does she need to rely on a Fourth Amendment violation. To state a malicious prosecution claim under § 1983, a plaintiff need only show that the malicious prosecution implicated a constitutional right. _Lennon_, 66 F.3d 416, 425 (2d Circ. 1995). Plaintiff has identified such a right: as explained above, the Supreme Court has long recognized a substantive due process right to custody over one's children. _Prince v. Massachusetts_, 321 U.S. 158, 166 (1944); _Meyer v. Nebraska_, 262 U.S. 390, 399 (1923); _Santosky v. Kramer_, 455 U.S. 745, 753 (1982) (there is "a fundamental liberty interest of natural parents in the care, custody, and management of their child."); _see also J.B. v. Washington County_, 127 F.3d 919, 925 (10th Cir. 1997) ("We recognize that the forced separation of parent from child, even for a short time, represents a serious infringement upon both the parents' and child's rights."); _Croft v. Westmoreland County Children and Youth Services_, 103 F.3d 1123, 1125 (3d Cir. 1997) ("The due process clause of the Fourteenth Amendment prohibits the government from interfering

in the familial relationship unless the government adheres to the requirements of procedural and substantive due process.").

### iii.    Defendants Misread the Supreme Court's Decision in *Albright v. Oliver*.

Defendants cite to a single case – *Emerson v. City of N.Y.*, 740 F. Supp. 2d 385, 392 (S.D.N.Y. 2010) – which held that a party alleging malicious prosecution in connection with Family Court proceedings must state a Fourth Amendment claim.  However, that case – which does not bind this Court, in any event – was wrongly decided.  *Emerson* was predicated on a misreading of the Supreme Court's decision in *Albright v. Oliver*, 510 U.S. 266 (1994).   In *Albright*, a plaintiff alleged malicious prosecution in connection with a criminal prosecution; however, he alleged neither a Fourth Amendment nor a due process violation.  Rather, the sole constitutional violation he identified was a "substantive due process right to be free from criminal prosecution except upon probable cause."  *Id.* at 271.  The Supreme Court held that no such right existed and that, owing to its reluctance to expand the body of substantive due process rights, a plaintiff asserting a right to be free from criminal prosecution without probable cause would have to situate that right in the Fourth Amendment.  *Id.* at 273-74.

However, nothing in *Albright* suggested that a plaintiff could not state a malicious prosecution claim based on the violation of a substantive due process right that is already well-established.  In fact, the Supreme Court helpfully identified familial rights as one of the few rights protected by substantive due process. *Id.* at 272 ("The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity.").  Tellingly, while the Second Circuit has never explicitly addressed *Albright*'s application to a case such as this, the one Circuit to consider this issue has squarely held that *Albright* does not preclude a malicious prosecution claim based on a violation of the substantive

due process right to raise one's children. *See Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1018 n.14 (7th Cir. 2000).

### iv. Defendants Affirmatively Interfered with Plaintiff's Constitutional Right to Raise Her Children.

Defendants' contention that they did not interfere with Plaintiff's constitutional right to raise her children is equally meritless. As explained above, that interference came in two forms. First, the Order following the Neglect Pre-Petition stripped Plaintiff of her unsupervised visitation rights.[7] Second, Neglect Petition proceedings had a deleterious impact on Plaintiff's ability to press her custody rights in the matrimonial proceedings.

Defendants further argue that there is no violation of a parent's constitutionally protected interests where a caseworker "has a reasonable basis for thinking that the child is abused or neglected." (Def. Mem. at 15) (quoting *Southerland v. City of N.Y.*, 680 F.3d 127, 152 (2d Cir. 2011)). But this is precisely the problem: Defendants never had a "*reasonable* basis" to believe that Plaintiff was abusing or neglecting the children. As alleged in the Complaint, the CPS Defendants brought the Petition to punish Plaintiff for speaking out and to deflect attention from their own incompetence.[8] Thus, Defendants' argument must be rejected.

---

[7] While Plaintiff's right to unsupervised visitation was reinstated after several months, it is well-established that even a temporary imposition on unsupervised contact with one's child is a "severe intrusion . . . on the fundamental right to familial association." *United States v. McGeoch*, 546 F. App'x 44, 48 (2d Cir. 2013) (collecting cases).

[8] Equally meritless is Defendants' contention that CPS cannot be held liable for the deprivation of unsupervised visitations because the Family Court granted CPS's request. *Southerland* stated that a "court confirmation" only relieves the caseworker of liability for a removal "where the purpose of the removal is to keep the child safe." 680 F.3d at 152. It does not apply where the caseworker's purpose is retaliatory, and where he or she lies to the court to secure an order of removal.

### D.     Defendants' Conduct Shocked the Conscience.

#### i.     Defendants Waived Their "Probable Cause" Argument By Conceding That Plaintiff Should Not Have Been "Indicated."

Defendants argue that their conduct did not shock the conscience because they had probable cause to pursue neglect and abuse charges. (Def. Mem. at 15) However, that argument is forfeited, since Defendants *conceded* before ALJ Mannino that they had no evidence to support CPS's determination that Plaintiff should be "indicated" on the abuse and neglect charges filed by Valva on October 31, 2017. Compl. ¶ 207. Shortly thereafter, the ALJ issued an order finding that CPS's determination was unfounded. *Id.* ¶ 206. That concession is fatal to Defendants' argument here. Under New York law, a report will only be indicated "if an investigation determines that some credible evidence of the alleged abuse or maltreatment exists." N.Y. Soc. Serv. Law § 412(7). Since the ALJ already found that here was no credible evidence of abuse, and since CPS Defendants conceded the point after being given a full and fair opportunity to contest the issue, Defendants are collaterally estopped from asserting now that they had a foundation to pursue charges against Plaintiff. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.5 (1979).

#### ii.     The Complaint is Rife with Highly Detailed Factual Allegations Establishing that Defendants Acted in Bad Faith and Without Probable Cause.

Even putting this concession aside, the Complaint alleges in detail that the CPS Defendants lacked probable cause, that they pursued the Neglect Petition not out of an honestly held belief that Plaintiff was a danger to her children, but out of a desire to punish Plaintiff and conceal their wrongdoing. Among other things, the Complaint alleges that:

- Defendant Clark filed the Neglect Pre-Petition the day after Plaintiff left her a voice mail informing her that she would filing a complaint alleging that CPS's investigation was conducted in a biased manner. Compl. ¶¶ 140-41. *See Kaytor v. Elec. Boat Corp.*, 609

F.3d 537, 552 (2d Cir. 2010) (close "temporal proximity" between protected activity and adverse action is enough to create an inference of retaliatory motive).

- Defendant Clark was motivated by a desire to deflect attention from her own gross failures as a CPS investigator – failures which led to Tommy's severe beating three days before the Neglect Pre-Petition was filed, and which would ultimately lead to his death. Compl. ¶ 145.

- Defendant Clark did not believe any of the allegations she placed in the Neglect Petition, as evidenced by the fact that she affirmatively stated "on her State Central Register reports dated October 31, 2018, November 7, 2017, November 13, 2017, January 8, 2018 and January 15, 2018, that there were NO safety concerns that placed the children in immediate danger of serious harm, in regards to her investigation against Plaintiff." *Id.* ¶ 147.

- Defendant Clark knew that Valva was the real danger, as evidenced by the fact that she filed a Neglect Petition against him following Tommy's beating. *Id*. ¶ 148.

- During the January 17, 2018 hearing, Defendant Clark withheld evidence from the Family Court that Plaintiff had provided her showing that Valva was the abuser and which exonerated Plaintiff. *Id.* ¶ 157.

- Defendant Clark alleged that Plaintiff was "mentally ill," while later admitting that she had *no knowledge* whatsoever of any psychiatric, psychological or mental health disorders afflicting Plaintiff, as no such disorders existed; even Clark's expert confirmed that there was no evidence of mental illness. *Id.* ¶¶ 163-66.

- Defendants Lantz and Estrada, who took over the proceedings from Defendant Clark, knowingly presented false evidence to the court and alleged, without basis, that Plaintiff's mental health was deteriorating, that she was violent and uncooperative, and that she had a drinking problem. *Id.* ¶ 170.

- None of the Defendants pursuing the Neglect Petition even bothered to speak with Plaintiff or meet with her in person; rather, they made up the false allegations out of whole cloth. *Id.* ¶ 172.

- These same Defendants submitted evidence that deliberately created the false impression that the children were safe and happy in the Valva home. *Id.* ¶ 174.

- Defendant Ratje manufactured false evidence concerning Plaintiff's mental state. *Id.* ¶¶ 177-81.

The complaint also alleges that Defendants Heepe and Leto were aware of these fabrications and nonetheless greenlit the filing of the Neglect Petition. *Id.* ¶¶ 142, 144. See also id. ¶¶ 125-127, 156, 160, 162, 202.

The above misrepresentations, individually and cumulatively, not only demonstrate a complete lack of probable cause – they readily meet the threshold for conscience-shocking behavior. "[N]o matter how much process is required, at a minimum it requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Brokaw v. Mercer Cty.*, 235 F.3d 1000, 1020 (7th Cir. 2000).  Thus, federal courts have uniformly held that a state official who fabricates a story of child abuse commits conscience-shocking behavior.  *See, e.g.*, *Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999); *Gedrich v. Fairfax Cty. Dep't of Family Servs.*, 282 F. Supp. 2d 439, 461 (E.D. Va. 2003); *Hirsch v. Otsego Cnty. Dep't of Soc. Servs.*, 1992 U.S. Dist. LEXIS 3052, 1992 WL 59178, at *4-5 (N.D.N.Y. Mar. 12, 1992) (finding that a reasonable jury could conclude that a caseworker's bias against plaintiff and failure to pursue "credible and believable" leads were "so egregious that it shocked the conscience"); *Estiverne v. Esernio-Jenssen*, 833 F. Supp. 2d 356, 373 (E.D.N.Y. 2011) (finding due process violation where plaintiffs were without custody of their three infant children for nearly ten months following a court-ordered removal and defendant doctor "both ignored significant exculpatory evidence and manufactured a false or reckless diagnosis"); *see also Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999) ("Case workers cannot be free to substantiate a claim of abuse, for instance, by ignoring overwhelming exculpatory information or by manufacturing false evidence.").[9]

---

[9] Further, Defendant Clark's suggestion that she cannot be held liable because the Neglect Petition was technically "initiated by CPS Case Worker Jami Robertson" (Def. Mem. at 15) – and not Clark herself – this argument has been rejected by the Second Circuit. *See Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("Although these charges were added by the Bronx district attorney's office, and thus not directly **f** filed by Lt. Wheeler, a jury could find that Lt. Wheeler played a role in initiating the prosecution by preparing the alleged false confession and forwarding it to prosecutors.")

### E.        Defendants Are Not Entitled to Absolute Immunity.

Defendants argue that the CPS workers are entitled to absolute immunity for their "failure to investigate …" the abuse allegations.  (Def. Mem. at 3, 16-17).  However, Plaintiff has alleged far more than a mere failure to investigate. Rather, Plaintiff has alleged *affirmative acts of misconduct* during the investigative phase, including the knowing falsification of evidence and concealment of exculpatory evidence. Given such allegations, the CPS defendants are not entitled to absolute immunity. *See Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) (recognizing right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity); *Anilao v. Spota*, 774 F. Supp. 2d 457, 467-68 (E.D.N.Y. 2011) ("[T]here is no absolute immunity for any alleged unconstitutional acts violating due process (including any alleged fabrication of evidence) during the investigative stage, not undertaken in preparation for the Grand Jury presentation or in the prosecutors' role as an advocate.").

Here, the Complaint specifically alleges that the CPS Defendants committed misconduct during the pre-filing, investigative stage. Compl. ¶¶ 110-125, 156-58.  The Second Circuit has identified the juncture in the criminal/civil process before which absolute immunity may not apply. Specifically, "a prosecutor's conduct prior to the establishment of probable cause should be considered investigative: 'A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested [or file charges].'" *Zahrey*, 221 F.3d at 347 n.2 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 274 (1993)); *accord Hill v. City of N.Y.*, 45 F.3d 653, 661 (2d Cir. 1995) ("Before any formal legal proceeding has begun and before there is probable cause to arrest . . . a prosecutor receives only qualified immunity for his acts"). Additionally, "the mere fact that a prosecutor might later convene a grand jury and obtain an

indictment does not automatically serve to cloak his prior investigatory actions with the protection of absolute immunity." *Anilao*, 774 F. Supp. 2d at (citing *Buckley*, 509 U.S. at 275-76).[10]

### i. Defendants Committed Misconduct During the Investigative Phase by Concealing Exculpatory Evidence.

Here, the Complaint alleges that CPS Defendants conspired to conceal exculpatory evidence that Plaintiff presented to them on December 19, 2017 and that -- rather than incorporate this material information into their investigation -- they summarily closed out the report mere days later in violation of the legal requirement that they conduct an investigation within 60 days. Compl. ¶¶ 110-125. The fact that this improper handling of evidence occurred prior to the filing of the Neglect Petition automatically deprives it of the absolute immunity shield. *Cf. Kulwicki v. Dawson*, 969 F.2d 1454, 1465 (3d Cir. 1992) ("Evidence gleaned prior to the filing is deemed investigative.").

### ii. CPS Case Workers Do Not Have Immunity for Initiating a Groundless Petition Based on Fabrications.

Defendants argue that the CPS case workers are entitled to absolute immunity because they were acting in a "quasi-prosecutorial manner ...." (Def. Mem. at 17). However, the CPS case workers were *not* acting as prosecutors or quasi-prosecutors in their pre-petition application for an Order of Protection against Plaintiff or in their filing of the Neglect Petition; rather they were acting as "complaining witnesses" – that is, witnesses "who play a role in initiating a prosecution." *White v. Frank*, 855 F.2d 956, 959 (2d Cir. 1988). Both the Second Circuit and the Supreme Court have squarely held that complaining witnesses – whether private citizens or public servants – are not entitled to absolute immunity for their role in commencing a prosecution. *See id.*; *Malley v.*

---

[10] As explained above, the CPS Defendants never had probable cause to bring charges in the first place. Thus, this Court can and should find at the motion to dismiss stage that *none* of the CPS Defendants' actions *at any time* were cloaked in absolute immunity.

*Briggs*, 475 U.S. 335, 339-40 (1986) (denying absolute immunity to police officers who wrongfully initiate criminal process by applying for arrest warrants); *see also Mejia v. City of N.Y.*, 119 F. Supp. 2d 232, 272 (E.D.N.Y. 2000) (officer who files a "charging affidavit is clearly a complaining witness" and is not entitled to immunity "if the information they falsely gave the prosecutor induced the prosecutor to act").

Moreover, the Complaint alleges that all CPS Defendants caused falsified investigative reports to be filed.  For example, the Complaint alleges that CSP Defendants Lantz and Estrada drafted CPS Report that falsely claimed that Plaintiff was behaving erratically, had a history of violence, and had a drinking problem, Compl ¶¶ 169, 170-71, 173-4, and that Defendant Clark encouraged the children's behavioral therapist to give false testimony to bolster her defamatory claims.[11]  It is reasonable to infer that much of this happened at the behest of Defendant Ratje, who realized that his case against Plaintiff was exceptionally weak. *Id.* ¶¶ 171, 176-78.  These are classic examples of investigative acts that fall outside of the privilege. *See, e.g., Fogle v. Sokol*, 957 F.3d 148, 164 (3d Cir. 2020) (a prosecutor who encouraged deliberately encouraged state troopers to elicit false testimony after realizing that the prosecution's evidence "was weak" was acting in an investigative capacity).

The fact that some of these Reports were submitted to the Family Court, or that they were compiled after the Neglect Petition proceedings commenced, is immaterial.  The later use of an investigative document in litigation does not cloak its creation with the absolute immunity privilege. *Anilao*, 774 F. Supp. 2d at 477.  And the law is clear that, while all conduct before a finding of probable cause is *necessarily* deemed investigative, a judicial finding of probable cause

---

[11] These allegations directly refute Defendants' claim that Plaintiff has not alleged "personal involvement" of Defendants Lantz and Estrada, or any of the other CPS Defendants. (Def. Mem. at 17 n.1).  In fact, Plaintiff has made detailed allegations against *all* of the CPS Defendants, including Heep, Leto, Sobosto and Montegue, throughout her Complaint.  Compl. ¶¶125-127 139, 142, 144, 156, 160, 162, 202, 254-256

does not make all prosecutorial evidence gathering thereafter non-investigative. *See Buckley*, 509 U.S. at 274 n.5, 276 ("[A] determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards."); *Zahrey*, 221 F.3d at 347 n.2 ("All members of the Court [in *Buckley*] recognized . . . that a prosecutor's conduct even after probable cause exists might be investigative."); *Fogle v. Sokol*, 957 F.3d 148, 164 (3d Cir. 2020) (in determining absolute immunity, the court's "role is not to look at the timing of the prosecutor's action (*e.g.* pre-or postindictment), but at the function being performed").

### iii.     Extending Absolute Immunity to Caseworkers Who Fabricate Evidence Would Be a Wholly Unwarranted Expansion of the Doctrine.

Extending absolute prosecutorial immunity to the actions of Defendants Clark, Lantz, Estrada, Heepe, Leto, and Montegue here would be a radical expansion of the absolute immunity doctrine.  Plaintiff is not aware of any instances where a court has granted absolute immunity to non-attorney social workers who fabricated investigative reports that were then used to support a malicious prosecution.  Even *Emerson v. City of New York*, 740 F.Supp.2d 385 (S.D.N.Y. 2010), which Defendants repeatedly cite, did not go that far.  In that case, the Court found that caseworkers were entitled to absolute immunity where an abuse and neglect petition based on evidence that was fabricated *by police officers*.  The complaint never alleged that the caseworkers participated in the investigation that led to the fabricated evidence.  And, as to the police officers who committed the fabrication, the court only found that they could assert qualified – not absolute – immunity.[12]

---

[12] Defendants' reliance on *Estate of Keenan v. Hoffman-Rosenfeld*, No. 16 Civ. 0149 (SFJ)(AYS), 2019 U.S. Dist. LEXIS 126330, at *57 (E.D.N.Y. July 29, 2019), is misplaced. That case acknowledged that evidence of investigatory misconduct would preclude a finding of absolute immunity, but held that after significant discovery, plaintiff had not actually furnished such evidence.

Nor is such immunity warranted under the "functional approach." (Def. Mem. at 15-17). The primary purpose of this approach – which requires courts to examine "the nature of the function performed, not the identity of the actor who performed it," *Doe v. Phillips*, 81 F.3d 1204, 1209 (2d Cir. 1996) – is to ensure that courts do not extend absolute immunity to an act simply because it was performed by a prosecutor.  *See Buckley*, 509 U.S. at 273 ("[T]he actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor.").  To be sure, in rare instances the courts have used the "functional approach" to expand absolute immunity to staff performing ministerial duties under the direction of a prosecutor, *see Hill*, 45 F.3d at 657 (social worker who operated camera at prosecutor's direction was entitled to absolute immunity when plaintiff filed a § 1983 action predicated on the improper use of a video in a prosecution, even though prosecutor himself was not entitled to such immunity); and, on one occasion, the Second Circuit used the test to extend absolute immunity to an attorney in the Department of Social Services who requested an arrest warrant be issued, notwithstanding the fact that this attorney was not a prosecutor. *Walden v. Wishengrad*, 745 F.2d 149, 152 (2d Cir. 1984). But it has never used that approach to extend absolute immunity to caseworkers who fabricated investigative reports.

Extending the protections of absolute immunity in these circumstances is not simply wrong as a matter of precedent, it is dangerous.  As the Second Circuit has explained, "[b]ecause qualified immunity is presumed to be sufficient to protect public officials in the exercise of their discretionary duties, absolute immunity extends only so far as necessary to protect the judicial process." *Hill*, 45 F.3d at 660 (internal citations omitted). "The rationale underlying the need for absolute immunity must be closely scrutinized before the Court will hold that a government official is protected from liability by an impenetrable shield." *Walden*, 745 F.2d at 151-52. It cannot be

that a social worker, who falsifies investigative reports to further a personal vendetta, and manufactures and conceals evidence to hide incompetence so extreme that it would get a child killed, is categorically immune from suit.

> **iv.** **The Issue of Immunity is Fact-Intensive and Cannot be Resolved at the Pleading Stage.**

Finally, to the extent it is unclear whether the CPS Defendants committed the misconduct alleged in a prosecutorial capacity or during an investigative stage, or the extent to which Defendant Ratje inserted himself into the investigative process, the Court must reject Defendants' premature invocation of absolute immunity. *EvidenBristol v. Queens Cty.*, No. 09 Civ. 5544 (JFB) (AKT), 2013 U.S. Dist. LEXIS 41655, at *61 (E.D.N.Y. Feb. 27, 2013) ("where it is impossible to determine from the pleadings the function a prosecutor played at certain stages, judgment on immunity should be reserved for summary judgment or trial"); *Bertuglia v. City of New York*, 839 F.Supp.2d 703, 732 (S.D.N.Y.2012) (delaying decision on whether a prosecutor was immune in an abuse of process claim because the role the prosecutor played "is a factual dispute that cannot be resolved on this motion [to dismiss]").

> **F.** **Defendants are Not Entitled to Qualified Immunity**

Defendants' assertion of qualified immunity is likewise meritless. A qualified immunity defense is established only if "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996).

Defendants do not dispute that it violates clearly established law for a government official to manufacture evidence against a parent and take away her custodial rights solely to punish that parent for complaining about an inadequate investigation. Nor could they. It has been clearly established for decades that the Constitution prohibits retaliatory prosecutions. *Magnotti v. Kuntz*,

918 F.2d 364, 368 (2d Cir. 1990). And even apart from the retaliatory motive, "the right to be free from . . . prosecution in the absence of probable cause is a long-established constitutional right," *Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 128 (2d Cir. 1997), as is the constitutional right not to be prosecuted "on the basis of false evidence fabricated by a government officer." *Zahrey*, 221 F.3d at 355 ("Any prosecutor . . . would understand that fabricating evidence in his investigative role violates the standards of due process and that a resulting loss of liberty is a denial of a constitutional right."); *see also Mejia v. City of N.Y.*, 119 F. Supp. 2d 232, 273 (E.D.N.Y. 2000) (a state actor that gives false information "to commence or continue proceedings against a plaintiff, knowingly violates the law and is not entitled to qualified immunity for his actions"); *Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999) ("It is beyond purview that any rational [state actor] could believe that governmental destruction of a family based on fabricated evidence is constitutionally allowed."); *Chi Chao Yuan*, 48 F. Supp. 2d at 349 ("the groundless initiation of a case in Family Court" violates the Constitution).

Instead, Defendants base their qualified immunity defense on the notion that CPS Defendants had a "reasonable basis" to file the neglect charges, and that they did so in good faith. Defs' Memo. at 18. That argument fails for the reasons explained above: not only have Defendants forfeited that argument (Compl. ¶¶ 205-207), the Complaint pleads with particularity that Defendants fabricated inculpatory evidence and deliberately concealed exculpatory evidence, and that they did so not to protect the child, but to retaliate against Plaintiff for complaining about the shoddiness of their investigation. All of those allegations are presumed to be true at the pleading stage. To extend qualified immunity "in such circumstances would thwart the basic purpose of § 1983 itself – to protect persons from abuse of official authority and, thus, must be rejected." *Mejia*, 119 F. Supp. 2d at 273.

### III.     THE COMPLAINT PLEADS A § 1983 ABUSE OF PROCESS CLAIM.

#### A.     Plaintiff Has Sufficiently Alleged a "Collateral Objective."

A malicious abuse of process claim lies against a defendant who "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). Defendants' sole argument – that Plaintiff has not adequately pled a "collateral objective" – is manifestly untrue.

The Complaint alleges that CPS brought the Neglect Petition for two improper reasons: first, to retaliate against Plaintiff and cover up for the inadequacy of their investigation; and second, to curry favor with the local police department. Compl. ¶¶ 136, 145. Both are pled with particularity. Plaintiff pleads that CPS Defendants filed the Neglect Pre-Petition *one day* after Plaintiff left a message threatening to file a complaint exposing CPS for gross incompetence. *Id.* ¶¶ 140-41. The "temporal proximity" between Plaintiff's threat and the Neglect Pre-Petition is, in and of itself, sufficient to establish a retaliatory motive, especially at the motion to dismiss stage. *Kaytor*, 609 F.3d at 552. Moreover, Defendant Clark had a strong motive to act quickly: a mere three days earlier, Valva had severely beat Tommy, and Defendant Clark had every reason to use the Neglect Petition to distract from the fact that CPS's incompetence had allowed such abuse to take place. Compl. ¶ 145.

Defendants say nothing about the first motive. Instead, they argue that the second – currying favor with the police department – "stretched the bounds of logic." Respectfully, Defendants are either being naive or obtuse. Valva was a 15-year veteran of the police force, and CPS works hand-in-glove with law enforcement. Compl. ¶ 322. It is imminently plausible that CPS would think twice before taking action that would tarnish the reputation or undermine the

interests of someone within law enforcement.  Moreover, courts have expressly held that such motives are sufficient to establish a collateral objective.  *See, e.g.,  Jovanovic v. City of N.Y.*, 2006 U.S. Dist. LEXIS 59165, at *32 n.4 (S.D.N.Y. Aug. 17, 2006) ("[M]otives such as protecting one's own job or currying favor with prosecutors may exceed mere malice and may constitute a 'collateral objective.'").

## IV.    THE COMPLAINT STATES VIABLE CLAIMS FOR FAIR TRIAL, STIGMA-PLUS AND CONSPIRACY.

To prevail on a claim for denial of the right to a fair trial based on fabrication of information, a plaintiff must show that "(1) an investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwarded that information to prosecutors, and (5) the plaintiff suffered a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016) (citing *Ricciuti*, 124 F.3d at 130).

### A.    Plaintiff Suffered a Sufficient "Deprivation of Liberty" to Establish a Fair Trial Claim.

Defendants' sole challenge to the fair trial claim is that Plaintiff has not identified a deprivation of liberty.  This is simply incorrect. As explained above, Defendants violated Plaintiff's liberty interest in having unincumbered access to her children by depriving her from unsupervised visits, and further violated her liberty by requiring that she make numerous court appearances, something which implicates the Fourth Amendment.[13] *Wellner v. City of N.Y.*, 393 F. Supp. 3d 388, 395 (S.D.N.Y. 2019) ("The plaintiff may prove the deprivation of liberty element of her denial of the right to a fair trial claim by proving that, because of fabricated evidence, she made several court appearances and suffered some other restriction.").

---

[13] Notably, a denial of fair trial claim is broader than a malicious prosecution claim.  Even if the Court found that Plaintiff failed to state a requisite Fourth Amendment violation for the latter, she may prevail on the former by stating a violation of *any* Fifth, Sixth, or Fourteenth Amendment right. *Bailey v. City of N.Y.*, 79 F. Supp. 3d 424, 446 (E.D.N.Y. 2015) (collecting cases).

**B.     Alteration of Custody Status is Sufficient to Establish a State-Imposed Burden for a Stigma Plus Claim.**

Defendants motion to dismiss the stigma-plus claim must be denied for the same reason. Defendants do not dispute that the complaint pled a defamatory utterance, only that it pleads a "material state-imposed burden." (Def. Mem. at 20).   But the threshold for a "material state-imposed burden" is even lower than the constitutional injury required to state a malicious prosecution claim. In fact, the burden (*i.e.*, "plus") need not even implicate one's constitutional rights.   Thus, "the loss of the right to purchase alcohol, foreclosure of the freedom to take advantage of government employment, and the extinguishment of the right to public education" all satisfy the "plus" requirement. *Balentine v. Tremblay*, 554 Fed. Appx. 58, 60 (2d Cir. Feb. 11, 2014) (collecting cases).   If the loss of these lesser entitlements is sufficient to state a stigma-plus claim, the impingements on the fundamental right to raise one's child without unwarranted state interference surely is as well. *See, e.g., Ray v. Basa,* No. 11 Civ. 02923-YGR (PR), 2015 U.S. Dist. LEXIS 39697, at *53 (N.D. Cal. Mar. 27, 2015) (alteration of custody status is sufficient to state a stigma-plus claim).

Finally, Defendants make only one argument in support of dismissal of the conspiracy claim – namely, that the Complaint fails to allege a constitutional violation.   This argument must be rejected for all the reasons explained above.

**V.     THE COMPLAINT ESTABLISHES *MONELL* LIABILITY.**

**A.     Plaintiff Has Made Detailed Factual Allegations Regarding Defendant County's Deliberate Indifference to Training its CPS Workers.**

Plaintiff has pled sufficient facts to establish municipal liability. A plaintiff may prove municipal liability by demonstrating that the injury was caused by "'a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to

deliberate indifference to the rights of those who come into contact with the municipal employees.'" *Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (quoting *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)).

The Complaint pleads sufficient facts giving rise to municipal liability for deliberate indifference. Plaintiff alleges that Defendants failed to implement rules and regulations as to: (1) how to properly assess children on the Autism spectrum, including how to properly interview them and verify their claims of abuse, Compl. ¶ 350; and (2) how to make credibility assessments in matrimonial disputes. *Id.* ¶ 351. There was a direct causal link between these failings and both the malicious prosecution of Plaintiff and the death of her child. *Id.* ¶ 362.

The Complaint also alleges that the County failed to properly train CPS caseworkers to properly detect signs of physical emotional and sexual abuse in children, *id.* ¶ 347, and to assess when children are making false claims or denials of abuse. *Id.* ¶ 348. It further alleges that the County failed to properly train CPS workers about its duty to make a full complete disclosure to Court concerning evidence of abuse, its duty to avoid concealing or misrepresenting evidence about abuse, and its duty to avoid giving preferential treatment to one litigant over another. *Id.* ¶ 349.[14]

**B.      Defendant's Position is Belied by the Admissions made by Suffolk County Officials Following Tommy's Death.**

Apart from Plaintiff's detailed factual allegations, Defendants' litigation position on municipal liability is directly at odds with the public admissions by Suffolk County officials in the aftermath of Tommy's death.  As widely reported in the media, several months after Tommy's death, the County legislature introduced *six new bills* designed to correct the policies that led to

---

[14] In light of these specific allegations, Defendants' claim that Plaintiff "fails to plead any facts to establish the claimed deficiency in training …." is simply false. (Def. Mem. at 22).

this tragedy.  Among the changes, the bills would create a specialized CPS team for autistic and developmentally disabled kids, mandate new training, and increase scrutiny for cases reported by certain school districts.  It would also limit the number of cases caseworkers could handle, provide greater public transparency and establish criminal penalties for knowingly recording agency interviews with children without the consent of the investigator.[15]  When interviewed by the *New York Daily News* about these laws, Suffolk County Executive, Steve Bellone, stated: "This system is just not set up to effectively protect kids on the autism spectrum or other kids with developmental disabilities." *Id.*  This Court should credit the well pled allegations in the Complaint, and take judicial notice of the Suffolk County Executive's public admissions, *Carcasole-Lacal*, 2003 U.S. Dist. LEXIS 11507, at *1 n.1, not the self-serving arguments that Defendants have  offered in support of their motion.

## VI.   THIS COURT SHOULD RETAIN JURISDICTION OVER PLAINTIFFF'S STATE LAW CLAIMS.

### A.   Plaintiff Complied with Gen. Mun. Law § 50.

Defendants argue that service was defective because it was done Priority, not via registered or certified mail, and because the Notice of Claim was served on the Suffolk County District Attorney, not the Suffolk County Attorney.  These arguments are meritless.

The USPS Priority Mail envelope containing the Notice of Claim bears the notation "ATTN: COUNTY ATTORNEY."  It was sent to an address shared by both the District Attorney

---

[15] *Changes Proposed for Suffolk County Child Welfare Agency After Abuse, Death of Thomas Valva*, New York Daily News (Mar. 4, 2020), *available at* https://www.nydailynews.com/new-york/ny-licop-child-protection-legislation-20200305-7x6g7zyo45c3bonqu4uyczpcju-story.html, last viewed on May 16, 2021. The Court can take judicial notice of these facts since they were widely reported in the local media. *See Carcasole-Lacal v. Am. Airlines, Inc.*, Civil Action No. CV-02-4359 (DGT), 2003 U.S. Dist. LEXIS 11507, at *1 n.1 (E.D.N.Y. July 8, 2003) ("Judicial notice can be taken of facts from newspaper articles that are widely reported in the media.") (collecting cases).

and the County Attorney, and the USPS document contains the notation that the envelope was received by "Dep't of Law; County Attorney; Suffolk County."  Ex. B to Defendants' Motion. As to their claim that service was defective because it was done through Priority mail, Defendants strategically omit a critical passage from General Municipal Law § 50-e, which states:

> If the notice is served within the period specified by this section, but in a manner not in compliance with the provisions of this subdivision, *the service shall be valid . . . if the notice is actually received* by a proper person within the time specified by this section, and the public corporation fail to return the notice, specifying the defect in the manner of service, within thirty days after the notice is received.

Gen Mun § 50-e3(c) (emphasis supplied).  Defendants never claim that the proper office did not actually receive the Notice of Claim, nor did they return the Notice specifying any defect. Accordingly, Defendants' claim of defective service must be rejected.

### B.    The Complaint States a Claim for Negligence.

Defendants make two arguments in support of their motion to dismiss the negligence claims: first, that the Complaint fails to plead that Defendants CPS owed a duty of care, and second, that Suffolk is entitled to absolute immunity.  Neither argument has merit.

### i.    CPS Owed a Duty of Care Based on Statutory Reporting Requirements under N.Y. Soc. Serv. Law  §§ 413-22.

It is well established that a state agency "may also owe a duty of care 'if a specific statutory duty has been imposed.'"  *Begley v. City of N.Y.*, 111 A.D.3d 5, 23 (App. Div. 2nd Dept. 2013) (quoting *Chainani v Board of Educ. of City of N.Y.*, 87 NY2d 370, 378 (1995).  Courts have held that the mandatory reporting and investigation requirements outlined in N.Y. Soc. Serv. Law §§ 413-22, not only give rise to such a duty, but rise to the level of a constitutional entitlement. *See, e.g., Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 680 (S.D.N.Y. 1996).

However, even if this Court analyzed the duty of care under the "special relationship" line of case law, Plaintiff's negligence claim is still viable. As Defendants acknowledge, CPS had a

duty under the law to take action in response to the veritable mountain of evidence showing that Valva was abusing the children.  *See* NY Soc. Serv. § 420.  Given that CPS Defendants *knew* that the abuse by Valva was ongoing, they cannot possibly assert that lacked knowledge that their inaction would lead to harm. *Sorichetti v. New York*, 65 N.Y.2d 461, 470 (1985) (police officer's awareness of abuser's violent tendencies was sufficient to establish the knowledge requirement). And CPS Defendants repeatedly interacted with Plaintiff and her children, establishing direct contact.

Defendants do not seriously contest the above. Instead, they assert that Plaintiff never relied on CPS Defendants.  But that is simply not true.  Plaintiff repeatedly placed – or, more precisely, misplaced – her trust in CPS. Rather than go to local law enforcement, Plaintiff repeatedly made reports to CPS – three times in 2017 alone.  She presented CPS with the flash drive of evidence because she hoped that they would fulfill their legal obligation to investigate the abuse.  She sought assistance after Tommy was abused in January 2018 because she believed they might finally act. Compl. ¶¶ 133-34.  She did not know until after the fact that CPS was declining to investigate her reports and closing them prematurely.  At the very least, Plaintiff justifiably relied on CPS to do their job until January 2018.  Whether Plaintiff could no longer justifiably rely on CPS as a whole after realizing that certain CPS caseworkers – *e.g.*, Defendant Clark – were biased and incompetent is ultimately a question for the jury. *See De Long v. Cty. of Erie*, 60 N.Y.2d 296, 306 (1983) (because reliance questions are laced with fact, "[w]hether a special duty has been breached is generally a question for the jury to decide"). But at the motion to dismiss stage, this Court is obligated to infer that Plaintiff was entitled to rely on CPS to prevent the murder of her children – even if that reliance was the product of desperation.

      **ii.**    **The CPS Workers Are Not Entitled to Absolute Immunity Under State Law, Since They Were Legally Obligated to Take Action to Protect the Children.**

Nor has the County remotely established an entitlement to absolute immunity. Immunity only attaches where a city official acts in a discretionary, not ministerial capacity. "[D]iscretionary or quasi-judicial acts involve the exercise of *reasoned judgment* which could typically produce different *acceptable results* whereas a ministerial act envisions direct adherence to a governing rule or standard with a compulsory result." *Tango v. Tulevech*, 61 N.Y.2d 34, 40 (1983) (emphasis added).

The County argues that it was entitled to absolute immunity because the CPS Defendants acted in a discretionary capacity in bringing the Neglect Petition.  They say nothing about the negligent failure to perform their legal duty to follow up on well-founded claims of abuse by Valva, N.Y. Soc. Serv. Law §§ 413-22, or their legal duty to conduct an investigation within 60 days, Compl. ¶¶ 125, 256, both of which are wrongs independent of the retaliatory Petition.  The fact that they had a legal duty to act -- as Defendants concede in their own papers (Def. Mem. at 18) --vitiates any claim that they were acting in a discretionary capacity.  *See also Marisol A. by Forbes*, 929 F. Supp. at 680 (recognizing that the requirements outlined in N.Y. Soc. Serv. Law §§ 413-22 impose mandatory, ministerial obligations on social service workers).

Moreover, New York courts have explained that immunity only extends "to those participating in the investigation of child abuse allegations as long as they act within the scope of their employment and do not engage in *willful misconduct or gross negligence*." *Van Emrik v. Chemung Cty. Dep't of Soc. Servs.*, 220 A.D.2d 952, 953 (3rd Dept. 1995) (emphasis supplied). Here, Plaintiff has alleged numerous instances of willful misconduct and gross negligence, including the fabrication of evidence against Plaintiff, the deliberate suppression of evidence

showing that Valva was an abuser, the failure to insist that Valva even open the door when they came to his house to investigate reports that he had brutally beat his child, and the failure to take *any* action when evidence mounted that the children were literally starving to death.

### iii. The Filing of the Neglect Petition was an Act of Willful Misconduct, and Cannot be Accorded Immunity under State Law.

Absolute immunity cannot attach to the filing of the Neglect Petition for similar reasons. The very filing of the Neglect Petition was itself willful misconduct, insofar as its purpose was to punish Plaintiff, not protect the children.   Moreover, even if such petitions are typically discretionary, CPS Defendants had certain ministerial duties that constrained them *while pursuing* that Petition.   The Constitution is, itself, a source of "governing rule[s] or standard[s] with a compulsory result." *Tango*, 61 N.Y.2d at 40.   CPS Defendants' falsification of evidence and concealment of exculpatory material was in direction contravention of the ministerial duties embedded in the Due Process Clause of the Constitution.[16]

### CONCLUSION

For the foregoing reasons, the County Defendants' Motion to Dismiss should be denied in its entirety.

Dated: New York, New York
      May 17, 2021

                                      Respectfully Submitted,

---

[16] To the extent that Defendants rely upon records from the Family Court proceedings to argue otherwise (see Def. Mem. at 2-3 n.1, 8) ("as evidenced by the attached Family Court documents …."); Mitchell Decl. Ex. A), such reliance is misplaced. When deciding a motion to dismiss, the Court's review is "limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). Here, apart from Judge Cheng's decision dismissing the Neglect Petition, Plaintiff did not rely any on of the Family Court records attached by Defendants. Since these Family Court records were not "integral" to Plaintiff's complaint, they cannot be considered by the Court on this motion to dismiss.  *See Sugar v. Greenburgh Eleven Union Free Sch. Dist.*, 2018 Civ. 67 (VB), 2018 U.S. Dist. LEXIS 217507, at *9 (S.D.N.Y. Dec. 28, 2018) ("Reliance is essential: the plaintiff's 'mere notice or possession' of a document does not suffice.") (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147 at 153 (2d Cir. 2002)) (citation omitted); *McLennon v. City of New York*, 171 F. Supp. 3d 69, 89 (E.D.N.Y. 2016) ("A document is integral to the complaint" only where the plaintiff ... has 'relied upon the[] documents in framing the complaint.'") (quoting Chambers, 282 F.3d at 153).

**JON L. NORINSBERG, ESQ, PLLC**

Jon L. Norinsberg, Esq.
*Attorney for Plaintiff*
110 East 59th Street, Ste 3200
New York, New York 10022
Tel: (212) 791-5396
Fax: (212) 406-6890
jon@norinsberglaw.com