UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JUSTYNA ZUBKO-VALVA, as Mother
and Natural Guardian of ANTHONY
VALVA and ANDREW VALVA, and as
Administratrix of the Estate of THOMAS
VALVA, and JUSTYNA ZUBKO-VALVA
Individually,

        Plaintiffs,

   – against –

THE COUNTY OF SUFFOLK, CPS
SENIOR CASEWORKER MICHELE
CLARK, Individually and in her Official
Capacity, CPS SUPERVISOR EDWARD
HEEPE, Individually and in his Official
Capacity, CPS ASSISTANT DIRECTOR
ROBERT LETO, Individually and in his
Official Capacity, CPS INVESTIGATOR
JENNIFER LANTZ, Individually and in
her Official Capacity CPS
INVESTIGATOR MELISSA ESTRADA,
Individually and in her Official Capacity,
CPS INVESTIGATOR LYDIA SABOSTO,
Individually and in her Official Capacity,
CPS SUPERVISOR JEAN MONTAGUE,
Individually and in her Official Capacity,
DEPARTMENT OF SOCIAL SERVICES
COUNTY ATTORNEY RANDALL
RATJE, ESQ., Individually and in his
Official Capacity, ATTORNEY FOR
CHILDREN DONNA MCCABE, ESQ.,
Individually and in her Official Capacity,
THE LAW OFFICE OF DONNA
MCCABE, SHANA CURTI, ESQ.,
Individually and in her Official Capacity,
ORSETTI & CURTI PLLC, EAST
MORICHES UNION FREE SCHOOL

**MEMORANDUM & ORDER**

2:20-cv-2663 (ERK)(ARL)

1

DISTRICT, PRINCIPAL EDWARD
SCHNEYER, Individually and in his
Official Capacity, SCHOOL
SUPERINTENDENT CHARLES RUSSO,
Individually and in his Official Capacity,
HOPE SCHWARTZ ZIMMERMAN,
Individually, ATTORNEY FOR
CHILDREN ETHAN HALPERN, ESQ,
Individually and in his Official Capacity,
THE LEGAL AID SOCIETY OF
SUFFOLK COUNTY, INC.,
CHILDREN'S LAW BUREAU,
MICHAEL VALVA, and ANGELA
POLLINA.

                    Defendants.
_____

KORMAN, *J.*:

On January 17, 2020, eight-year-old Thomas Valva ("Tommy") froze to death

in his father's garage. ECF No. 1 ¶¶ 45, 263. Tommy's father Michael Valva and his

father's girlfriend Angela Pollina had locked him in the garage overnight as a form

of punishment. *Id.* ¶ 259. Indeed, Mr. Valva, who was a police officer, subjected

Tommy, along with his brothers Anthony and Andrew, to a slew of sadistic

"punishment[s]" in the years leading up to Tommy's death, such as forcing the

children to eat hot pepper powder, denying them access to the bathroom, and leaving

them home alone without any food or water. *Id.* ¶¶ 53, 257. Tommy and Anthony

suffered the worst of Mr. Valva and Ms. Pollina's punishments, likely because both

Tommy and Anthony were autistic. *Id.* ¶¶ 127, 239, 276. Forcing Tommy and

Anthony to sleep in subfreezing temperatures on a cold, cement slab in the garage

was so common in Mr. Valva and Ms. Pollina's household that they referred to the garage as the "kid's room." *Id.* ¶ 261.

While the barbaric acts of Mr. Valva and Ms. Pollina are directly responsible for Tommy's death, there is an institutional actor that is almost as culpable. The facts describing that culpability, which I proceed to discuss below, are detailed in the complaint filed by Mrs. Valva against Mr. Valva, Ms. Pollina, CPS officials, and numerous other private and government defendants. Pending is a motion to dismiss this complaint brought by Suffolk County, an attorney for the Suffolk County's Department of Social Services, and seven Suffolk County Child Protective Services employees (collectively, but excluding the County, the "CPS Defendants").[1]

## FACTUAL BACKGROUND

On December 30, 2015, Mr. Valva filed for divorce. ECF No. 64-7 at 3. Mrs. Valva initially retained custody of their three children—Tommy, Anthony, and Andrew—while the divorce action was pending. *Id.* But after Donna McCabe, who had been appointed to represent the children in the divorce action, informed New York Supreme Court Judge Zimmerman that Mrs. Valva had been interfering with her access to the children, Judge Zimmerman decided to award temporary custody

---

[1] I address the other Defendants' motions in two additional memoranda that will be filed separately.

3

of the children to Mr. Valva. ECF No. 64-8 at 9–22. Judge Zimmerman did, however, allow Mrs. Valva unsupervised visitation with the children. ECF No. 1 ¶ 85.

After Mr. Valva was awarded temporary custody of the children, he began to file child abuse allegations against Mrs. Valva with CPS. *Id.* ¶ 94. Mr. Valva alleged that Mrs. Valva was hitting the children and poisoning them with a toxic "brown medicine." *Id.* ¶ 95. He also accused Mrs. Valva of suffering from a deteriorating mental illness that rendered her incapable of caring for children. *Id.* A day after Mr. Valva filed his child abuse report, defendant Michele Clark, a CPS investigator, visited Tommy and Anthony at their school. *Id.* ¶ 99. The children denied Mr. Valva's allegations. *Id.* ¶¶ 99–100. They told CPS investigator Clark that they had no concerns about visiting their mother, that their mother did not use physical punishment, and that they were not afraid of her. *Id.*; *see also* ECF No. 79 at 6–7.

Mrs. Valva filed her own child abuse reports against Mr. Valva. ECF No. 1 ¶¶ 103–04. Mrs. Valva informed CPS that her children were starving and suffering severe weight loss while living at their father's house. *Id.* ¶ 105. Mrs. Valva noted that in one month (i) Anthony, who was eight years old at the time, had lost 13.2 pounds; (ii) Tommy, who was six, had lost 4.4 pounds; and (iii) Andrew, who was four, had lost 3.7 pounds. *Id.* Mrs. Valva also reported that Mr. Valva and Ms. Pollina were beating the children on their heads, hands and backs, putting them in extremely long time-outs without food or drink, and making them stay outside in the backyard with no shoes. *Id.* ¶ 106. Mrs. Valva tried unsuccessfully to follow up on her report

4

by calling the CPS hotline on November 13, 2017 and December 1, 2018. *Id.* ¶ 107. She later learned that CPS investigator Clark "closed" the child abuse complaint against Mr. Valva on November 9, 2017, only two days after Mrs. Valva filed her report with CPS. *Id.* ¶ 108–09.

On December 19, 2017, Mrs. Valva met with CPS investigator Clark and two of her supervisors, defendants Edward Heepe and Robert Leto. *Id.* ¶ 110. Mrs. Valva told Ms. Clark, Mr. Heepe, and Mr. Leto that the boys were losing weight while living with their father, that their educational needs were not being met, and that their father was leaving them outside in the cold without shoes as a form of discipline. *Id.* ¶ 111. Mrs. Valva alleges that she provided Ms. Clark, Mr. Heepe, and Mr. Leto with a flash drive containing 320 files of direct evidence that Mr. Valva and Ms. Pollina were abusing the children. *Id.* ¶ 112. The flash drive also contained letters from the children's pediatrician and a neuropsychologist who specializes in treating children with autism (both Tommy and Anthony were diagnosed as autistic), *id.* ¶¶ 127, 276, which claimed that Mrs. Valva was a loving parent and that there were no signs that she abused her children. *Id.* ¶ 115. Moreover, the flash drive contained a letter from Dr. Kimberly Berens (who supervised Anthony's intensive behavior treatment), which predicted that Judge Zimmerman's order removing the children from Mrs. Valva's custody would cause regression in Anthony's developmental progress, as well as psychological and emotional distress for all three children. *Id.* ¶ 116. Mrs. Valva also provided CPS with certified transcripts of audio

recordings showing Mr. Valva and Ms. Pollina trying to brainwash the children against their mother by forcing them to repeat phrases like "I don't love mommy," "mommy is mean," and "I don't want to stay with mommy." *Id.* ¶ 113.

On January 2, 2018, Mrs. Valva filed another child abuse report against Mr. Valva with Suffolk County CPS. ECF No. 1 ¶ 124. The complaint alleges that CPS closed out the report a day later without conducting any investigation. *Id.* ¶ 125. On January 14, 2018, Mrs. Valva filed a third child abuse report against Mr. Valva after she noticed injuries on Tommy's buttocks, which included coagulated blood spots, bruises, and broken blood vessels. ECF No. 1 ¶¶ 127–28. Tommy told Mrs. Valva that Mr. Valva hit him 12 times the day before. *Id.* ¶ 130. After investigating the injuries to Tommy's buttocks, CPS filed a neglect petition against Mr. Valva for using excessive corporal punishment. *Id.* ¶ 148, ECF No. 79 at 9 n.1. Mr. Valva's neglect case was adjourned in contemplation of dismissal on March 7, 2018, and an order of protection was issued directing Mr. Valva to refrain from domestic violence and the use of corporal punishment and to take classes at a local library. ECF No. 1 ¶ 151; ECF No. 79 at 9 n.1.

On January 16, 2018, Mrs. Valva threatened to file a complaint against CPS investigator Clark for conducting CPS' investigation in a biased and unfair manner. *Id.* ¶ 140. Mrs. Valva also blamed Ms. Clark for Mr. Valva's January 13 assault of Tommy. *Id.* The next day, Ms. Clark filed a neglect pre-petition against Mrs. Valva under § 1029 of New York's Family Court Act. *Id.* ¶ 141. Soon after, CPS filed a

neglect petition against Mrs. Valva. *Id.* ¶ 142. Mrs. Valva alleges that CPS filed the neglect petition as retaliation for Mrs. Valva's threat to file a complaint against Ms. Clark. *Id.* ¶¶ 143–47. CPS removed Ms. Clark from the case in February 2018 and replaced her with defendants Jennifer Lantz and Melissa Estrada. *Id.* ¶ 168.

The complaint alleges that CPS investigators Lantz and Estrada repeatedly lied to ensure that the neglect petition against Mrs. Valva would continue. *Id.* ¶¶ 169–71. Specifically, Mrs. Valva claims that Ms. Lantz and Ms. Estrada fabricated allegations that (i) Mrs. Valva had mental health problems that deteriorated since losing custody of the children in September 2017, (ii) her behavior had become increasingly erratic and concerning, (iii) she had exhibited a recent history of violence and was out of control, (iv) she was consistently uncooperative and unmanageable when dealing with authority, and (v) she had a drinking problem. *Id.* ¶ 170. Mrs. Valva contends that Ms. Estrada and Ms. Lantz made these allegations without any evidence and that, indeed, the two CPS investigators never even spoke to her. *Id.* ¶ 172. Mrs. Valva also alleges that Ms. Estrada and Ms. Lantz misrepresented the situation in the Valva home by stating that (i) the Valva home was stable and provided excellent living conditions, (ii) Mr. Valva was affectionate towards all the children, (iii) Mr. Valva used discipline appropriate for the children's age, development, and conduct, (iv) Mr. Valva provided age appropriate care and supervision of the children, and (v) Mr. Valva accepted responsibility for past problematic behavior and had taken appropriate steps to initiate change. *Id.* ¶ 174.

Unlike Mr. Valva, who had his neglect case adjourned in contemplation of dismissal, CPS decided to prosecute the neglect case against Mrs. Valva. Because CPS chose to proceed with the neglect proceedings, Mr. Valva and Mrs. Valva's divorce proceedings were stayed pending resolution of the neglect petition. *Id.* ¶ 198. The neglect proceedings began with an emergency hearing on January 17, 2018, in which Family Court Judge Cheng issued a temporary order of protection suspending Mrs. Valva's rights to unsupervised visitations with her children. ECF No. 79 at 28; ECF No. 79-1 at 36–37. Mrs. Valva then requested a hearing on the temporary order of protection, which culminated in Judge Cheng modifying the order of protection two months later to allow for unsupervised visitation. ECF No. 79-1 at 8–9.

Judge Cheng proceeded to hold a full fact-finding hearing on the neglect petition. *See* ECF No. 79 at 3–22. Defendant Randall Ratje, an Assistant County Attorney, prosecuted the case on behalf of Suffolk County. ECF No. 1 ¶¶ 176–78. On April 12, 2019, Judge Cheng concluded that the County had produced "insufficient credible evidence" to support a finding of child neglect against Mrs. Valva. ECF 79 at 22. Judge Cheng held that many of the County's allegations did "not even rise to the level of child neglect behavior." *Id.* Moreover, the judge rejected the County's claims that Mrs. Valva's mental health was impaired. *Id.* at 21. Indeed, he observed that Mrs. Valva, who worked as a corrections officer, had submitted a pre-employment psychological evaluation report from the Department of Corrections that concluded that there was "no evidence of psychopathology." *Id.*

Judge Cheng also stated that he had the opportunity to observe Mrs. Valva during the pendency of the case and during her testimony. *Id.* He found that, although Mrs. Valva expressed her belief that CPS, the County Attorney, and the attorney for the children were all working against her, she "was focused, goal-directed and clear" and did not appear to suffer from mental illness. *Id.* Thus, Judge Cheng dismissed the County's neglect petition against Mrs. Valva. *Id.* at 22.

Based on the multiple complaints from the children's school about Mr. Valva's abuse, Judge Cheng ordered CPS to investigate. ECF No. 1 ¶ 230; ECF No. 79 at 24–27. As a result, CPS generated investigative reports on October 2, 2018, October 15, 2018, and March 5, 2019, which contained statements from the children's teachers and doctors about Mr. Valva and Ms. Pollina's abuse. ECF No. 1 ¶ 230. For example, CPS' October 15, 2018 report contained the following troubling claims from the boys' teachers: (i) "Ms. Emin (school psychologist) reports that she and the teachers of Anthony and Tommy are all concerned as the children have lost a noticeable amount of weight and are both very thin and constantly asking for food"; (ii) Anthony's special education teacher told CPS that "she has concerns for Anthony," that he "looks emaciated" and "shoves food in his mouth as fast as he can"; (iii) Tommy's teacher stated that she had "witness[ed] Tommy eat crumbs off the floor and out of the garbage" and expressed concern that he "has been sent to school in a wet pull-up" and was "not allowed to go to the nurse's office to take it off"; and (iv) Anthony's teacher indicated that she was "concerned as Anthony is

very thin, has little to no affect, [and] has been observed snatching food off the desks and off the floor." *Id.* ¶ 231 (emphases omitted). In the same report, the children's doctor expressed concern that Anthony and Tommy were undernourished and explained that "both children [were] underweight with their BMI being in the 1st percentile." *Id.* ¶ 232.

Meanwhile, the children remained in Mr. Valva and Ms. Pollina's custody. On January 8, 2020, CPS investigator Lydia Sabosto and her supervisor, Jean Montague, closed out the last report that had been filed on the CPS hotline. *Id.* ¶ 254. Mrs. Valva spoke to CPS supervisor Montague on the phone twice and begged her not to close the investigation. *Id.* ¶ 255. Less than 10 days after CPS closed out its final investigation into Mr. Valva and Ms. Pollina's abuse, Tommy died. *Id.* ¶ 256.

## DISCUSSION

This opinion resolves the motion to dismiss brought by Suffolk County and the CPS Defendants. In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint is construed liberally, all factual allegations are accepted as true, and all reasonable inferences are drawn in the plaintiff's favor. *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In addition to the facts alleged in the complaint, a court may consider documents

incorporated by reference. *Chamberlain v. City of White Plains*, 960 F.3d 100, 105 (2d Cir. 2020).

## I.   Federal Claims

Mrs. Valva brings numerous causes of action claiming that the CPS Defendants violated her constitutional rights under 42 U.S.C. § 1983. Section 1983 does not itself create substantive rights; it offers "a method for vindicating federal rights elsewhere conferred." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quotation marks omitted). To state a claim under § 1983, a plaintiff must allege: (1) "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws," (2) by a person acting under the color of state law. 42 U.S.C. § 1983; *see also Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir. 1999). Importantly, while "[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue," "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution" in order to state a § 1983 claim. *Iqbal*, 556 U.S. at 676.

### A.   *"Deliberate Indifference" in Violation of Due Process*

Mrs. Valva claims that the CPS Defendants violated the Constitution by displaying "deliberative indifference" towards her children's plight in the care of Mr. Valva and Ms. Pollina. To support this theory of relief, Mrs. Valva invokes cases that recognize an individual's substantive due process right to be free from "state action [that is] 'so egregious, so outrageous, that it may fairly be said to shock the

contemporary conscience.'" *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).

Of course, nobody could dispute that Mr. Valva and Ms. Pollina's actions, as outlined in the complaint, "shock the contemporary conscience." *Id.* But "[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause" even if state actors "may have been aware of the dangers that [the individual] faced" from specific private actors. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197, 201 (1989). Rather, private violence can only form the basis of a substantive due process claim in two scenarios: (1) where "the state had a special relationship with the victim" that gave rise to an obligation to protect him from the private violence and (2) where the state actor "in some way had assisted in creating or increasing the danger to the victim." *Matican v. City of New York*, 524 F.3d 151, 155 (2d Cir. 2008) (quotation marks omitted). Moreover, "[e]ven if [a] claim falls within one of these two exceptions," the defendants' actions themselves must "shock the contemporary conscience"; it is not enough that the private individuals' actions would meet that standard. *Id.* (quotation marks omitted). Thus, in order to survive a motion to dismiss her "deliberate indifference" claim, Mrs. Valva's complaint must plausibly allege that (1) the defendant is a state actor; (2) the defendants either (a) had a "special relationship" with her children that required them to protect the children from Mr.

Valva and Ms. Pollina's abuse or (b) helped to "creat[e] or increas[e] the danger" Mr. Valva and Ms. Pollina posed to the children; and (3) the defendant's actions "shock[ed] the contemporary conscience." *Id.*

No party disputes that the CPS Defendants are state actors. Rather the CPS Defendants argue that Mrs. Valva's substantive due process claim fails because she merely alleges that CPS Defendants "fail[ed] to protect" the Valva children from Mr. Valva and Ms. Pollina's "private violence," *DeShaney*, 489 U.S. at 197, and that, in any event, none of the CPS Defendants' alleged actions "shock the contemporary conscience." *Matican*, 524 F.3d at 155. Each argument will be addressed in turn.

Mrs. Valva claims that the CPS Defendants did not merely fail to protect her children from Mr. Valva and Ms. Pollina, but rather, the CPS Defendants "enhanced the danger" that Mr. Valva and Ms. Pollina posed. *Okin*, 577 F.3d at 428. At first blush, *DeShaney* appears to foreclose Mrs. Valva's argument. In *DeShaney*, the police received a report that Joshua DeShaney's father was physically abusing him. 489 U.S. at 192. In response, the "Winnebago County Department of Social Services (DSS) interviewed the father, but he denied the accusations, and DSS did not pursue them further." *Id.* When "Joshua was [later] admitted to a local hospital with multiple bruises and abrasions," DSS obtained a court order placing Joshua in the temporary custody of the hospital. *Id.* Yet three days later, DSS (working as part of a team with other individuals) determined that it lacked sufficient evidence to ask the court to retain custody over Joshua and had Joshua "returned . . . to the custody of his father."

*Id.* DSS also agreed with the father that he would enroll Joshua in a preschool program, obtain counselling services, and encourage his girlfriend to move out of his home. *Id.*

"A month later, emergency room personnel called the DSS caseworker handling Joshua's case to report that he had once again been treated for suspicious injuries." *Id.* But the caseworker took no action. *Id.* That same caseworker then made six monthly visits to Joshua's home "during which she observed a number of suspicious injuries on Joshua's head" and that Joshua's father was not complying with the terms of his agreement. *Id* at 192–93. Still, the caseworker made no effort to remove Joshua from his father's custody. *Id.* at 193. Additionally, "neighbors informed the police that they had seen or heard Joshua's father or his [girlfriend] beating or otherwise abusing Joshua." *Id.* at 209 (Brennan, J., dissenting). After "the emergency room notified DSS that Joshua had been treated once again for injuries that they believed to be caused by child abuse," the caseworker made two attempts to see Joshua, but his father told her "that Joshua was too ill to see her." *Id.* at 193 (majority opinion). Soon afterward Joshua's father "beat 4-year-old Joshua so severely that he fell into a life-threatening coma . . . [and] suffered brain damage so severe that he [was] expected to spend the rest of his life confined to an institution" for individuals with severe disabilities. *Id.*

Joshua and his mother subsequently sued Winnebago County, DSS, and several DSS employees under § 1983 for violating Joshua's due process rights.

Although it recognized that the facts of the case were "undeniably tragic," *id.* at 191, the Supreme Court held that the defendants' actions did not violate due process, *id.* at 194. The Court explained that the Due Process Clause "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law," but do not "impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." *Id.* at 195. Thus, the Court concluded "that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. It did not matter, the Court said, that the state actors in that case "may have been aware of the dangers that Joshua faced" from his father. *Id.* at 201. What did matter was that the State "played no part in . . . creati[ng]" that danger "nor did it do anything to render [Joshua] any more vulnerable to [it]." *Id.* The defendants' actions in that case, the Court observed, "placed [Joshua] in no worse position than that in which he would have been had it not acted at all." *Id.* And, therefore, no due process violation occurred in that case. *See id.* at 203.

Many of the CPS Defendants' alleged actions that form the basis of Mrs. Valva's substantive due process claims bear an eerie resemblance to *DeShaney*. Mrs. Valva made multiple reports detailing abuse her children were suffering at Mr. Valva's home. She also provided CPS defendants Clark, Heepe, and Leto with photographic evidence of this abuse. Nonetheless, the CPS Defendants did very little to intervene. In response to many of the reports, the CPS Defendants took no action,

marking the reports as closed without conducting any investigations. On one occasion a CPS employee attempted to visit the children at Mr. Valva's home but declined to pursue the matter any further once Mr. Valva denied him entry. CPS eventually filed a neglect petition against Mr. Valva, but that petition focused on only one incident of alleged abuse and did not seek to remove the children from Mr. Valva's care or impose any supervision on him. Moreover, CPS agreed with Mr. Valva to an adjournment in contemplation of dismissal after less than two months. And even when CPS later conducted a more thorough investigation into Mr. Valva and uncovered evidence of abuse, CPS did not step in to protect the children.

CPS, it seems, adopted the same strategy as DSS in *DeShaney*; it waited for "the phone [to] ring some day" when one of the Valva children "would be dead." 489 U.S. at 209 (Brennan, J., dissenting) (quotation marks omitted). Sickening as it is, *DeShaney* establishes that such a course of action does not violate the Due Process Clause. *See id.* at 203 (majority opinion). While Mrs. Valva appeals to some general language in the Second Circuit's decision in *Okin* that, in a vacuum, might be understood to establish that a state's repeated failure to act can alone form the basis of a substantive due process claim, that language, in context, does not stand for such a broad proposition. *Okin* states that "repeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute prior assurances rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." 577 F.3d at 428 (internal citation and quotation

marks omitted). While this language appears to be in tension with *DeShaney*, a careful reading of *Okin* suggests only that "repeated, sustained inaction . . . *might* constitute prior assurances rising to the level of an affirmative condoning of private violence" but only in cases where there is some additional act by the government officials that would lead the perpetrator of the violence to believe that the inaction signaled condonation. 577 F.3d at 428 (emphasis added). Indeed, in explaining the actual holding in the case, *Okin* and subsequent Second Circuit decisions distinguishing *Okin* focus on the fact that, in addition to the government officials' inaction in *Okin*, those officials "openly expressed camaraderie with [the perpetrator] and contempt for [the victim]." *Id.* at 430; *see also Brown v. City of New York*, 786 F. App'x 289, 292 (2d Cir. 2019) ("This case is unlike *Okin*, where officers repeatedly and 'openly expressed camaraderie' with a physical abuser and contempt for the victim." (quoting *Okin*, 577 F.3d at 430)); *Coleman v. Cnty. of Suffolk*, 685 F. App'x 69, 71 (2d Cir. 2017) (nearly identical). Thus, Mrs. Valva cannot defeat the CPS Defendants' motion to dismiss by pointing only to allegations of CPS' failure to take actions to protect her children from Mr. Valva and Ms. Pollina even if those defendants were "aware of the dangers that [the children] faced." *DeShaney*, 489 U.S. at 201.

But Mrs. Valva's complaint alleges more than the CPS Defendants' failure to act. It alleges that certain CPS Defendants pursued a neglect petition against Mrs. Valva in which they advanced false and misleading accounts of Mrs. Valva's

treatment of the children. Specifically, CPS investigator Clark, "with the full knowledge, consent and encouragement of Heepe and Leto" falsely accused Mrs. Valva of suffering from mental illness, using excessive corporal punishment, and other serious abuse. ECF No. 1 ¶¶ 142–43, 156, 160. Ms. Clark made these claims even though, on five previous occasions, including two days before the neglect pre-petition was filed, Ms. Clark reported that "there were no safety concerns that placed the children in immediate danger of serious harm, in regards to her investigation against [Mrs. Valva]." *Id.* ¶ 147 (capitalization omitted). The complaint also alleges that, after CPS investigator Clark filed the petition, CPS defendant Lantz and her supervisor CPS defendant Estrada amplified Ms. Clark's lies to ensure that the neglect petition against Mrs. Valva would continue. *Id.* ¶¶ 169–72.

The CPS Defendants argue that the fact that CPS filed a neglect petition against Mr. Valva effectively cancels out any inference Mrs. Valva asks the court to draw in her favor from the neglect petition CPS pursued against her. The CPS Defendants are wrong. The relief CPS requested vis-à-vis Mr. Valva confirmed that, despite Mrs. Valva's allegations, they favored Mr. Valva over Mrs. Valva. CPS requested a stay-away order for Mrs. Valva that only allowed her supervised visits with her children, but for Mr. Valva, CPS merely asked the family court order him to refrain from violence and corporal punishment towards his children. ECF No. 79-1 at 38. And CPS' preferential treatment of Mr. Valva continued when, less than two months later, it agreed to an adjournment in contemplation of dismissal of the

petition. ECF No. 1 ¶ 151. In contrast, CPS pursued its petition against Mrs. Valva until the family court dismissed it on the merits sixteen months after it was filed. ECF No. 79 at 22.

Crucially, Mr. Valva was aware of the disparate treatment he and Mrs. Valva were receiving from CPS. During Mrs. Valva's neglect proceedings, Mr. Valva testified for CPS in support of the petition. ECF No. 1 ¶ 203; ECF No. 79 at 16–17. And it is not unreasonable to infer that through that invited support of the neglect petition against Mrs. Valva, Mr. Valva also learned of the CPS Defendants' glowing reports of his care for the children and their cavalier attitude towards Mrs. Valva's allegations and evidence against him. Thus, based on Mrs. Valva's allegations, one can plausibly infer that the CPS Defendants' "affirmative conduct" in pursuing the neglect petition against Mrs. Valva "enhanced the danger to [her children] because they conveyed to" to Mr. Valva that, no matter what they would learn about Mr. Valva, only Mrs. Valva would remain in their crosshairs. *Okin*, 577 F.3d at 430. With this additional knowledge of CPS' blinding fixation on Mrs. Valva, Mr. Valva was could safely assume that he and Ms. Pollina could continue and escalate their abuse "with impunity." *Id.* at 431.

To be clear, what distinguishes this case from *DeShaney* is not Mr. Valva's knowledge that CPS was not moving against him despite the evidence of his abuse they possessed. Joshua's father must have also possessed such knowledge in *DeShaney*. *See* 489 U.S. at 192–93. Rather, what is different here is that Mrs. Valva's

allegations plausibly demonstrate that CPS took affirmative actions that demonstrated to Mr. Valva, not only that they had information implicating him that they were not acting on, but also that, even with the evidence they possessed, they had effectively concluded that Mrs. Valva, not him, was the guilty party in this ordeal. Knowing this, Mr. Valva could logically conclude that he did not risk serious repercussions from his and Ms. Pollina's continued and intensifying abuse of his children. Thus, Mrs. Valva plausibly alleges that "state officials communicate[d] to a private person that he or she [would] not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others." *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir. 2005); *see also id.* at 110–12 (holding that plaintiffs stated a § 1983 claim based on a drunk driving incident where they alleged that the state official defendants "encouraged" the driver "to inappropriately and excessively drink alcohol" and made it plausible to infer that the defendants "communicated to [the driver] that he could drink excessively and drive while intoxicated without fear of punishment"). And whether the CPS Defendants' actions "in this particular case . . . did in fact communicate permission is a factual determination which" a court must "decline to resolve on a 12(b)(6) motion to dismiss." *Id.* at 112.

Having concluded that Mrs. Valva plausibly alleges that the CPS Defendants "enhanced the danger" that Mr. Valva and Ms. Pollina posed to her children, *Okin*, 577 F.3d at 428, the next question is whether CPS Defendants' danger-enhancing

activity was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," *id.* at 431. According to the complaint, the CPS Defendants repeatedly ignored a desperate mother's plea for help, despite having significant evidence of Mr. Valva and Ms. Pollina's abuse, and then pursued a neglect petition against Mrs. Valva to cover up for, and distract from, their failures. As Mrs. Valva observes, "[i]f the conduct described in the Complaint does not 'shock the conscience,' it is hard to fathom what conduct would meet that bar." ECF No. 78-6 at 23; *see also Okin*, 577 F.3d at 432 (holding that state officials' "conduct shocks the conscience" if their "actions demonstrate a willful disregard of the obvious risks of a domestic violence situation, the serious implications of [a victim's] complaints over a fifteen-month period, and the likelihood that their misconduct would enhance the danger to [the victim]").

The deliberate indifference claim may proceed against CPS defendants Clark, Heepe, Leto, Lantz, and Estrada, as Mrs. Valva has adequately alleged that these defendants' actions enhanced the danger Mr. Valva and Ms. Pollina posed to her children.[2] The motion to dismiss this claim is granted as to CPS defendants Sabosto

---

[2] Even though the deliberate indifference claim may pose a close question, the claim should not be dismissed because it arises from the same factual predicates as other valid federal claims against the CPS Defendants discussed below—the denial of fair trial and stigma plus claims. "If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted. As observed by Judge Clark in an analogous context: '[T]here seems no question that in the long run fragmentary disposal of what is essentially one matter is unfortunate not merely for the waste of

and Montague because Mrs. Valva has not alleged that these defendants were involved in the neglect proceedings or otherwise enhanced the danger to Mrs. Valva's children.

### B. *Denial of Fair Trial Claim*

Mrs. Valva claims that the CPS Defendants violated Mrs. Valva's Fourteenth Amendment right to a fair trial by fabricating the evidence Suffolk County used to prosecute Mrs. Valva in the neglect proceedings before Judge Cheng. Mrs. Valva alleges that CPS investigator Clark, with the "full knowledge, consent[,] and encouragement" of CPS supervisors Heepe and Leto, fabricated evidence that Mrs. Valva was neglecting and abusing her children. ECF No. 1 ¶ 160. CPS then used this evidence to initiate neglect proceedings against Mrs. Valva. *See* ECF 79-1 at 22–40.

A § 1983 "fair trial" claim is, in fact, a misnomer since a plaintiff may still bring such a claim even if she prevails in the proceeding at issue. *See Frost v. New York City Police Dep't*, 980 F.3d 231, 249–50 (2d Cir. 2020). Indeed, "a criminal defendant's right to a fair trial protects more than the fairness of the trial itself[;] . . . the (perhaps imprecisely named) fair trial right protects against [any and all] deprivation[s] of liberty that result[] when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, *were that*

---

time and expense caused the parties and the court, but because of the mischance of differing dispositions of what is essentially a single controlling issue.'" *Thibodeaux v. Travco Ins. Co.*, 2014 WL 354656, at *2 (E.D.N.Y. January 31, 2014) (quoting *Audi Vision Inc. v. RCA Mfg. Co.*, 136 F.2d 621, 625 (2d Cir. 1943)).

*evidence presented to the jury.*" *Id.* (italics in original). To prove a violation of her right to a fair trial, a plaintiff must show that "an (1) investigating official (2) fabricate[d] information (3) that [wa]s likely to influence a jury's verdict, (3) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016).

Mrs. Valva's allegations are sufficient to state a fair trial claim. She states that the CPS Defendants, acting as investigating officials, fabricated evidence that was used to prosecute her in a neglect proceeding and temporarily resulted in a loss of her parental rights. ECF No. 1 ¶¶ 313–18. The CPS Defendants argue that Mrs. Valva has failed to establish a causal connection between the fabricated evidence and a deprivation of liberty because her children were removed from her custody in the matrimonial proceeding before Judge Zimmerman—not the neglect proceeding before Judge Cheng. But the neglect proceedings did result in a deprivation of liberty for Mrs. Valva. At the beginning of the proceedings, CPS requested, and Judge Cheng granted, a temporary order of protection suspending Mrs. Valva's right to unsupervised visitations with her children. ECF No. 79 at 28; *see* ECF No. 79-1 at 36–37. This restriction on Mrs. Valva's rights lasted almost two months. ECF No. 79-1 at 8–9. The Supreme Court has recognized "the fundamental right of parents to make decisions concerning the care, custody, and control of their children" as a liberty interest protected by the Fourteenth Amendment. *Troxel v. Granville*, 530

U.S. 57, 66 (2000); *see Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir. 1992). The temporary protection order restricting Mrs. Valva's ability to interact with her children to supervised visits thus constituted a deprivation of liberty sufficient to allege a denial of the right to a fair trial claim. *See Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) ("Parents have a substantive right under the Due Process Clause to remain together with their children without the coercive interference of the awesome power of the state." (internal quotation marks and alterations omitted)).

The denial of the right to a fair trial claim may proceed against CPS defendants Clark, Heepe, Leto, Lantz, and Estrada, as Mrs. Valva has adequately alleged that these defendants fabricated evidence that was used against her in the neglect proceedings. The motion to dismiss this claim is granted as to CPS defendants Sabosto and Montague because Mrs. Valva has failed to allege that these defendants falsified evidence that was used in the neglect proceedings.

C. *Stigma Plus*

Mrs. Valva brings a stigma plus claim against the CPS Defendants based on the false statements they made about her treatment of her children that culminated in the neglect proceedings. To prevail on a stigma plus claim, "a plaintiff must demonstrate '(1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's

status or rights.'" *Mudge v. Zugalla*, 939 F.3d 72, 80 (2d Cir. 2019) (quoting *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004)).

Mrs. Valva alleges that the CPS Defendants falsely stated that she abused and neglected her children, injuring her reputation and resulting in the temporary loss of unsupervised visitation with her children through the neglect proceedings. ECF No. 1 ¶¶ 325–31. These allegations are sufficient to state a stigma plus claim. The CPS Defendants argue that Mrs. Valva has not shown that the allegedly defamatory statements resulted in "a material state-imposed burden or state-imposed alteration of [her] status or rights." *Sadallah*, 383 F.3d at 38. But as the stigma plus claim, like the denial of fair trial claim, arises under the Fifth and Fourteenth Amendments, the state-imposed burden requirement is the same as the deprivation of liberty requirement for the denial of a fair trial claim. *Id.* (pointing out that a stigma plus claim only applies to defamation that is "a deprivation of a liberty or property interest protected by due process."). Thus, just as the loss of unsupervised visitation constitutes a deprivation of liberty for Mrs. Valva's denial of a fair trial claim, it constitutes a state-imposed alteration of her rights for her stigma plus claim.

The stigma plus claim may proceed against CPS defendants Clark, Heepe, Leto, Lantz, and Estrada, as Mrs. Valva has adequately alleged that these defendants were involved in making false statements about Mrs. Valva that were used against her in the neglect proceedings. The motion to dismiss this claim is granted as to CPS

defendants Saboto and Montague because Mrs. Valva has failed to allege that these defendants were involved in the neglect proceedings.

D. *Malicious Prosecution*

Mrs. Valva brings a malicious prosecution claim against the CPS Defendants, alleging that their instigation of baseless neglect proceedings against her violated her Fourth Amendment right to be free of an unreasonable seizure of her person. To prevail on a § 1983 claim for malicious prosecution, "a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (citations omitted). Under New York law, the elements of a malicious prosecution claim are: "(1) that the defendant initiated a prosecution against the plaintiff, (2) that the defendant lacked probable cause to believe the proceeding could succeed, (3) that the defendant acted with malice, and (4) that the prosecution was terminated in the plaintiff's favor." *Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (quoting *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 417 (2d Cir. 1999)). "In addition, if the proceeding of which plaintiff complains was a civil action, the plaintiff must prove special injury— some interference with the plaintiff's person or property beyond the ordinary burden of defending a lawsuit." *Engel v. CBS*, 145 F.3d 499, 502 (2d Cir. 1998) (quotation marks omitted and alterations adopted).

Mrs. Valva's allegations are sufficient to state a claim for malicious prosecution under New York law. While the neglect proceedings were not criminal, they did cause Mrs. Valva to lose unsupervised visitation with her children for almost two months. This was an interference with Mrs. Valva's personal rights that should rise to the level of a special injury sufficient to serve as the basis of a malicious prosecution claim under New York law. *See Yuan v. Rivera*, 48 F. Supp. 2d 335, 349 (S.D.N.Y. 1999) (holding that depriving the plaintiff "of the custody of her children for several months" satisfied the special injury requirement). By alleging that the CPS Defendants acted with malice and lacked probable cause for the neglect proceedings, which terminated in her favor, Mrs. Valva has satisfied the rest of the elements of a New York law malicious prosecution claim. *See* ECF No. 1 ¶¶ 300–12.

But Mrs. Valva has not brought a New York law malicious prosecution claim.[3] Instead, Mrs. Valva only alleges malicious prosecution under § 1983. To state a § 1983 claim for malicious prosecution, Mrs. Valva must also allege a violation of her Fourth Amendment rights. *See Albright v. Oliver*, 510 U.S. 266, 271–74 (1994); *Thompson v. Clark*, 142 S. Ct. 1332, 1337 n.2 (2022) ("Because this claim is housed in the Fourth Amendment, the plaintiff also has to prove that the malicious

---

[3] Nor could she because the statute of limitations has expired. *See* N.Y. Civ. Prac. L. & Rules § 215(3) (establishing a one-year statute of limitations for malicious prosecution claims under New York law).

prosecution resulted in a seizure of the plaintiff."). She has failed to do so. Mrs.

Valva argues that the requirement that she attend court proceedings in the neglect

case rises to the level of a Fourth Amendment seizure. But "the issuance of a pre-

arraignment, non-felony summons requiring a later court appearance, without

further restrictions, does not constitute a Fourth Amendment seizure." *Burg v.*

*Gosselin*, 591 F.3d 95, 98 (2d Cir. 2010). After Judge Cheng restricted Mrs. Valva's

visitation rights at an emergency hearing that Mrs. Valva did not attend, Mrs. Valva

appeared in court four times—once to object to the temporary order of protection

and three times to attend a hearing on the order of protection that she herself

requested—before Judge Cheng restored Mrs. Valva's right to unsupervised

visitation. ECF No. 79 at 28–29. These court appearances without any allegations of

"*any* restrictions on [her] travel or on [her] liberty in general" do not amount to a

Fourth Amendment violation. *Dellutri v. Elmsford*, 895 F. Supp. 2d 555, 571

(S.D.N.Y. 2012) (italics in original). The same is true even if I were to account for

Mrs. Valva's court appearances after unsupervised visitation was restored. *See*

*Washington v. Cnty. of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004) ("[I]t is unlikely

that a civil proceeding . . . would implicate constitutional rights in a manner that

would warrant redress under § 1983.").

Because Mrs. Valva has not sufficiently alleged a violation of her Fourth

Amendment rights in connection with the neglect proceedings, she has failed to state

a claim for malicious prosecution under § 1983. The CPS Defendants' motion to dismiss the malicious prosecution claim is granted.

### E. *Abuse of Process*

Mrs. Valva claims that the baseless neglect proceedings constituted a malicious abuse of process under § 1983. But "[§] 1983 liability may not be predicated on a claim of malicious abuse of *civil* process." *Alroy v. City of New York Law Dep't*, 69 F. Supp. 3d 393, 402 (S.D.N.Y. 2014) (italics in original); *see Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) (recognizing a § 1983 abuse of process claim only for abuse of criminal process—not civil process); *Spear v. Town of W. Hartford*, 954 F.2d 63, 68 (2d Cir. 1992) (holding that § 1983 liability may not be predicated on a claim for malicious abuse of civil process). Because the only proceedings Mrs. Valva was subject to were civil, she cannot state an abuse of process claim under § 1983. Thus, the motion to dismiss the abuse of process claim is granted.

### F. *Conspiracy*

Mrs. Valva generally alleges that the CPS Defendants were involved in a conspiracy to violate her rights under § 1983. But Mrs. Valva does not specifically allege that any of the CPS Defendants entered into an agreement with each other or with the other defendants to violate Mrs. Valva's rights. *See* ECF No. 1 ¶¶ 140–95, 339–44. "[T]o state a claim of conspiracy under § 1983 the complaint must contain more than mere conclusory allegations." *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993). Because Mrs. Valva's complaint contains no more than

"conclusory, vague, [and] general allegations that the [CPS] defendants have engaged in a conspiracy to deprive [her] of [her] constitutional rights," this claim is dismissed. *Id.* at 100; *see Ostrer v. Aronwald*, 567 F.2d 551, 553 (2d Cir. 1977) ("[C]omplaints containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights will be dismissed." (internal quotation marks omitted)).

G. *Absolute Immunity*

Absolute immunity applies to all actions taken by Assistant County Attorney Randall Ratje in prosecuting Mrs. Valva in the neglect proceeding. *See Walden v. Wishengrad*, 745 F.2d 149, 152 (2d Cir. 1984). As Mrs. Valva has not alleged that Ratje infringed on Mrs. Valva's rights outside the context of this proceeding, the motion to dismiss is granted as to all claims against CPS defendant Ratje.

As to the other CPS Defendants, Mrs. Valva has adequately alleged that these defendants were acting in their investigative capacity and were thus not entitled to absolute immunity. *See Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) ("[O]nly qualified immunity [is accorded] to prosecutors who act in an investigating capacity."); *see also Malley v. Briggs*, 475 U.S. 335, 340–41 (complaining witnesses not entitled to absolute immunity).

H. *Qualified Immunity*

The CPS Defendants argue that they are entitled to qualified immunity because they had a reasonable basis for initiating neglect proceedings. As Mrs. Valva

has adequately alleged that the CPS Defendants had no basis for initiating neglect proceedings, this fact-intensive issue should not be resolved at the pleading stage. *See Almonte v. City of Long Beach*, 478 F.3d 100, 110 (2d Cir. 2007) ("[Q]ualified immunity may only be granted on a motion to dismiss if the available record adequately supports the defendants' claim that" their actions were "objectively reasonable." (internal quotation marks omitted)).

I. *Municipal Liability*

To state a claim for municipal liability under § 1983, "a plaintiff is required to plead . . . three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983). Mrs. Valva alleges that Suffolk County violated her constitutional rights under § 1983 by failing to train CPS workers "on the full scope of their duties toward children" and on "how to properly assess children who are on the Autism spectrum, including . . . how to . . . verify the claims of autistic children who may be the victim of abuse." ECF No. 1 ¶¶ 349–50. By failing to adequately train CPS workers, Mrs. Valva alleges that Suffolk County tacitly endorsed CPS workers' decisions to bring baseless neglect proceedings against Mrs. Valva while ignoring the overwhelming evidence that Mr. Valva and Ms. Pollina were the ones abusing the children.

"A municipality may be found to have a custom that causes a constitutional violation when 'faced with a pattern of misconduct[, it] does nothing, compelling

the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" *Okin*, 577 F.3d at 439 (quoting *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)). "[W]here a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants, . . . such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "Deliberate indifference in a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (internal quotation marks and alterations omitted). Because municipal liability "does not provide a separate cause of action for the failure by the government to train its employees" but rather "*extends* liability to a municipal organization where that organization's failure to train . . . led to an independent constitutional violation," the plaintiff must plausibly allege that the failure to train caused a cognizable constitutional injury. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (italics in original).

At this preliminary stage, Mrs. Valva has adequately alleged that Suffolk County's failure to train CPS employees violated her constitutional rights. Mrs. Valva alleges that CPS employees Clarke, Heepe, Leto, Lantz, Estrada, Sabosto, and Montague repeatedly ignored reports by Mrs. Valva and school employees that Mr. Valva and Ms. Pollina were abusing the children. ECF No. 1 ¶¶ 93–174, 228, 230–34, 254–55. She also alleges that CPS employees Clarke, Heepe, Leto, Lantz, and

Estrada were involved in fabricating evidence against Mrs. Valva to bring neglect proceedings against her even though it was clear that Mr. Valva and Ms. Pollina were the ones abusing her children. *Id.* ¶¶ 141–90. As discussed above, these allegations underly cognizable constitutional violations: deliberate indifference, denial of a fair trial, and stigma plus. Mrs. Valva plausibly alleges that Suffolk County's failure to train CPS employees in "verify[ing] the claims of autistic children who may be the victim of abuse" and "assess[ing] the veracity of autistic children who deny that they have been abused" was responsible for several CPS employees privileging the claims against Mrs. Valva over those against Mr. Valva and Ms. Pollina despite significant evidence to the contrary, resulting in violations of Mrs. Valva's constitutional rights. *Id.* ¶ 350.

While a single incident is typically insufficient to establish that a municipal actor was deliberately indifferent to constitutional violations, *see Connick*, 563 U.S. at 62, Mrs. Valva has plausibly alleged multiple constitutional violations by several CPS employees over the course of more than two years, ECF No. 1 ¶¶ 93–190, 228–55. At this stage, this is sufficient for Mrs. Valva to state a claim that Suffolk County "ha[s] deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62. The motion to dismiss the municipal liability claim against Suffolk County is denied.

As the suits against the individual CPS Defendants in their official capacities are in essence suits against Suffolk County, they are redundant. *See Kentucky v.*

*Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."). Thus, the motion to dismiss the official-capacity suits against the individual CPS Defendants is granted.

Mrs. Valva also brings her municipal liability claim against "the CPS Supervisory Defendants." Mrs. Valva does not specifically name which CPS Defendants she is referring to, but presumably this group includes CPS supervisors Heepe and Montague. Nevertheless, Mrs. Valva cannot state a municipal liability claim against "the CPS Supervisory Defendants" because these defendants are not municipalities. *See Segal*, 459 F.3d at 219 ("*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." (emphasis omitted)). The motion to dismiss the municipal liability claim against the CPS Supervisory Defendants is granted.

## II.   State Law Claims

As some of the federal law claims against the CPS Defendants and Suffolk County remain in this case, I have supplemental jurisdiction over Mrs. Valva's state law claims against the CPS Defendants and Suffolk County because they arise out of the "same case or controversy" as the federal claims. 28 U.S.C. § 1367(a).

The CPS Defendants argue that all of Mrs. Valva's state law claims against them must be dismissed because she failed to comply with New York General Municipal Law § 50-e, which requires notice of a claim against a public corporation and its employees in a personal injury suit to "be served on the public corporation against which the claim is made by delivering a copy thereof personally, or by registered or certified mail, to . . . [the] attorney regularly engaged in representing such public corporation" no later than 90 days after the claim arises. *See Rentas v. Ruffin*, 816 F.3d 214, 226–27 (2d Cir. 2016). In this case, the Suffolk County Attorney was the appropriate recipient of the notice because that office is the one regularly engaged in representing Suffolk County, CPS, and CPS' employees.

Here, Mrs. Valva sent her notice of claim to the "Suffolk County District Attorney" via priority mail. ECF No. 78-5. While the "Suffolk County District Attorney" is not technically the same as the "Suffolk County Attorney"—the office that should have received the notice—the address listed on the mailing was correct and it did eventually end up at the correct office. *Id.* This error was thus not fatal to Mrs. Valva providing adequate service under Section 50-e.

Nevertheless, Mrs. Valva's decision to send the notice via priority mail does render her service inadequate. Section 50-e requires service by "registered or certified mail"; priority mail is insufficient to meet this requirement. N.Y. Gen. Mun. Law § 50-e(3)(a). And while service can still be valid if it is "in a manner not in compliance with [the statute's] provisions," as long as "the notice is actually

received by a proper person" no later than 90 days after the claim arises, *id.* § 50-e(3)(c), the Suffolk County Attorney did not receive the notice until May 20, 2020—124 days after Tommy's death, ECF No. 78-5 at 7. Thus, Mrs. Valva failed to comply with Section 50-e's requirements.

"Failure to comply with [Section 50(e)'s] requirements ordinarily requires a dismissal for failure to state a cause of action." *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 794 (2d Cir. 1999). I thus grant the CPS Defendants' motion to dismiss as to all of Mrs. Valva's state claims against the CPS Defendants and Suffolk County. Nevertheless, because Mrs. Valva's failure to comply with Section 50(e)'s requirements is more akin to insufficient service under Federal Rule of Civil Procedure 12(b)(5) than a failure to state a claim under 12(b)(6), I will dismiss the state law claims against the CPS Defendants without prejudice. *See* 5B Wright & Miller, Fed. Prac. and Proc. § 1353 (3d ed. 2020).

## CONCLUSION

The § 1983 claims for deliberate indifference, denial of the right to a fair trial, and stigma plus may proceed against CPS defendants Clark, Heepe, Leto, Lantz, and Estrada in their individual capacities. The § 1983 municipal liability claim may proceed against Suffolk County. The rest of the claims are DISMISSED.

**SO ORDERED.**

*Edward R. Korman*
Edward R. Korman

Brooklyn, New York

36

June 15, 2022                                        United States District Judge